**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES HAYS, Derivatively on Behalf of QUALCOMM INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>PAUL E. JACOBS, BARBARA T. ALEXANDER, DONALD G. CRUICKSHANK, RAYMOND V. DITTAMORE, SUSAN HOCKFIELD, THOMAS W. HORTON, SHERRY LANSING, HARISH MANWANI, STEVE MOLLENKOPF, DUANE A. NELLES, CLARK T. RANDT, JR., FRANCISCO ROS, JONATHAN J. RUBINSTEIN, GEN. BRENT SCOWCROFT, WILLIAM E. KEITEL, GEORGE S. DAVIS, MARC I. STERN, and ANTHONY J. VINCIQUERRA,<br><br>Defendants,<br><br>– and –<br><br>QUALCOMM INCORPORATED,<br><br>Nominal Defendant. | Case No. 17-cv-00603-SRF<br><br>DEMAND FOR JURY TRIAL |

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff James Hays ("Plaintiff"), by and through his attorneys, alleges the following based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, and media reports concerning QUALCOMM Incorporated ("Qualcomm" or the "Company"), seeking to remedy Defendants' (defined herein) breaches of fiduciary duties, unjust enrichment and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") from at least 2013 to the present (the "Relevant Period").[1]

[1] While Plaintiff's counsel has conducted its own, independent investigation, many of the allegations herein (and, in particular, the allegations that relate to confidential witness ("CW") accounts) are contained in a Second Amended Class Action Complaint for violation of the federal securities laws (the "Securities Complaint") filed against the Company and certain of its officers

**NATURE OF THE ACTION**

1. According to its public filings, Qualcomm designs, develops, manufactures, and markets digital communications products and services. The Company operates through three segments: Qualcomm CDMA Technologies ("QCT"), Qualcomm Technology Licensing ("QTL"), and Qualcomm Strategic Initiative. QCT and QTL are the Company's main segments.

2. The Company has operations and earns revenue both domestically and internationally. The Company's presence in the Asian markets is of particular importance to the Company and, in turn, its shareholders. In fact, in the Company's filings, Defendants have repeatedly stressed the importance of the Asian market, in general, and the Chinese market, in particular. For instance, in the Company's Annual Report filed with the United States Securities and Exchange Commission (the "SEC") on Form 10-K on November 6, 2013 (the "2013 Form 10-K"), Defendants caused the Company to disclose that during fiscal 2013, 49% of the Company's revenues were from customers and licensees based in China.

3. Given the Company's substantial international presence, Defendants have repeatedly recognized in the Company's SEC filings (including in the 2013 Form 10-K) the importance of adhering to the various government regulations and policies that the Company is subjected to and admitted that the Company "may suffer" in the event of "adverse rulings in enforcement or other proceedings." Thus, Defendants cannot now claim that they were blamelessly unaware of the importance of compliance with all laws, rules, and regulations in the countries in which the Company does business.

---

and directors in the United States District Court for the Southern District of California (*3226701 Canada, Inc. v. Qualcomm Incorporated et al.* (No. 15-cv-02678) (S.D.C.A., filed March 17, 2017)) (the "Securities Action"). On October 20, 2017, the Honorable Michael M. Anello ("Judge Anello") sustained certain of the Securities Action plaintiff's claims in the Securities Action.

4. Notwithstanding the importance of China to the Company generally combined with the importance that the Company follows all laws, rules, and regulations in countries in which it does business, on November 25, 2013, Defendants caused the Company to disclose that regulators from the National Development and Reform Commission of the Government of the People's Republic of China (the "NDRC") had launched an antitrust probe into the Company related to China's Anti-Monopoly Law.

5. Then, on February 9, 2015, Defendants caused the Company to issue a press release entitled "Qualcomm and China's National Development and Reform Commission Reach Resolution" announcing that the Company had agreed to settle the NDRC antitrust dispute for $975 million (the "China Settlement"), which was the ***largest*** settlement in Chinese history.

6. Significantly, the Company's antitrust problems are not limited to China. *The Wall Street Journal* reported on February 12, 2015 in an article entitled "Qualcomm May Face Antitrust Probe in South Korea" that South Korea's Fair Trade Commission (the "SKFTC") was likewise considering an investigation of the Company. The article noted that the SKFTC previously investigated the Company and fined the Company approximately $235 million, a ruling that is currently under appeal. Significantly, as discussed below, in November 2015, it was reported that the SKFTC had recommended a fine for the Company's antitrust violations.

7. On December 27, 2016, the SKFTC fined Qualcomm a record 1.03 trillion Won (or approximately $868 million based on exchange rates at December 25, 2016) for violating antitrust laws.

8. More recently, on January 25, 2017, Defendants caused the Company to file its Form 10-Q for the First Quarter of 2017 (the "1Q 2017 Form 10-Q"). Therein, Defendants announced that on January 22, 2017, the Company received the SKFTC's final decision, which

found that the Company's conduct affirmatively violated the Korean Monopoly Regulation and Fair Trade Act. In particular, according to the 1Q 2017 Form 10-Q, the SKFTC found that the Company (under Defendants' direction and on their watch) violated South Korean law by: "(i) refusing to license, or imposing restrictions on licenses for, cellular communications standard essential patents with competing modem chipset makers; (ii) conditioning the supply of modem chipsets to handset suppliers on their execution and performance of license agreements with the Company; and (iii) coercing agreement terms including portfolio license terms, royalty terms and free cross-grant terms in executing patent license agreements with handset makers."

9. Notably, the Company's antitrust problems have not been limited to Asia. For instance, in a press release dated July 16, 2015 and entitled "Antitrust: Commission opens two formal investigations against chipset supplier Qualcomm," the European Commission (the "EC") announced that it had initiated twin formal investigations related to the Company's potential antitrust violations (the "EC Release").

10. Additionally, the Company's antitrust problems have been extended to the United States. For instance, on January 17, 2017, the U.S. Federal Trade Commission (the "FTC") commenced an enforcement action against Qualcomm following an investigation of the Company's licensing practices. The agency's complaint, filed in U.S. District Court for the Northern District of California, alleged that Qualcomm used its dominant position to maintain an illegal monopoly in the market.

11. Further, on January 20, 2017, *The Wall Street Journal* reported that tech-giant Apple Inc. ("Apple") was suing Qualcomm, alleging that the Company "leveraged its monopoly position as a manufacturer of baseband chips, a critical component used in cellphones, to seek 'onerous, unreasonable and costly' terms for patents, and that Qualcomm blocked Apple's ability

to choose another supplier for chipsets." The article further stated that Apple is seeking $1 billion in rebate payments that Qualcomm allegedly withheld as retribution for Apple's involvement in an investigation conducted by South Korea's antitrust regulator.

12. Accordingly, as a result of Defendants' breaches, the Company has been damaged and has been forced to expend nearly $1 billion to resolve the China Settlement and over $850 million for its antitrust violations in South Korea. Further, the Company has been named as a defendant in an additional securities class action lawsuit related to many of these allegations.[2] Finally, the Company likewise faces additional costly investigations in Europe and the United States, which also may result in future costly fines.

13. In addition to the Company's serious antitrust issues, this action likewise concerns Defendants' misrepresentations and illicit course of conduct surrounding Qualcomm's premium-tier microprocessor – the Snapdragon 810 ("Snapdragon 810" or "the 810"). In April 2014, under Defendants' direction and on their watch, Qualcomm launched the Snapdragon 810 to much hype and fanfare and touted the chip as its "highest performing platform to date" that would "enable an exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets." Based on Defendants' representations of the current performance and readiness of Snapdragon 810, the financial media hailed the chip as "the next step in Qualcomm's dominance of the high-end smartphone market" that would purportedly drive growth in Qualcomm's chip business in 2015 and beyond.

14. Defendants caused the Company to continue to falsely represent the performance of Snapdragon 810 and its likelihood of success, including that it "deliver[s] high levels of compute

[2] *See In re Qualcomm Inc. Sec. Litig.*, No. 17-cv-121 (S.D. Cal.). While Plaintiff's counsel has conducted its own, independent investigation, some of the allegations herein are contained in this additional securities class action lawsuit.

performance at low power," is "engineered to use less power and remain cooler," and "will completely change the next generation of user experience[]…." Defendants also represented that Snapdragon 810's performance capabilities would allow the Company to "maintain [its] leadership position in the premium tier [of smartphones]" based upon industry expectations that manufacturers of high-tier smartphones would "[b]uild] around Qualcomm Snapdragon 810 processors." Indeed, Defendants' continuous stream of misleadingly bullish statements regarding the Snapdragon 810 were highly material, as Qualcomm was relying heavily on the Snapdragon 810 to maintain market share and strengthen growth in its highly lucrative QCT business – a segment accounting for the vast majority (70% in 2014) of the Company's overall revenues.

15. However, Defendants knew, but failed to disclose, that under their direction and on their watch, the Snapdragon 810 was plagued with design and operational problems from inception, including severe and highly abnormal overheating problems[3] that fundamentally compromised its performance and functionality and called into question the ultimate viability of the chip. Defendants also knew that the design and operational problems afflicting the 810 were driven by their rash decision to alter Qualcomm's usual production and testing methodology in direct response to competitive pressures caused by Apple's sudden announcement of a 64-bit processor in its iPhone 5. Compounding these issues even further, Defendants promised Qualcomm's most important customer – Samsung – that the Company (under their direction and on their watch) would accelerate significantly the usual timeline for development, testing, and ultimate delivery of the 810 chip, all of which significantly impacted the chip's overall performance and functionality.

[3] The terms "thermal" problems and "overheating" problems are used interchangeably herein, and refer to the excessive overheating of silicon semiconductors and processors.

16. Despite these serious, but undisclosed, problems, Defendants knowingly rushed Snapdragon 810 to market and continued to take aggressive shortcuts in the typical design process, making it almost certain that the chip would overheat and/or compromise functionality crucial to the chip's overall success. Even when rumors of overheating problems began to surface in late 2014 and early 2015, Defendants continued to make misleading statements and vigorously deny that any problems existed at all, falsely representing that the Snapdragon 810 was performing well or as expected.

17. In addition to deliberately concealing the overheating problems themselves, Defendants also failed to disclose that the problems had caused Samsung to drop the chip altogether from its flagship premium tier smartphone, the "Galaxy S6." Because Samsung accounted for a large percentage of the total premium tier market for smartphones, Qualcomm's loss of Snapdragon 810 product share in the Galaxy S6 not only cost the Company an estimated $1.3 billion or more in potential revenues from millions of Galaxy S6 phones, it also was a huge blow to the Company's marketing of the 810 and raised questions about the ability of Snapdragon 810 to drive overall profits in Qualcomm's all-important QCT segment. Likewise, the loss of share in the Samsung flagship product revealed concerns about Qualcomm's ability (under Defendants' direction and on their watch) to deliver in its future products the performance expectations that the Defendants had promised.

18. On January 20, 2015, reports of rumors began to surface suggesting that Samsung might drop Snapdragon 810 from its S6 due to overheating problems. Although a few analysts discussed the rumors and the initial partial disclosure caused Qualcomm's stock price to decline on the news, Defendants (and Samsung) failed to confirm or deny the validity of report.

19. On January 28, 2015, Defendants caused Qualcomm to disclose that it was significantly lowering its outlook for QCT "largely driven by the effects of," among other things, "[e]xpectations that our Snapdragon 810 processor will not be in the upcoming design cycle of a large customer's flagship device." Analysts uniformly confirmed that the "large customer" was Samsung and that the "flagship device" was the Galaxy S6. Following this partial disclosure of adverse news, the Company's stock price plummeted over 10%.

20. Despite these partial disclosures of adverse news relating to Snapdragon 810 in January 2015, however, Qualcomm's stock price remained artificially inflated by Defendants' continuous and steady barrage of false representations, omissions, and deceptive denials regarding the 810's systemic overheating problems and the true reasons for Samsung's rejection of the chip for its Galaxy S6 smartphone. For example, without even mentioning the 810's overheating problems, Defendants falsely stated that the Samsung loss was an "isolated" event limited to "one account" and "one portion of their portfolio" and represented that "Snapdragon 810 is performing well," "our design momentum for the Snapdragon 810 processor remains robust," and "[a]ny concerns about the 810 terms of design traction really are probably limited to one OEM[4] versus anything else." Significantly, as discussed below, Judge Anello in the Securities Action specifically held that the statements that the Snapdragon 810 was "performing well" and that any concerns were "limited to one OEM" were false and misleading when made.

21. Even when analysts specifically pressed Defendants during the Company's January 2015 conference call to explain the "heart of the 810 issue" and confirm whether the rumored overheating problems were cause for concern or had anything to do with Samsung's decision to

[4] An original equipment manufacturer ("OEM") is a company that, as relevant here, manufactures the final mobile device product, and includes companies such as Samsung, Foxconn (which manufactures the Apple iPhone), LG, and others.

drop the 810, Defendants continued to make misleading statements: "On the 810, I'll be very clear, this device is working the way that we expected to work and we have design traction that reflects that….[s]o we are quite pleased with how that is performing."

22. Analysts confirmed that "[m]anagement noted on the call that the loss was likely not due to the 810 overheating, but rather the lack of differentiation with their application processor."

23. On July 22, 2015, Defendants caused Qualcomm to disclose that, as a result of the problems with the Snapdragon 810 and the resulting loss of share in the Samsung Galaxy S6, the Company's QCT segment would again miss expectations by a wide margin, and that as a result of the 810's failures, QCT's competitive outlook for the remainder of the year had been significantly weakened. Defendants admitted that in terms of the 810, "probably the biggest single impact as we look at the year…again, much like the fourth quarter, it's almost entirely attributable to changes in the premium tier and certainly, the socket loss at a major vertical customer [Samsung]."

24. Analysts agreed, with one stating, "we suspect that the performance issues that have plagued the S810-based phones have also been a factor, as we believe a number of OEMs have delayed launches as they work through some issues."

25. Upon this disclosure, Qualcomm's stock price declined another 3.75% to close at $61.78 per share – more than 25% lower than the recent high of $81.97 per share.

26. Accordingly, as a result of Defendants' breaches, the Company has been damaged, and has suffered severe loss of reputation and standing, a diminishment in the price of its common stock, and being named as a defendant in two securities class action cases (including the sustained Securities Action).

27. In light of the foregoing, on January 14, 2016, Plaintiff issued a Demand (further defined herein) on the Board to investigate and take action against the Defendants named herein. The Board and the Board's so-called Demand Review Committee (the "Committee") thereafter improperly refused the Demand, as alleged in detail below. Thus, Plaintiff has been left with no other recourse other than filing this Action. Given the wrongful, bad-faith refusal of the Demand, this Action must be allowed to proceed.

**JURISDICTION AND VENUE**

28. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question and pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and the Defendants are citizens of different states, and citizens of a foreign state are additional parties; and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

29. Venue is proper in this district because Qualcomm is incorporated in this district. Further, Qualcomm engages in numerous activities and conducts business here, which had an effect in this district.

**THE PARTIES**

30. Plaintiff is a current shareholder of Qualcomm and has been continuously since 1997. Plaintiff is a citizen of Pennsylvania.

31. Nominal Defendant Qualcomm is a Delaware corporation with its principal executive offices located at 5775 Morehouse Drive, San Diego, California 92121.

32. Defendant Dr. Paul E. Jacobs ("Jacobs") has served as Chairman of the Board since March 2009. In addition, defendant Jacobs has served as Executive Chairman of the Board since March 2014. Previously, defendant Jacobs served as the Company's Chief Executive Officer ("CEO") from July 2005 until March 2014. Upon information and belief, defendant Jacobs is a citizen of California.

33. Defendant Barbara T. Alexander ("Alexander") has served as a director of the Company since July 2006. Upon information and belief, defendant Alexander is a citizen of California.

34. Defendant Donald G. Cruickshank ("Cruickshank") served as a director of the Company from June 2005 until March 8, 2016. In addition, defendant Cruickshank served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period. Upon information and belief, defendant Cruickshank is a citizen of the United Kingdom.

35. Defendant Raymond V. Dittamore ("Dittamore") served as a director of the Company from December 2002 until January 2017. In addition, defendant Dittamore served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Dittamore is a citizen of California.

36. Defendant Dr. Susan Hockfield ("Hockfield") served as a director of the Company from July 2012 until March 2016. In addition, defendant Hockfield served as a member of the Board's Governance Committee (the "Governance Committee") during the Relevant Period. Upon information and belief, defendant Hockfield is a citizen of Massachusetts.

37. Defendant Thomas W. Horton ("Horton") has served as a director of the Company since December 2008. In addition, defendant Horton has served as a member of the Audit Committee during the Relevant Period. Further, defendant Horton was a member of the

Committee tasked with investigating the Demand. Upon information and belief, defendant Horton is a citizen of Texas.

38. Defendant Sherry Lansing ("Lansing") served as a director of the Company from September 2006 until March 2016. Upon information and belief, defendant Lansing is a citizen of California.

39. Defendant Harish Manwani ("Manwani") has served as a director of the Company since May 2014. Upon information and belief, defendant Manwani is a citizen of India.

40. Defendant Steve Mollenkopf ("Mollenkopf") has served as the Company's CEO since March 2014. In addition, defendant Mollenkopf has served as a director of the Company since December 2013. Previously, defendant Mollenkopf served as CEO-elect and President from December 2013 to March 2014 and as President and Chief Operating Officer ("COO") from November 2011 to December 2013. In his previous role as COO, Mollenkopf led the Company's chipset business (QCT segment) while the Snapdragon 810 was in its initial development stages. Accordingly, he was in a position to know, and did know, about the details of that product's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems. Upon information and belief, defendant Mollenkopf is a citizen of California.

41. Defendant Duane A. Nelles ("Nelles") served as a director of the Company from August 1988 until July 2015. Upon information and belief, defendant Nelles is a citizen of California.

42. Defendant Clark T. Randt, Jr. ("Randt") has served as a director of the Company since October 2013. In addition, defendant Randt has served as a member of the Governance Committee during the Relevant Period. Further, defendant Randt was a member of the Committee

tasked with investigating the Demand. Upon information and belief, defendant Randt is a citizen of New York.

43. Defendant Dr. Francisco Ros ("Ros") has served as a director of the Company since December 2010. Upon information and belief, defendant Ros is a citizen of Spain.

44. Defendant Jonathan J. Rubinstein ("Rubinstein") served as a director of the Company from May 2013 until May 2, 2016. Further, defendant Rubinstein was a member of the Committee tasked with investigating the Demand. Upon information and belief, defendant Rubinstein is a citizen of Connecticut.

45. Defendant Brent Scowcroft ("Scowcroft") served as a director of the Company since December 1994 until July 17, 2015. Upon information and belief, defendant Scowcroft is a citizen of Virginia.

46. Defendant Marc I. Stern ("Stern") served as a director of the Company from February 1994 until March 2016. Upon information and belief, defendant Stern is a citizen of California.

47. Defendant William E. Keitel ("Keitel") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from 2002 until his "retirement" in March 2013. Upon information and belief, defendant Keitel is a citizen of California.

48. Defendant George S. Davis ("Davis") has served as the Company's Executive Vice President and CFO since March 2013. As a member of the Company's Executive Committee, Davis helps to "drive Qualcomm's overall global strategy." Accordingly, he was in a position to know, and did know, about the details of the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems. Upon information and belief, defendant Davis is a citizen of California.

49. Defendant Anthony J. "Tony" Vinciquerra ("Vinciquerra") has served as a director of the Company since July 2015. In addition, defendant Vinciquerra serves as a member of the Audit Committee. Upon information and belief, defendant Vinciquerra is a citizen of California.

50. Collectively, defendants Jacobs, Alexander, Keitel, Davis, Cruickshank, Dittamore, Hockfield, Horton, Lansing, Manwani, Mollenkopf, Nelles, Randt, Ros, Rubinstein, Scowcroft, Stern, and Vinciquerra shall be referred to herein as "Defendants."

51. Collectively, defendants Cruickshank, Dittamore, Horton and Vinciquerra shall be referred to herein as the "Audit Committee Defendants."

52. Collectively, defendants Hockfield, Randt, and Scowcroft shall be referred to herein as the "Governance Committee Defendants."

**Relevant Non-Party Entities**

53. Derek K. Aberle ("Aberle") has served as the Company's President since March 2014. Previously, Aberle served as Executive Vice President and Group President from November 2011 to March 2014, as President of QTL from September 2008 to November 2011 and as Senior Vice President and General Manager of QTL from October 2006 to September 2008. As a member of the Company's Executive Committee, Aberle helped to "drive Qualcomm's overall global strategy." Accordingly, he was in a position to know, and did know, about the details of the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

54. Venkata S.M. "Murthy" Renduchintala ("Renduchintala") was, at relevant times, an Executive Vice President of Qualcomm, and Co-President of the Company's QCT division. He joined Qualcomm in 2004 and served as Co-President of Mobile and Computing Products at Qualcomm from June 2012 through October 2012. As set forth herein, Renduchintala was in a

position to know, and did know, about the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

55. Tim McDonough ("McDonough") serves as a Senior Vice President, Global Marketing at Qualcomm. From September 2010 through October 2015, McDonough served as Vice President of Worldwide Marketing for Qualcomm. McDonough has described his role (on his LinkedIn profile) as a chief marketing officer for Qualcomm's QCT segment responsible for "product marketing, branding, public relations, events, online marketing, and analyst relations" for the Company's Snapdragon line of mobile processors. During the Relevant Period, McDonough spoke regularly on behalf of the Company with investors and securities analysts. As discussed in detail below, McDonough was in a position to know, and did know, about the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

56. Cristiano R. Amon ("Amon") currently serves as the Executive Vice President of Qualcomm Technologies, Inc., and is the President of QCT. He is also a member of the Company's executive committee. At relevant times, Amon spoke to investors and securities analysts regarding the Company on a regular basis. Amon was appointed Co-President of QCT (with Renduchintala) on July 27, 2012, and in that role was responsible for the oversight of activities related to Qualcomm's semiconductor business. Prior to becoming Co-President of QCT, he was Qualcomm's Senior Vice President of Product Management with QCT where he was responsible for managing the Company's wireless chipset portfolio. As discussed in detail below, Amon was in a position to know, and did know, about the 810's design, testing, marketing to

Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

57. As alleged above, the Securities Complaint from the related Securities Action contained allegations from nine (9) CWs, identified as "CW 1," "CW 2," "CW 3," "CW 4," "CW 5," "CW 6," "CW 7," "CW 8" and "CW 9".

58. It has been alleged that CW 1 is a former Qualcomm employee and software engineer who worked for the Company from 2004 through November 2015. It has been alleged that CW 1 worked in various capacities for more than ten years, including as a Technical Account Manager, which put him in direct contact with product engineering, sales, and marketing. It has been alleged that in this role he also worked in Qualcomm's Digital Signal Processor ("DSP") program, which worked on the Snapdragon 810. It has been alleged that CW 1 was in a position to know, and did know, about the problems with the 810, as well as the Company's overall relationships with its largest OEM customers, including Samsung. It has been alleged that CW 1 reported to Kuntal Sampat, Qualcomm's Director of Engineering and Steve Brightfield, the Director of Product Management.

59. It has been alleged that CW 2 is a former Qualcomm Senior Staff Engineer in the Company's San Diego headquarters. It has been alleged that he worked for Qualcomm for more than eight years, and interacted regularly with OEMs Samsung, LG, and Sony to coordinate the launch of the Snapdragon 810 in their respective product offerings. It has been alleged that during his work on the Snapdragon 810 project, CW 2 reported to the Project Engineer Rajeev Pal ("Pal") who reported to Renduchintala. In connection with his work with Samsung, LG, and Sony, it has been alleged that CW 2 was responsible for the release of the Snapdragon 810 to commercial stage production for those OEMs, and met with those clients on a weekly basis to discuss their respective

commercial launches of products incorporating the Snapdragon 810. Thus, it has been alleged that CW 2 was in a position to know, and did know, about the testing and development of the Snapdragon 810, as well as the status of the Company's discussions with OEMs to whom it was negotiating the sale and use of the Snapdragon 810, and ultimate commercial launch of the 810.

60. It has been alleged that CW 3 is a former Senior Staff Engineer in the Company's San Diego headquarters. It has been alleged that CW 3 worked at Qualcomm in various engineering capacities for more than 20 years. It has been alleged that CW 3 was responsible for assessing product test needs for upcoming chipsets, including the Snapdragon 810, including test planning, special test requirements, and IT resource planning. It has been alleged that in this capacity, he was also responsible for aggregating the various test results for the 810 from members of the Product Test Group and submitting those test results to Pal (who then sent them to Renduchintala), and others. It has been alleged that CW 3 reported to the Head of Product Testing Syed Ahsan, who reported to Vice President of Engineering, Rashmi Char. Char reported to Tony Schwartz, Qualcomm's SVP of Engineering in the QCT segment, who in turn reported to James "Jim" Thompson, who in turn reported to Renduchintala. It has been alleged that in this position, CW 3 was in a position to know, and did know, about testing of all QCT chipsets, (specifically including the 810), including allocation of resources (both human and financial) necessary for all stages of testing, and comparative performance of Qualcomm chipsets based on testing results.

61. It has been alleged that CW 4 is a former Qualcomm Technical Director of Engineering who worked in the Company's San Diego headquarters. It has been alleged that CW 4 worked at the Company in various engineering roles for more than 15 years, including from 2000 through early 2016. It has been alleged that CW 4 was the lead engineer responsible for the Linux Kernel platform on QCT chipsets, including the 810. It has been alleged that CW 4 reported to VP

Neesh Pgraol, who reported to SVP Torrey Harmon. SVP Harmon reported to James "Jim" Thompson, who in turn reported to Renduchintala. It has been alleged that in this position, CW 4 was in a position to know, and did know, about testing of all QCT chipsets including the testing and development of the Snapdragon 810, and its performance.

62. It has been alleged that CW 5 is a former Customer Support Engineer who worked for the Company in Tokyo, Japan from 2013 until late 2015. It has been alleged that CW 5 was responsible for communicating with and supporting Japanese OEMs, including Sony, Sharp and Fujitsu. It has been alleged that CW 5 reported to Harry Shibata, a Staff Engineer, who in turn reported to Michi Yamaoka, a Director in Customer Support Engineering. It has been alleged that in this role, CW 5 personally communicated with Sony, Sharp and Fujitsu regarding thermal and power consumption issues with the 810 between December 2014 and April 2015. It has been alleged that CW 5 personally communicated customer complaints regarding the 810 to Customer Support Engineers at the Company's San Diego Headquarters, including specifically an individual with the first name "Gagan," who was responsible for regional customer support teams, including those in Japan. It has been alleged that CW 5 further communicated with Customer Support Engineers in San Diego regarding potential solutions for the 810's thermal and battery consumption issues. It has been alleged that CW 5 was therefore in a position to know, and did know, about the problems the 810 experienced before and after its commercial launch, as well as the Company's overall relationships with some of its largest OEM customers, including Sony.

63. It has been alleged that CW 6 is a former Vice President of Engineering with management-level responsibility who worked for the Company for over 10 years, including from 2000 through the summer of 2015, in its San Diego headquarters. It has been alleged that in this role, CW 6 oversaw a team that worked with OEMs, including Samsung, Sony, LG, HTC and

Xiaomi, to implement Qualcomm chipsets, including the 810, in their devices. More specifically, it has been alleged that CW 6 and CW 6's team provided technical support regarding, and guidance with respect to implementation of, Qualcomm hardware and software. It has been alleged that CW 6 explained that during CW 6's time at Qualcomm, there was a constant interplay between heat, power, and performance of Qualcomm's SoCs. It has been alleged that CW 6 further stated Qualcomm and its customers would work to remedy the heat versus performance issues. It has been alleged that CW6 and CW6's team worked specifically on the 810 during the Relevant Period. It has been alleged that CW 6 was therefore in a position to know, and did know, about the problems the 810 experienced after its commercial launch, as well as the Company's overall relationships with some of its largest OEM customers, including Samsung, Sony, LG, HTC and Xiaomi.

64. It has been alleged that CW 7 was employed by Sony as a Senior Software Engineer, testing and verifying interface protocols for Sony Mobile Communications in San Francisco, CA during a period which included 2013 through early 2016. It has been alleged that CW 7 worked specifically on Sony's devices for sale by Verizon, including phones within the Xperia series. It has been alleged that CW 7's responsibilities included verifying, testing, and debugging the log files for these devices. It has been alleged that CW 7 confirmed that Sony was "very concerned" about the 810's overheating issue. It has been alleged that CW 7 was therefore in a position to know, and did know, about the problems the 810 experienced after its commercial launch, specifically with respect to Sony's Xperia devices.

65. It has been alleged that CW 8 was a former Senior Engineer who worked for the Company in its San Diego headquarters during a period that included 2010 through late 2015. It has been alleged that CW 8 worked in the Applications Processor Test Unit ("APT Unit") and

reported to Technical Director, Sunil Kumar. The APT Unit was part of the Application Processor Subsystems Software Division. It has been alleged that CW 8 was responsible for testing audio, video, and media applications on Qualcomm processors for OEMs such as LG. It has been alleged that CW 8 worked on the Snapdragon 800 and 805 processors, and interacted with colleagues from the APT Unit who worked on the 810. It has been alleged that CW 8 was therefore in a position to know, and did know, about the problems the 810 experienced immediately prior to and following its commercial launch.

66. It has been alleged that CW 9 was a Director of Engineering at the Company's San Diego headquarters from 2013 through the end of 2015. It has been alleged that CW 9 spoke to members of the Linux Kernel team for the Snapdragon 810 about the thermal issues that the 810 was experiencing. It has been alleged that CW 9 was therefore in a position to know, and did know, about the problems the 810 experienced prior to and following its commercial launch.

67. Samsung Electronics Co., Ltd. ("Samsung") is a multinational electronics company headquartered in Suwon, South Korea. Samsung designs, manufactures and sells, among other things, consumer electronics (such as smartphones) and electronic components such as silicon semiconductors (including microprocessors like the Snapdragon 810). Thus, in its capacity as an OEM, it was a Qualcomm customer and purchased Snapdragon processors; and in its capacity as a chip designer and manufacturer, it was a Qualcomm competitor. At relevant times, Samsung designed, marketed, and sold to consumers the most popular premium-tier smartphones including the Galaxy S series. Sales of Samsung's mobile devices made up approximately 25% and 22% of global market share in 2014 and 2015, respectively.

68. Rajeev Pal ("Pal") was the Project Engineer for the Snapdragon 810. It has been alleged that in this role, he was the Qualcomm employee to whom CW 2 reported and to whom

CW 3 forwarded product testing results. It has been alleged that according to CW 2, Pal reported to Renduchintala. It has been alleged that CW 3 also stated that all of the test groups submitted their reports to Pal and all 810 data flowed through him. It has also been alleged that both CW 2 and CW 3 stated that as Renduchintala's subordinate, Pal regularly reported the progress of the 810 directly to him.

## DEFENDANTS' DUTIES

69. By reason of their positions as officers, directors, and/or fiduciaries of Qualcomm and because of their ability to control the business and corporate affairs of Qualcomm and its subsidiaries, Defendants owed Qualcomm and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Qualcomm and its subsidiaries in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Qualcomm and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Qualcomm and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

70. Defendants, because of their positions of control and authority as directors and/or officers of Qualcomm, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Qualcomm, each of the Defendants had knowledge of material non-public information regarding the Company.

71. To discharge their duties, the officers and directors of Qualcomm were required to exercise reasonable and prudent supervision over the management, policies, practices and controls

of the Company. By virtue of such duties, the officers and directors of Qualcomm were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable foreign and domestic laws, rules, regulations and requirements, including acting only within the scope of its legal authority; and

(c) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

72. Pursuant to the Company's Code of Ethics (the "Code of Ethics"), all directors, officers, and employees of the Company and its subsidiaries are required to comply "with all applicable governmental laws, rules and regulations."

73. With regard to specific compliance with competition laws in the U.S. and abroad, the Company's Code of Business Conduct (the "Business Code"), which also applies to every defendant named herein, specifically states:

> Qualcomm engages in vigorous, yet fair competition. We must all abide by U.S. antitrust laws, as well as the competition laws wherever we do business. These laws are designed to promote a competitive marketplace that provides consumers with high-quality goods and services at fair prices. Failure to comply with these laws can have serious consequences for the individuals involved and our Company.
>
> In complying with these laws, we must never agree with a competitor to limit how we compete with one another. In fact, we must avoid even the appearance of such an agreement. We should never discuss the following with competitors:

- Pricing or pricing policy, costs, marketing or strategic plans
- Agreeing on the prices we will charge customers
- Agreeing to divide customers, markets, territories or countries
- Boycotting certain customers, suppliers or competitors

74. Pursuant to the Company's Governance Principles and Practices (the "Governance Principles"), the entire Board is and was specifically obligated to, *inter alia*:

(a) Review, approve and monitor fundamental operating, financial and other corporate plans, strategies and objectives;

(b) Review and assess major risks facing the Company and evaluate management's approach to addressing such risks;

(c) Assure maintenance of proper accounting, financial and other appropriate controls; and

(d) Assure adherence to proper policies and corporate conduct, including compliance with applicable laws, regulations, business and ethical standards.

75. Pursuant to the Audit Committee's Charter, the Audit Committee Defendants are specifically obligated to, *inter alia*:

(a) Review the Company's procedures for monitoring compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption laws;

(b) Review and discuss with management the Company's annual audited consolidated financial statements and the Company's interim condensed consolidated financial statements included in quarterly filings;

(c) Review and discuss with management any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies;

(d) Review and discuss annually with management its assessment of the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures;

(e) Consider whether any changes to the internal control over financial reporting or disclosure controls and procedures are appropriate in light of management's assessment or the independent auditor's report;

(f) Review with the principal executive and financial officers of the Company any report on significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weakness in internal controls identified to the independent auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

(g) Establish procedures for receipt, retention and treatment of complaints or concerns received by the Company regarding accounting, internal controls or auditing matters, and the confidentiality and anonymity of such submissions. The Committee will assure, as necessary, that appropriate remedial measures or actions are taken with respect to such complaints or concerns; and

(h) Review and approve the Company's Code of Ethics and provide for and review prompt disclosure to the public of any change in, or waiver of such Code of Ethics. The Committee will review conduct alleged to be in violation of such Code of Ethics and adopt as necessary or appropriate remedial, disciplinary or other measures with respect to such conduct.

76. Pursuant to the Governance Committee's Charter, the Governance Committee Defendants are specifically obligated to, *inter alia*:

(a) Review the Governance Principles for continued compliance with best practices; and

(b) Take such actions as it deems necessary to encourage continuous improvement of, and foster adherence to, the Company's corporate governance policies, procedures, and practices at all levels.

## FACTUAL ALLEGATIONS

### A. The Company's Antitrust Violations

#### 1. Overview of the Company's Business and Applicable Standards

77. By way of background, industry participants required the Company to commit to the industry's standard-setting bodies that they would license Qualcomm's patents essential to the standard ("standard-essential patents" or "SEPs") to all companies on a "fair, reasonable, and non-discriminatory basis." Defendants made and reaffirmed this commitment—known as the "FRAND" commitment—countless times to the standard-setting bodies in written declarations and certifications.

78. Defendants' compliance with their commitment to the standard-setting bodies and industry participants was also important because it impacted the risk profile of holding shares in the Company. Failure by Defendants to fulfill the Company's commitment to license its standard-essential patents would result in enforcement actions and fines by regulators, as well as civil lawsuits for injunctions and money damages by industry participants. For this reason, Defendants affirmatively represented in reports filed with the SEC and in public statements that they were "committed to such standards bodies that we will offer to license our essential patents for these

CDMA standards on a fair, reasonable and non-discriminatory basis" and that the Company (under Defendants' direction and on their watch) had complied with that commitment.

79. In addition to licensing its patents, Qualcomm designs and sells "chipsets." These integrated semiconductor circuits, which are contained in virtually every cellular phone, function as a wireless controller or application processor for the device. Qualcomm began manufacturing chipsets for cellular phones in 1992, and for the next fifteen years faced competition from other chipset manufacturers (including, but not limited to, Texas Instruments, MediaTek, Broadcom, Freescale, Infineon, Motorola, NEC, and STMicro). Then, beginning in 2008, an unexpected shift occurred. Qualcomm's share of the chipset market greatly increased—along with its chipset revenues—and competitors were forced to exit the industry. In 2008, for example, Qualcomm saw its share of the chipset market nearly double to 37% from the year before. Over the next six years, Qualcomm's share of the global chipset market continued to climb, achieving 66% share in 2014—two-thirds of the entire worldwide market. In a few years, Qualcomm went from one in a field of many competitors to the global powerhouse in the flourishing market for mobile-phone chipsets.

80. However, upon information and belief (and as it has been alleged), Defendants caused Qualcomm to achieve dominance over the mobile chipset market by violating the Company's (*i.e.,* Defendants') commitment to standard-setting bodies and industry participants, and by violating worldwide anti-competition laws. Contrary to Defendants' public representations that the Company licensed its cellular technologies "broadly" on a "non-discriminatory" basis to the "entire industry," Defendants caused Qualcomm to adopt a policy of refusing to license its standard-essential patents to competitor chipset manufacturers. Without a license to these standard-essential patents, Qualcomm's rival chipmakers were bound to fail, as mobile phone manufacturers were unwilling to buy chipsets from unlicensed companies. Accordingly, in the

course of a few years, nearly all of the leading chipset manufacturers exited the market, leaving Qualcomm with sheer dominance over the entire global mobile telecommunications industry.

81. In addition to misrepresenting the Company's willingness to license to the entire industry, Defendants also falsely contended that the Company did not "bundle" the terms of its license and chipset agreements. The commitment to license on fair and non-discriminatory terms obligates holders of standard-essential patents (such as Qualcomm) to license their essential patents, regardless of whether licensees also agree to purchase the patent holder's downstream products (such as Qualcomm's chipsets). In this case, Defendants not only committed to license on non-discriminatory terms—and, thus, not bundle—but they also affirmatively represented that "we don't bundle." Indeed, defendant Mollenkopof has stated that "we don't bundle those together" and "we have been very clear that we keep those two things separate."

82. Defendants have repeated the Company's purported commitment to license on a "fair, reasonable and non-discriminatory basis. Defendants have highlighted how Qualcomm had "informed [the standard-setting bodies] that we hold patents that might be essential" for the cellular standards and "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." Defendants have stated that the Company did offer licenses to interested companies on terms that are "fair, reasonable and nondiscriminatory." As of July 2017, Defendants have caused Qualcomm to declare over 30,000 global assets to be "essential" to the wireless standards and was thus obligated to grant licenses to these standard-essential patents on a fair, reasonable, and nondiscriminatory basis to all potential licensees wishing to implement the standards.

83. Upon information and belief, Defendants modified Qualcomm's basic licensing policy by 2008 and, after that point, refused to license Qualcomm's standard-essential patents to

competitor chipmakers. This undisclosed policy change, aimed at stifling competition, violated the Company's oft-repeated commitment to license on a "fair, reasonable and nondiscriminatory basis" and has resulted in a near-billion dollar fine and antitrust enforcement worldwide (as set forth herein).

### 2. The Company is Investigated for Antitrust Violations and Subsequently Fined Nearly $1 Billion by China

84. On November 25, 2013, Defendants caused the Company to disclose that regulators from the NDRC had launched an antitrust probe into the Company related to China's Anti-Monopoly Law. A November 25, 2013 *Financial Times* article entitled "China Launches Antitrust Probe Into Qualcomm" reporting on the probe stated, in pertinent part:

> Chinese regulators have launched an antitrust probe into Qualcomm as the country gears up for the launch of high-speed LTE networks, a market where the US company has become an early leader and owns important patents.
>
> Qualcomm disclosed the investigation, by China's National Development and Reform Commission, on Monday. It said the probe involved the country's Anti-Monopoly Law, though it was "not aware of any charge" by the regulators that it had broken the law.
>
> * * *
>
> The disclosure, which wiped nearly 2 per cent from Qualcomm's shares in early trading, came as the Chinese authorities laid out more assertive plans for antitrust enforcement. State media reported on Monday that the NDRC will broaden price-related antitrust investigations launched earlier this year to include six new industries – aerospace, medicine, cars, household chemicals, telecommunications and household appliances. It was not clear if the Qualcomm case was part of this widening.
>
> China has become Qualcomm's biggest market, accounting for 49 per cent of sales in its latest fiscal year, thanks to the number of manufacturers based there which build its chipsets into their products. China has also become an increasingly important end-market as the US company moves deeper into the lower-priced chips used in feature phones and smartphones sold there.
>
> Qualcomm's control of intellectual property central to widely used wireless standards has drawn antitrust complaints in the past, though it was unclear if the

> latest investigation was prompted by similar concerns. European regulators spent four years looking into charges from manufacturers based in the EU that Qualcomm had refused to license its patents for use in 3G networks on reasonable terms. The case was dropped in 2009 after the companies had resolved their disputes with Qualcomm and dropped their complaints.
>
> "They are the [market] share leader in wireless IP [intellectual property]," said Patrick Moorhead, an independent chip industry analyst in the US. Such control of key technology often leads to charges of abuse, he added. "You can be a monopoly, but you can't use that to block competition."
>
> The US company has less dominance in the latest generation of 4G networks such as LTE, though it is still among the leading patent holders in the technology. Paul Jacobs, Qualcomm's chief executive, forecast earlier this month that his company's fortunes were likely to be boosted in the second half of next year by the rollout of LTE in China, though licences for carriers to use the technology have yet to be issued.
>
> In the Chinese bureaucracy, the NDRC, the powerful central planning agency, only has the power to investigate monopolistic behaviour related to price-fixing and price manipulation. The agency has launched more than 50 price-related probes into domestic and foreign companies since China's anti-monopoly law came into effect in 2008 and publicly issued fines and penalties in at least 20 of these cases.
>
> Earlier this year, the NDRC fined six liquid-crystal display manufacturers (two Korean companies and four Taiwanese companies) a total of about $57m for participating in an alleged price-fixing cartel agreement.
>
> The agency has also launched an industry-wide investigation into the pricing of medicine and in August it levied its biggest ever penalties for pricing violations, fining six international infant milk formula companies a combined $110m.

85. On February 9, 2015, Defendants caused the Company to issue a press release entitled "Qualcomm and China's National Development and Reform Commission Reach Resolution" announcing that the Company (under Defendants' direction and on their watch) had agreed to settle the NDRC antitrust dispute for $975 million as part of the China Settlement, which was the largest settlement in Chinese history. As part of the China Settlement, the Company was also forced to lower its royalty rates on patents used in China. The February 9, 2015 press release set forth:

SAN DIEGO - February 9, 2015 - Qualcomm Incorporated (NASDAQ: QCOM) today announced that it has reached a resolution with China's National Development and Reform Commission (NDRC) regarding the NDRC's investigation of Qualcomm under China's Anti-Monopoly Law (AML). The NDRC has issued an Administrative Sanction Decision finding that Qualcomm has violated the AML. Qualcomm will not pursue further legal proceedings contesting the NDRC's findings. Qualcomm has agreed to implement a rectification plan that modifies certain of its business practices in China and that fully satisfies the requirements of the NDRC's order. Although Qualcomm is disappointed with the results of the investigation, it is pleased that the NDRC has reviewed and approved the Company's rectification plan. The following are the key terms of the rectification plan:

- Qualcomm will offer licenses to its current 3G and 4G essential Chinese patents separately from licenses to its other patents and it will provide patent lists during the negotiation process. If Qualcomm seeks a cross license from a Chinese licensee as part of such offer, it will negotiate with the licensee in good faith and provide fair consideration for such rights.

- For licenses of Qualcomm's 3G and 4G essential Chinese patents for branded devices sold for use in China, Qualcomm will charge royalties of 5% for 3G devices (including multimode 3G/4G devices) and 3.5% for 4G devices (including 3-mode LTE-TDD devices) that do not implement CDMA or WCDMA, in each case using a royalty base of 65% of the net selling price of the device.

- Qualcomm will give its existing licensees an opportunity to elect to take the new terms for sales of branded devices for use in China as of January 1, 2015.

- Qualcomm will not condition the sale of baseband chips on the chip customer signing a license agreement with terms that the NDRC found to be unreasonable or on the chip customer not challenging unreasonable terms in its license agreement. However, this does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee, and does not apply to a chip customer that refuses to report its sales of licensed devices as required by its patent license agreement.

In addition, the NDRC imposed a fine on the Company of 6.088 billion Chinese Yuan Renminbi (approximately $975 million at current exchange rates), which Qualcomm will not contest. Qualcomm will pay the fine on a timely basis as required by the NDRC.

"We are pleased that the investigation has concluded and believe that our licensing business is now well positioned to fully participate in China's rapidly accelerating adoption of our 3G/4G technology," said Derek Aberle, president of Qualcomm.

"We appreciate the NDRC's acknowledgment of the value and importance of Qualcomm's technology and many contributions to China, and look forward to its future support of our business in China."

"Qualcomm has played an important role in the success of the mobile and semiconductor industries in China for many years, and we look forward to building upon this foundation as we grow our investments, engagement and business in China," said Steve Mollenkopf, CEO of Qualcomm. "We are pleased that the resolution has removed the uncertainty surrounding our business in China, and we will now focus our full attention and resources on supporting our customers and partners in China and pursuing the many opportunities ahead."

Qualcomm is proud to have contributed extensively for many years to the growth and success of the mobile and semiconductor industries in China, and plans to continue to grow its investments and collaborations going forward, including with China's mobile operators and handset and other device suppliers, and within the Chinese semiconductor sector. Some recent examples of these investments and support include:

- Providing extensive engineering assistance and support to China's mobile operators in rolling out their 4G LTE networks in China.
- Working closely with Chinese handset manufacturers to build their businesses both inside and outside of China as they seek to become top global brands and leading global suppliers of smartphones.
- Expanding Qualcomm's longstanding relationship with Semiconductor Manufacturing International Corporation (SMIC), one of China's largest and most advanced semiconductor foundries, which has led to SMIC's major milestone of producing high-performance, low-power mobile processors using cutting-edge advanced 28nm technology.
- Creating a China-specific investment fund of $150 million to further the development of mobile and semiconductor technologies, including initial investments from the fund in five innovative Chinese companies.

86. Critically, Defendants cannot claim that they were blamelessly unaware of the importance of the Chinese market or that they were unaware of the consequences that failing to comply with Chinese law would undoubtedly bring on the Company and its shareholders. In fact, in the Company's filings, Defendants have repeatedly stressed the importance of the Asian market, in general, and the Chinese market, in particular. For instance, in the 2013 Form 10-K, Defendants

caused the Company to disclose that during fiscal 2013, 49% of the Company's revenues was from customers and licensees based in China. Specifically, in the 2013 Form 10-K Defendants reported:

> Consolidated revenues from international customers and licensees as a percentage of total revenues were 97%, 95% and 94% in fiscal 2013, 2012 and 2011, respectively. During fiscal 2013, 49%, 20% and 11% of our revenues were from customers and licensees based in China, South Korea and Taiwan, respectively, as compared to 42%, 22% and 14% during fiscal 2012, respectively, and 32%, 19% and 17% during fiscal 2011, respectively. We distinguish revenues from external customers by geographic areas based on the location to which our products, software or services are delivered, or for QTL licensing revenues, the invoiced addresses of our licensees. Additional geographic information is provided in the notes to our consolidated financial statements in this Annual Report in "Notes to Consolidated Financial Statements, Note 8. Segment Information."

87. Further, in light of the Company's substantial international presence, in the 2013 Form 10-K (and in prior and subsequent SEC filings), Defendants specifically recognized the importance of adhering to the various government regulations and policies that the Company is subjected to and admitted that the Company "may suffer" in the event of "adverse rulings in enforcement or other proceedings." Specifically, Defendants stated:

> ***We are subject to government regulations and policies. Our business may suffer as a result of new or changes in laws, regulations or policies, our failure or inability to comply with laws, regulations or policies or adverse rulings in enforcement or other proceedings.***
>
> Our business, products and services, and those of our customers and licensees, are subject to various laws and regulations globally, as well as government policies and the specifications of international, national and regional communications standards bodies. The adoption of new laws, regulations or policies, changes in the interpretation of existing laws, regulations or policies, changes in the regulation of our activities by a government or standards body and/or adverse rulings in court, regulatory, administrative or other proceedings relating to such laws, regulations or policies, including, among others, those affecting the use of our technology or products, competitive business practices, licensing practices, protection of intellectual property, trade, foreign investments or loans, spectrum availability and license issuance, adoption of standards, the provision of device subsidies by wireless operators to their customers, taxation, environmental protection or employment, could have an adverse effect on our business. Delays in government approvals or other governmental activities that could result from, among others, a decrease in or a lack of funding for certain agencies or branches of the government

> and/or political changes, could result in our incurring higher costs, could negatively impact our ability to timely consummate strategic transactions and/or could have other negative impacts on our business and the businesses of our customers and licensees.
>
> * * *
>
> Laws, regulations and standards relating to corporate governance, business conduct, public disclosure and health care are complex and changing and may create uncertainty regarding compliance. Laws, regulations and standards are subject to varying interpretations in many cases, and their application in practice may evolve over time. As a result, our efforts to comply may fail, particularly if there is ambiguity as to how they should be applied in practice. New laws, regulations and standards or evolving interpretations of legal requirements may cause us to incur higher costs as we revise current practices, policies and/or procedures and may divert management time and attention to compliance activities.

88. Thus, it is clear that under Defendants' direction and on their watch, the Company affirmatively violated Chinese antitrust laws, which resulted in the Company being forced to expend nearly ***$1 billion*** pursuant to the China Settlement.

### 3. The Company is Found to Have Affirmatively Violated South Korea Law and Subsequently Assessed a Massive Fine

89. After the China Settlement was announced, it was revealed that the Company's antitrust problems may not be limited to China. In particular, *The Wall Street Journal* reported on February 12, 2015 in an article entitled "Qualcomm May Face Antitrust Probe in South Korea" that the SKFTC was likewise considering an investigation of the Company. The article noted that the SKFTC previously investigated the Company and fined the Company approximately $235 million, a ruling that is currently under appeal. Additionally, the article revealed that the SKFTC and antitrust authorities in Europe are also investigating the Company. The article stated, in pertinent part:

> Qualcomm Inc. might face an antitrust investigation in South Korea—not for the first time—underscoring its continuing legal issues after accepting a settlement with China earlier this week.

South Korea's Fair Trade Commission said Thursday it is considering an investigation into whether the big chip maker abused its dominant position in the market for smartphone technology. The agency in 2009 fined the company about $235 million after a three-year investigation, a ruling that is still under appeal.

A spokesman for the commission declined to discuss details of the latest potential investigation. Local media reports said the probe might focus on whether Qualcomm violated antitrust regulations in collecting royalty payments for its patents.

A Qualcomm spokeswoman declined to comment.

The San Diego-based company said this week it will pay a $975 million fine in China as part of a settlement after an antitrust investigation there. Qualcomm also agreed to accept a different formula for calculating patent royalties on devices sold in China, offering separate licenses rather than a combined license for a bundle of technologies.

Analysts regarded the fine and other provisions of the settlement as milder than expected. But some raised questions on whether regulators in other markets would seek a royalty formula like the one Qualcomm agreed to pay in China, which could tend to reduce the company's royalty revenue.

Qualcomm disclosed last fall that U.S. Federal Trade Commission and antitrust authorities in Europe also are investigating its tactics.

The company, while generating most of its revenue from cellular modem and processor chips, gets the majority of its profit from patent royalties paid by handset makers. Its strong patent position stems largely from the company's innovations in a technology called CDMA, for code division multiple access.

South Korea, the home of big handset makers such as Samsung Electronics Co. and LG Electronics Inc., became one of a few countries to standardize on CDMA in the 1990s. The country provided a key early revenue source for Qualcomm, which gained less market share elsewhere as most other countries installed second-generation cellular networks based on other technologies.

Disagreements about Qualcomm's tactics emerged in the next decade after the arrival of third-generation networks, which rely heavily on CDMA. The transition enabled Qualcomm to seek royalties on all 3G handsets, whether they used the company's chips.

Qualcomm first disclosed in 2006 that South Korean FTC officials had visited its offices in Seoul, seeking information about its dealings with Samsung, LG and another local cellphone maker called Pantech Co. Three years later, the commission issued a ruling that Qualcomm exploited its patent position in ways that

> discouraged handset makers from buying chips from rivals. The FTC said Qualcomm imposed higher patent royalties on handset makers that used modem chips provided by its rival companies.
>
> The company disagreed with the ruling, stating that the agency improperly characterized legitimate discounts for customers who used its chips as a penalty on those that didn't. Qualcomm lost one appeal of the ruling and in July 2013 filed an appeal with the Korea Supreme Court. The company hasn't reported any developments in the appeal recently.

90. On or about November 18, 2015 it was widely reported that South Korea had recommended a fine for the Company's antitrust violations. For example, on November 18, 2015, *The Wall Street Journal* published an article entitled "Qualcomm Says South Korea Recommends Fine for Alleged Antitrust Violations," which set forth, in pertinent part:

> Qualcomm Inc. faces new antitrust charges in South Korea that focus on a foundation of the chip maker's lucrative patent-licensing business. The company said the staff of the country's antitrust agency has alleged that the company has violated anticompetition laws there, recommending that the company be fined and required to modify some business practices. Qualcomm, which has battled antitrust cases in multiple countries, said a case examiner's report generated by the staff of the Korea Fair Trade Commission, known as the KFTC, attacks its practice of licensing patents only to cellphone makers and said the company doesn't properly negotiate aspects of its licenses. The company said it plans to vigorously contest the allegations before the commission, which it said must approve any action brought against the company.
>
> Qualcomm, in a statement issued late Tuesday, said such device licensing "is the world-wide industry norm." It added that Korean companies have long enjoyed the benefits and protections of access to its patents. Qualcomm didn't disclose the size of any potential fine and declined to comment beyond its statement. A spokesman for the KFTC said the agency can't comment on ongoing investigations. Qualcomm's shares were down nearly 9% on the news Wednesday. The San Diego-based company is the biggest maker of chips used in mobile phones, which account for most of its revenue. But Qualcomm gets more than half its profit from royalties on patents, stemming from its inventions in cellular communications and other technologies. Qualcomm charges handset makers royalties based on a percentage of the price of their handsets. Qualcomm doesn't typically issue licenses for its wireless technology to other chip makers. KFTC staff members alleged that those practices are illegal, Qualcomm said. The company stated that the staff's findings "are not supported by the facts and are a serious misapplication of law." South Korea was one of the first countries to adopt the version of digital cellular

> technology popularized by Qualcomm known as CDMA, or code division multiple access.
>
> The company's market power has garnered the attention of the KFTC before; in 2009, the regulator ordered Qualcomm to pay a $208 million fine over other practices in a ruling still under appeal. Qualcomm disclosed the current Korea investigation earlier this year. It faces pending investigations by the U.S. Federal Trade Commission, which is also focusing on its patent licensing practices, and European regulators, who are studying its sales tactics. In February, Qualcomm agreed to a settlement with antitrust authorities in China that included a $975 million fine and required changes to its business practices. Company executives at the time said they were pleased that Chinese regulators chose not to challenge Qualcomm's model of charging royalties to handset makers. Qualcomm on Nov. 4 reported a 44% drop in fiscal fourth-quarter profit, and projected financial results below expectations because of delays in reaching licensing deals with Chinese handset makers. The company has been reviewing strategic options that include splitting its chip and licensing businesses in the wake of pressure from activist investor Jana Partners LLC. Stacy Rasgon, an analyst with Sanford C. Bernstein, said the current dispute in South Korea could drag on for years. But he added that the charges are an additional worry for a company facing other pressures, calling any move away from handset-based royalties a "doomsday scenario" for Qualcomm's licensing business.

91. On July 20, 2016, it was reported that the Company could face a fine of approximately $880 million for its antitrust violations in South Korea. On July 20, 2016, *The Register* published an article entitled "South Korea mulls TREELLION-Won fine for Qualcomm," which reported on the potential massive fine and set forth, in pertinent part:

> South Korea's Fair Trade Commission (KFTC) has Qualcomm in its sights again, telling the Korea Times the company could be up for a trillion-won fine (nearly US$880 million) over anti-trust violations.
>
> The fine (which would set a KFTC record) concerns an ongoing dispute in South Korea over how Qualcomm levies royalties for its mobile phone chips.
>
> The chip-designer first stated it was under investigation by the KFTC in November; the regulator has been investigating the company for nearly 18 months, according to Korea Times.
>
> The regulator wants the company to charge its standards-essential patent royalties on a per-chip basis; Qualcomm said in November charging royalties for finished products from its OEMs is normal.

> A KFTC official told Korea Times "Qualcomm has been collecting royalty fees from mobile phone manufacturers based on certain fixed rates from the suggested price of a mobile device. Qualcomm should have sought royalty fees based on each chipset".
>
> The regulator also believes the company applies unfair conditions to the use of its patents.
>
> Qualcomm's chief customers in South Korea are Samsung and LG Electronics, and they account for more than US$1 billion of the company's annual license fee haul.
>
> Licensing has also caused trouble for the company in Europe and China.

92. On December 27, 2016, the SKFTC fined Qualcomm a record 1.03 trillion won for violating antitrust laws. After a three-year investigation, the South Korean antitrust regulator found that Qualcomm breached antitrust law by limiting competing chip makers' access to its patents. It also found that the Company forced mobile-phone manufacturers into unfair license agreements by refusing to supply critical phone chips to those that disagreed to abide by its terms.

93. On this news, Qualcomm stock fell $1.50 per share, or 2.23%, to close at $65.75 per share on December 28, 2016.

94. More recently, on January 25, 2017, Defendants caused the Company to file its 1Q 2017 Form 10-Q wherein Defendants announced that on January 22, 2017, the Company received the SKFTC's final decision, which found that the Company's conduct violated the Korean Monopoly Regulation and Fair Trade Act. The 1Q 2017 Form 10-Q stated, in pertinent part:

> Korea Fair Trade Commission (KFTC) Investigation: On March 17, 2015, the KFTC notified the Company that it was conducting an investigation of the Company relating to the Korean Monopoly Regulation and Fair Trade Act (MRFTA). On December 27, 2016, the KFTC announced that it had reached a decision in the investigation, finding that the Company has violated provisions of the MRFTA. On January 22, 2017, the Company received the KFTC's formal written decision, which finds that the following conducts violate the MRFTA: (i) refusing to license, or imposing restrictions on licenses for, cellular communications standard essential patents with competing modem chipset makers;

> (ii) conditioning the supply of modem chipsets to handset suppliers on their execution and performance of license agreements with the Company; and (iii) coercing agreement terms including portfolio license terms, royalty terms and free cross-grant terms in executing patent license agreements with handset makers. The KFTC's decision orders the Company to: (i) upon request by modem chipset companies, engage in good-faith negotiations for patent license agreements, without offering unjustifiable conditions, and if necessary submit to a determination of terms by an independent third party; (ii) not demand that handset companies execute and perform under patent license agreements as a precondition for purchasing modem chips; (iii) not demand unjustifiable conditions in the Company's license agreements with handset companies, and upon request renegotiate existing patent license agreements; and (iv) notify modem chipset companies and handset companies of the decision and order imposed on the Company and report to the KFTC new or amended agreements. According to the KFTC's decision, the foregoing will apply to transactions between the Company and the following enterprises: (i) handset manufacturers headquartered in Korea and their affiliate companies; (ii) enterprises that sell handsets in or to Korea and their affiliate companies; (iii) enterprises that supply handsets to companies referred in (ii) above and the affiliate companies of such enterprises; (iv) modem chipset manufacturers headquartered in Korea and their affiliate companies; and (v) enterprises that supply modem chipsets to companies referred in (i), (ii) or (iii) above and the affiliate companies of such enterprises. The KFTC's decision also imposes a fine of approximately 1.03 trillion Korean Won (approximately $868 million based on exchange rates at December 25, 2016), which was recorded as a charge to other expenses in the first quarter of fiscal 2017. The Company believes that its business practices do not violate the MRFTA, and intends to challenge the decision in the Seoul High Court. The Company will also seek a stay of the decision's remedial order.

**4. The Company Comes Under Fire from the European Commission for its <u>Antitrust Violations in Europe</u>**

95. The Company's antitrust problems have not been limited to Asia. For instance, in the EC Release dated July 16, 2015 and entitled "Antitrust: Commission opens two formal investigations against chipset supplier Qualcomm," the EC announced it had initiated twin formal investigations related to the Company's potential antitrust violations. The EC Release, which gave further details concerning the investigations stated, in pertinent part:

> The European Commission has opened two formal antitrust investigations into possible abusive behaviour by Qualcomm in the field of baseband chipsets used in consumer electronic devices. The first will examine whether Qualcomm has breached EU antitrust rules that prohibit the abuse of a dominant market position

> by offering financial incentives to customers on condition that they buy the baseband chipsets exclusively or almost exclusively from Qualcomm. The second will look into whether Qualcomm engaged in 'predatory pricing' by charging prices below costs with a view to forcing its competition out of the market.
>
> EU Commissioner in charge of competition policy Margrethe Vestager said: "***We are launching these investigations because we want to be sure that high tech suppliers can compete on the merits of their products. Many customers use electronic devices such as a mobile phone or a tablet and we want to ensure that they ultimately get value for money. Effective competition is the best way to stimulate innovation***."
>
> European consumers increasingly access the internet through mobile devices – therefore it is important that effective competition takes place for the supply of one of the key components of such devices: Baseband chipsets process communication functions in smartphones, tablets and other mobile broadband devices. They are used both for voice and data transmission.
>
> Qualcomm is the world's largest supplier of baseband chipsets.
>
> The first antitrust investigation focuses on Qualcomm's conditions related to the supply of certain chipsets that comply with 3G (UMTS) and 4G (LTE) standards and are used to deliver cellular mobile connectivity in smartphones and tablets. In particular, the Commission will investigate whether Qualcomm has granted payments, rebates or other financial incentives to its customers on condition that they purchase all or a significant part of their baseband chipsets requirements from Qualcomm, and whether any such behaviour might hinder the ability of rivals to compete.
>
> The second investigation concerns Qualcomm's pricing practices with regard to certain chipsets that comply with 3G (UMTS) standards and are used to deliver cellular mobile connectivity. In particular, the Commission will be assessing whether Qualcomm has engaged in 'predatory pricing' by selling these chipsets at prices below costs, with the intention of hindering its competition from remaining in the market and competing with Qualcomm.
>
> The opening of proceedings means that the Commission will examine the cases as a matter of priority. It does not prejudge the outcome of the investigations.

96. Immediately after the announcement of the EC's investigation, also on July 16, 2015, prior to conducting any investigation into the EC's serious allegations, Defendants issued a press release that summarily rejected the allegations and stated that they had "no merit." In particular, Defendants stated:

> We were informed that the European Commission has taken the procedural step of "initiating proceedings" against Qualcomm with regard to the two ongoing investigations into Qualcomm's sale of chipsets for mobile devices. This step allows investigators to gather additional facts, but it represents neither an expression by the Commission on the merits of the case nor an accusation against the Company. While we were disappointed to hear this, we have been cooperating and will continue to cooperate with the Commission, and we continue to believe that any concerns are without merit.

97. On December 8, 2015, *Fortune.com* published an article entitled "Qualcomm Faces Another European Antitrust Investigation." This article set forth, in relevant part:

> The European Commission is pursuing an antitrust investigation against mobile chip provider Qualcomm, accusing the company of selling chips below market rates to undercut competitor Icera, which was purchased by Nvidia back in 2010. In proof that the wheels of justice move slowly, Nvidia announced in May of this year, that it planned to take a $125 million charge to shut down its Icera division.
>
> Europe's antitrust officials are also investigating Qualcomm on another charge, paying other customers to exclusively use its chips. These two charges—the exclusivity payments and the predatory pricing—could put a dent in Qualcomm's efforts to restructure itself. If found guilty, Qualcomm could be fined up to 10% of its $25 billion in fiscal 2015 revenue, according to the Wall Street Journal.
>
> The complaints were opened earlier this year and are the second time that Qualcomm has faced an inquiry into its pricing in Europe. The first time was in 2009, when it was investigated for a similar complaint and was cleared. However, the EU recently fined Google over antitrust issues and Facebook over privacy violations, so it is clearly acting more aggressive. Qualcomm has also faced scrutiny in other international venues, with the most recent—and damaging—being China.
>
> In February the chip company settled with Chinese authorities on new licensing terms over the royalties that Chinese chip firms would have to pay. This threw its second and third quarter earnings into disarray as it struggled to get Chinese handset vendors to agree to the new terms. In some cases, Qualcomm executives admitted that Chinese companies stopped paying licensing fees altogether while the firms were settling their deals as a negotiating ploy.
>
> Just last week, Chinese smartphone vendor Xiaomi signed a licensing agreement, which sent Qualcomm's stock up 7.4% the day that deal was announced.

### 5. The Company's Antitrust Problems Extend to the United States

98. On January 17, 2017, the FTC commenced an enforcement action against Qualcomm following an investigation of the Company's licensing practices. The agency's complaint, filed in U.S. District Court for the Northern District of California, alleged that Qualcomm used its dominant position to maintain an illegal monopoly in the market. According to the FTC:

> The Federal Trade Commission filed a complaint in federal district court charging Qualcomm Inc. with using anticompetitive tactics to maintain its monopoly in the supply of a key semiconductor device used in cell phones and other consumer products.
>
> Qualcomm is the world's dominant supplier of baseband processors – devices that manage cellular communications in mobile products. The FTC alleges that Qualcomm has used its dominant position as a supplier of certain baseband processors to impose onerous and anticompetitive supply and licensing terms on cell phone manufacturers and to weaken competitors.
>
> Qualcomm also holds patents that it has declared essential to industry standards that enable cellular connectivity. These standards were adopted by standard-setting organizations for the telecommunications industry, which include Qualcomm and many of its competitors. In exchange for having their patented technologies included in the standards, participants typically commit to license their patents on what are known as fair, reasonable, and non-discriminatory, or "FRAND," terms.
>
> When a patent holder that has made a FRAND commitment negotiates a license, ordinarily it is constrained by the fact that if the parties are unable to reach agreement, the patent holder may have to establish reasonable royalties in court. According to the complaint, by threatening to disrupt cell phone manufacturers' supply of baseband processors, Qualcomm obtains elevated royalties and other license terms for its standard-essential patents that manufacturers would otherwise reject. These royalties amount to a tax on the manufacturers' use of baseband processors manufactured by Qualcomm's competitors, a tax that excludes these competitors and harms competition. Increased costs imposed by this tax are passed on to consumers, the complaint alleges.
>
> By excluding competitors, Qualcomm impedes innovation that would offer significant consumer benefits, including those that foster the increased interconnectivity of consumer products, vehicles, buildings, and other items commonly referred to as the Internet of Things.

> The FTC has charged Qualcomm with violating the FTC Act. The complaint alleges that Qualcomm:
>
> - **Maintains a "no license, no chips" policy under which it will supply its baseband processors only on the condition that cell phone manufacturers agree to Qualcomm's preferred license terms.** The FTC alleges that this tactic forces cell phone manufacturers to pay elevated royalties to Qualcomm on products that use a competitor's baseband processors. According to the Commission's complaint, this is an anticompetitive tax on the use of rivals' processors. "No license, no chips" is a condition that other suppliers of semiconductor devices do not impose. The risk of losing access to Qualcomm baseband processors is too great for a cell phone manufacturer to bear because it would preclude the manufacturer from selling phones for use on important cellular networks.
>
> - **Refuses to license standard-essential patents to competitors.** Despite its commitment to license standard-essential patents on FRAND terms, Qualcomm has consistently refused to license those patents to competing suppliers of baseband processors.
>
> - **Extracted exclusivity from Apple in exchange for reduced patent royalties.** Qualcomm precluded Apple from sourcing baseband processors from Qualcomm's competitors from 2011 to 2016. Qualcomm recognized that any competitor that won Apple's business would become stronger, and used exclusivity to prevent Apple from working with and improving the effectiveness of Qualcomm's competitors.
>
> The FTC is seeking a court order to undo and prevent Qualcomm's unfair methods of competition in violation of the FTC Act. The FTC has asked the court to order Qualcomm to cease its anticompetitive conduct and take actions to restore competitive conditions.

99. On this news, Qualcomm's stock price fell $2.69 per share, or 4.02%, to close at $64.19 per share on January 17, 2017.

100. On January 20, 2017, *The Wall Street Journal* reported that tech-giant Apple was suing Qualcomm, alleging that the Company "leveraged its monopoly position as a manufacturer of baseband chips, a critical component used in cellphones, to seek 'onerous, unreasonable and costly' terms for patents, and that Qualcomm blocked Apple's ability to choose another supplier for chipsets." The article further stated that Apple is seeking $1 billion in rebate payments that

Qualcomm allegedly withheld as retribution for Apple's involvement in an investigation conducted by South Korea's antitrust regulator.

101. On this news, Qualcomm's share price fell $1.56 per share, or 2.42%, to close at $62.88 per share on January 20, 2017.

102. Accordingly, as a result of Defendants' breaches, the Company has been damaged and has been forced to expend nearly $1 billion to resolve the China Settlement and over $850 million in fines for its antitrust violations in South Korea. Moreover, the Company likewise faces additional costly investigations in Europe and the United States, which also may result in future costly fines. Finally, the Company faces the costs and potential consequences of the lawsuit initiated by Apple.

103. The fines and regulatory actions described above (as well as the resulting harm to the Company) flow from a similar course of conduct perpetrated by Defendants. Of critical importance are Defendants' representations that the Company licensed its standard-essential patents on a non-discriminatory basis to the entire cellular communications industry. Rather than continuing to abide by that representation, Defendants opted to exploit the Company's position as the holder of the industry's standard-essential patents to suppress competition, drive its rivals out of business, and extract supra-competitive royalties. Upon information and belief, and as it has been alleged, in or about 2008, Defendants amended the Company's well-established licensing policies, began refusing to offer licenses to standard-essential patents to competing chipmakers, and gave out royalty relief to mobile phone manufacturers that agreed to largely or exclusively purchase Qualcomm's chipsets.

**6. The Company's Relevant Period Financial Statements Fail to Disclose that the Company Was Being Operated Illicitly**

104. On November 6, 2013, Defendants caused the Company to file the 2013 Form 10-K. In the 2013 Form 10-K, Defendants caused Qualcomm to state that it had "committed to [the] standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." The 2013 Form 10-K further represented that "[w]e have licensed or otherwise provided rights to use our patented technologies to interested companies on terms that are fair, reasonable and nondiscriminatory."

105. This was false and misleading. Qualcomm (under Defendants' direction and on their watch) had not licensed "interested companies on terms that are fair, reasonable and non-discriminatory." Rather, Defendants caused the Company to discriminate against, and refuse to license its standard-essential patents to, competitor chipset manufacturers, as well as to discriminate against licensees by providing royalty relief to customers who agreed to purchase exclusively Qualcomm chipsets. These statements also omitted material facts when made, including that: (i) Qualcomm (under Defendants' direction and on their watch) maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) under Defendants' direction and on their watch, Qualcomm had consistently refused to license its standard-essential patents to competitor chipmakers, including (but not limited to) MediaTek, Samsung, Intel and Via Technologies; and (iii) Defendants caused Qualcomm, in licensing its essential patents, to discriminate against and provide unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

106. In the 2013 Form 10-K, Defendants also purported to describe the Company's contribution to "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number

of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Defendants had stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to chipset manufacturers the Company's patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

107. The 2013 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Defendants caused Qualcomm to refuse to license its technology to an entire segment of the industry—namely, its global rival chipset manufacturers. This statement also omitted material facts when made, including that: (i) under Defendants' direction and on their watch, Qualcomm maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) under Defendants' direction and on their watch, Qualcomm consistently refused to license its standard-essential patents to competitor chipmakers, including (but not limited to) MediaTek, Samsung, Intel and Via Technologies.

108. Further, in the 2013 Form 10-K, defendants Mollenkopf and Davis each issued certifications pursuant to (among other things) Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications").[5] The SOX Certifications certified, *inter alia*, that the Company's financial

[5] Defendants included similar SOX Certifications in the Company's 2012 Annual Report filed on Form 10-K on November 6, 2013, the Company's 2011 Annual Report filed on Form 10-K on

statements were not false and misleading and that the Company's systems of internal controls were effective. Specifically, the SOX Certifications stated:

> I, [Steven M. Mollenkopf/George S. Davis], certify that:
>
> 1. I have reviewed this Annual Report on Form 10-K of QUALCOMM Incorporated;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

---

November 7, 2012, the Company's 2010 Annual Report filed on Form 10-K on November 2, 2011, and the Company's 2009 Annual Report filed on Form 10-K on November 3, 2010. Each of the annual reports included, *inter alia*, a detailed narrative concerning Qualcomm's ongoing business operations, the Company's consolidated financial statements, and the notes to the Company's financial statements.

> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's Board of Directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.
>
> * * *
>
> In connection with the accompanying Annual Report of QUALCOMM Incorporated (the "Company") on Form 10-K for the fiscal year ended September 29, 2013 (the "Report"), I, [Paul E. Jacobs, Chief Executive Officer of the Company/George S. Davis, Chief Financial Officer of the Company], certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and
>
> (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

109. On November 5, 2014, Defendants caused Qualcomm to file its financial results for fiscal year 2014 on Form 10-K with the SEC (the "2014 Form 10-K"), which was signed by defendants Mollenkopf, Davis, Alexander, Cruickshank, Dittamore, Hockfield, Horton, Jacobs, Lansing, Manwani, Nelles, Randt, Ros, Rubinstein, Scowcroft and Stern.

110. Even though the 2014 Form 10-K touted that during fiscal 2014, 50% of the Company's revenues were from customers and licensees based in China, the 2014 Form 10-K

nonetheless failed to disclose that these revenues were only achieved by violating China's antitrust laws. Specifically, in the 2014 Form 10-K, Defendants stated the following about the Company's presence in the Asian market, in general, and the Chinese market, in particular:

> Consolidated revenues from international customers and licensees as a percentage of total revenues were 99%, 97% and 95% in fiscal 2014, 2013 and 2012, respectively. During fiscal 2014, 50%, 23% and 11% of our revenues were from customers and licensees based in China (including Hong Kong), South Korea and Taiwan, respectively, compared to 49%, 20% and 11% during fiscal 2013, respectively, and 42%, 22% and 14% during fiscal 2012, respectively. We report revenues from external customers by country based on the location to which our products or services are delivered, which for QCT is generally the country in which our customers manufacture their products, or for licensing revenues, the invoiced addresses of our licensees. As a result, the revenues by country presented herein are not necessarily indicative of either the country in which the devices containing our products and/or intellectual property are ultimately sold to consumers or the country in which the companies that sell the devices are headquartered. For example, China revenues could include revenues related to shipments of integrated circuits to a company that is headquartered in South Korea but that manufactures devices in China, which devices are then sold to consumers in Europe and/or the United States. Additional geographic information is provided in the notes to our consolidated financial statements in this Annual Report in "Notes to Consolidated Financial Statements, Note 8. Segment Information."

111. The 2014 Form 10-K also contained SOX Certifications, signed by defendants Mollenkopf and Davis, which were substantially similar to those set forth above.

112. In the 2014 10-K, Defendants stated that the Company had "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." This statement was misleading and omitted material facts when made, including that: (i) Defendants had caused Qualcomm to discriminate against, and refuse to license its standard-essential patents to, competitor chipset manufacturers; (ii) under Defendants' direction and on their watch, Qualcomm has consistently refused to license its standard-essential patents to competitor chipmakers, including (but not limited to) MediaTek, Samsung, Intel and Via Technologies; and (iii) under Defendants' direction and on their watch,

Qualcomm had, in licensing its essential patents, discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

113. In the 2014 Form 10-K, Defendants also purported to describe the Company's contribution to "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Defendants caused Qualcomm to stifle competition in the cellular communications industry, and did so by, among other things, refusing to license to competitor chipset manufacturers the Company's patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

114. In the 2014 Form 10-K, Defendants touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made.

115. Rather than "make [its] patented technologies broadly available," Defendants caused Qualcomm to refuse to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. This statement also omitted material facts when made, including that: (i) under Defendants' direction and on their watch, Qualcomm maintained a licensing policy in which it refused to license its standard-essential patents to competitor chipset manufacturers; and (ii) under Defendants' direction and on their watch, Qualcomm had

consistently refused to license its standard-essential patents to competitor chipmakers, including (but not limited to) MediaTek, Samsung, Intel and Via Technologies.

116. Additionally, as discussed in detail below, the Company's Proxy Statements, which sought shareholder votes for, *inter alia*, the election of directors and the approval of executive compensation packages, were likewise false and misleading because, *inter alia*, they failed to disclose that the Company was being operated illicitly, in violation of numerous domestic and international laws (i.e. for many of the reasons set forth above).

117. In light of the China Settlement and the recent findings in South Korea, it is clear that the Company's financial statements were false and misleading when made and that the Company, under Defendants' direction and on their watch, suffered from woefully inadequate controls, which ultimately cost the Company and its shareholders nearly $1 billion to resolve the China Settlement and over $850 million for violations of South Korean law. Additionally, as discussed above, the Company likewise faces potentially significant exposures concerning its potential violations of European law and the law of the United States, including a securities class action.

118. The materially inaccurate annual reports caused direct harm to the Company in that, among other things, Defendants' omissions perpetuated the systematic legal violations within the Company, which brought about the severe China Settlement and south Korean fine (and EC and FTC investigations), which the Company was ultimately subjected to.

119. Each director on the Board (*i.e.*, many of the Defendants named herein) was duty-bound – pursuant to their general fiduciary duties under Delaware law and the specific duties applicable to directors set forth in the Company's foundational corporate documents (discussed

above) – to fully disclose all material information. Despite these clear fiduciary duties, the Board caused the Company to file the materially inaccurate annual reports mentioned above.

**B. Defendants' Illicit Scheme Concerning the Snapdragon 810**

**1. Overview of the Company and the Telecommunications Industry**

120. As set forth above, the Company operates through two main segments: QCT and QTL. According to the 2014 Form 10-K, QCT is a leading developer and supplier of integrated circuits. An integrated circuit, also called a chip or microprocessor, is a semiconductor wafer on which millions or billions of tiny resistors, capacitors, and transistors are fabricated for the purpose of processing data. These circuits are used in virtually all electronic devices, including specifically, mobile phones. Qualcomm designs, markets, and sells a particular type of mobile phone integrated circuit known as a "mobile station modem" or MSM integrated circuit, which allows a mobile device to process data for, *inter alia*, playing games, operating a digital camera, or streaming video, and to connect to one of several generations of wireless networks (hereafter "mobile processor").

121. In recent years, Qualcomm sold mobile processors through its QCT segment to OEMs such as Samsung (and many others) for use in cellular phones, smartphones, and other mobile devices such as tablets. These mobile processors had the capacity of connecting to both third generation or "3G" wireless networks and the faster, more advanced fourth generation or "4G/LTE" wireless networks. For fiscal year 2014, Qualcomm's QCT segment shipped 861 million mobile processors worldwide and generated 70% of the Company's total revenues, or $18.7 billion.

122. Much of Qualcomm's success has been the result of its design and development of an extensive range of technologically advanced mobile processors, which have been incorporated

into smartphones since the late 1990s. By the end of 2013, Qualcomm's sales represented 64% of the overall mobile processor market and 94% of the 4G/LTE mobile processor market. Qualcomm also had a significant one to two year technological lead on its nearest competitors, launching its fourth and fifth generation of 4G/LTE mobile processors when its competitors only were announcing their first generation. Coupled with the explosive growth in the smartphone market—from 122 million smartphones sold in 2007 to more than 1.4 billion sold in 2015—the Company's purportedly superior mobile processors and command of the relevant market share made Qualcomm one of the most important partners of OEMs who design and manufacture the most sought-after (and most expensive) premium-tier smartphones, such as Apple, Samsung, and LG.

### 2. Background of the Snapdragon Processors and their Importance to the Company

123. Defendants attempted to seize the opportunity for technology leadership in smartphones by causing the Company to design the Snapdragon series of all-in-one processors known as "System on a Chip" ("SoC"). An SoC is a type of mobile processor that aggregates multiple, different processors onto a single piece of silicon that works collectively to allow the smartphone to maximize the speed of data processing, improve power efficiency, and create an overall enhanced user experience. Prior to the development of the SoC, most mobile devices included a number of different processors tailored to specific functions, *e.g.*, gaming or playing video. The SoC allowed for each of these separate processors to be included on one chipset, leading to the development of (and demand for) thinner and smaller mobile devices.

124. Each function of a mobile device (*e.g.*, placing a call, sending a text, playing a game, or connecting to the internet) is performed by a distinct "functional block" in an SoC.

125. Although each of an SoC's functional blocks is important to the overall performance of a mobile device, the central processing unit or CPU is the "brains" of a smartphone,

and is central to its functionality. It governs how quickly a device can perform various functions, and determines how well a device can perform multiple different functions simultaneously. Accordingly, a processor's ability to correctly process the millions of bits of data per second that flow through it at ever-increasing speeds is central to its utility. Modern SoCs have multiple "cores," or distinct units that work in concert as the devices' CPU regulates its operations for more efficient processing.

126. Each functional block, and particularly the CPU, processes data by utilizing the electrical energy from billions of transistors to digitize the data signals. This electrical energy creates heat within the circuits of the functional blocks and occasionally causes mobile devices to run warm when these blocks are in use. As the "brains" of the device, the CPU is more likely to emanate heat than other functional blocks on the SoC.

127. There is a threshold, however, at which the heat becomes so excessive that it threatens the other functional blocks, the overall device (and its user's skin) and, importantly, the utility of the CPU itself. In the latter instance, the software controlling the SoC has a built-in safety mechanism that shuts down the entire CPU or one or more of its "cores"—a unit of the CPU that reads and executes program instructions—to prevent further damage. Once engaged, this safety mechanism slows down the SoC's overall processing speed, efficiency, and other capabilities until the unit cools down.

128. In devices with multi-core CPUs, the software controlling the SoC may shut down the most-strained cores (which are sometimes more powerful), while allowing the slower, less strained cores to process incoming data. This automated shutdown of strained cores shifts the work onto the other cores, which typically operate at slower speeds and usually results in slower data processing. Known in the industry as "throttling," shifting to slower cores can be a means of

preventing thermal damage to the chip. However, "throttling" also may result in a device that resets at random intervals and utilizes slower speeds for functions processed by the remaining cores. When the heat generated by the CPU is consistently excessive, such thermal issues may prevent the device from performing as originally designed or, in the case of a sale to an end user, as advertised.

129. As a leader in SoC processors, Qualcomm was strongly positioned to benefit from the growth of smartphone sales, and from high demand for increasingly fast data and processing capabilities into thinner smartphones and other mobile devices. While Qualcomm was not the only company to develop an SoC, its Snapdragon series was advertised as the most technologically advanced and generally considered the industry leading chipset for mid- to premium tier smartphones. Indeed, the Snapdragon platform (including its expansion into new mobile and server technologies) represented one of the Company's fundamental strategies to grow QCT.

130. Since 2007, Qualcomm has released four different series of Snapdragon mobile processors—the 200 series, 400 series, 600 series, and the 800 series—each of which included the capability of accessing both 3G and 4G/LTE wireless networks, something that Qualcomm's competitors were not able to do until at least the second half of 2014. This was significant because by the end of 2013, some of the largest smartphone markets in the world—the United States, Europe, and China (with nearly 1 billion subscribers alone) had launched lightning fast 4G/LTE wireless networks and Qualcomm had the only 4G/LTE SoC for premium-tier smartphones. Additionally, prior to 2014, each Snapdragon processor relied on a customized CPU and gaming processor unit or GPU, which further set it apart from other SoCs available on the market. Not only was Qualcomm's expertise in developing these individual processors unparalleled, but its competitors typically used "off-the-shelf" processors, which were not designed with any particular

device in mind. By 2014, one billion devices had shipped with Qualcomm's Snapdragon processors.

131. The Snapdragon 800 series, in particular, was purportedly designed with the most powerful and efficient processing capabilities for use in OEMs' premium-tier smartphones, which were intended for subscribers in the US, Europe, and China, among other markets with 4G/LTE wireless networks. OEMs paid a premium for the Snapdragon 800 series given the level of design, customization, technology, and raw processing power these mobile processors purportedly provided. As a result, Qualcomm's profit margins on the 800 series generally were higher than the other Snapdragon series.

132. In mid-2013, Qualcomm (under Defendants' direction and on their watch) began work on its latest generation of the Snapdragon 800 series—commercially known as the Snapdragon 810—with a planned January 2015 launch. Qualcomm initially designed the Snapdragon 810 to represent the next generation in power efficiency, processing speeds, and technical capabilities, including, critically, the ability to seamlessly connect to 4G/LTE networks. While Qualcomm historically released new SoCs every year, it has been alleged that according to CW 4, due to the high costs and number of resources required to launch new mobile processers, the Company decided to switch to a two-year development schedule for its Snapdragon mobile processors starting with the 810. Accordingly, Defendants intended the 810 to be commercially available for at least two years before the launch of its successor.

133. It has been alleged that as described by CW 3, the Snapdragon 810 was intended to be Qualcomm's "Cadillac" processor. In fact, Defendants caused Qualcomm to promote it in that manner to OEMs and the market. A successful launch of the Snapdragon 810 was essential to the Company's competitive position—ensuring that a significant share of Qualcomm chips would

continue to be included in the designs of virtually all of the premium-tier smartphone handsets—as well as to its revenues and profit margins, as the Company generated as much as 60% more in revenues for the Snapdragon 810 than its predecessors.

134. Several broader market forces emerged in 2014 and 2015, however that adversely impacted QCT's ability: (i) to compete with processor manufacturers going forward; and (ii) to continue increasing its profit margins.

135. The first was the emergence of other less-expensive SoC processors offered by smaller competitors. These new players already had emerged as a significant competitor for chips in the low- and mid-tier smartphone market, giving OEMs more options when selecting a chipset for their mobile devices. One such competitor, MediaTek, was developing a premium-tier SoC with 4G/LTE capabilities that would compete directly with Qualcomm's premium-tier Snapdragon processers, including the 810. This presented significant competitive pressure for Qualcomm, especially within China, which, at the time, had one billion mobile device subscribers.

136. Another factor affecting QCT's ability to reap higher profit margins on its mobile processors was the lower average sales prices or "ASPs" for smartphones. This was largely the result of increased smartphone demand in China with the launch of 3G networks in 2009 and then 4G/LTE networks in 2014. Lower sales prices meant tighter margins for OEMs and greater scrutiny on costs. As a result, OEMs became more cognizant of the value of a mobile device's components as compared to its cost. Thus, OEMs only would choose more expensive and complex processors for their premium-tier smartphones if those processors actually delivered substantial improvements in operating performance.

137. A third factor affecting QCT's bottom line was the growth of so-called "in-house" SoC solutions with similar power and 4G/LTE connectivity at such large OEMs as Samsung and

Huawei. Prior to April 2014, Samsung and Huawei both utilized prior versions of Snapdragon processors for their premium tier smartphones. Qualcomm's ability to keep its largest customer, Samsung, and one of the largest Chinese OEMs, Huawei, from permanently eschewing Qualcomm SoCs in favor of their in-house SoC solutions hinged on the Company's ability to deliver cutting-edge products that performed noticeably better than these OEMs' own processor designs.

138. Thus, during 2014 and 2015, Defendants undoubtedly knew or had reason to know that Qualcomm needed a strong 800 series Snapdragon chipset in order to cement the Company's technological leadership and expertise, differentiate itself from its competitors, justify the cost of its premium-tier SoC, and convince its most important customers to continue to look outward for chipset solutions.

### 3. <u>Timeline for Development of an SoC</u>

139. It has been alleged that according to Professor Scott Thompson ("Thompson") (the plaintiffs' expert in the Securities Action and alleged to be an expert in electronic engineering and semiconductor manufacturing), the timeline for developing a mobile processor is dependent on a multi-month process for fabricating silicon wafers and includes multiple steps which vary little from company to company. Moreover, it has been alleged that given the complexity of designing, testing, and launching an SoC, it is possible to identify the likely production timeline of a chip based on its commercial launch date. As a result, it has been alleged that based on his expertise and experience manufacturing and developing chips similar to those at issue here, Thompson is able to identify with reasonable degree of certainty the production timeline of the Snapdragon 810 given its planned launch dates for Samsung in November 2014 and the actual launch dates for LG in January 2015.

140. The initial conceptual and design stages for the development of an SoC (like the 810) focuses primarily on identifying various performance requirements that the chip is intended to satisfy. High-level goals that are evaluated at this stage include power, heat, chip frequency, and instruction size (*e.g.*, 64-bit or 32-bit). This stage is performed in conjunction with consultations with OEMs to whom Qualcomm intends to market and sell the respective SoC.

141. After the conceptual and design stages are complete, a company fabricates sample chips from silicon based on the final approved design, which is known as "first silicon." So-called "fabless" semiconductor companies like Qualcomm engage a foundry, such as the Taiwan Semiconductor Manufacturing Company, to fabricate the first silicon. It has been alleged that according to CW 3, first silicon also was known within Qualcomm as "Silicon on Dock," or SoD.

142. It has been alleged that according to Thompson, first silicon is considered the most important, closely monitored, and heavily scrutinized milestone for an SoC because of the hundreds of millions of dollars, thousands of man-hours, and nearly two-year lead time that must be invested just to get the processor to the "first silicon" stage. The process of creating this first silicon (also known as the "bring up" phase) typically takes three months, primarily because of the extensive and microscopic layering of silicon involved in the manufacturing process. It has been alleged that based on the 810's commercial launch schedule and complexity, Thompson notes that the first silicon was likely delivered no later than March 2014. Specifically, it has been alleged that Thompson stated that the 810 first silicon was likely delivered no later than March because: (i) Qualcomm would have possessed the first silicon at least several weeks prior to issuing its April 7, 2014; and (ii) Qualcomm would have needed at least 9 months between receiving the first silicon and LGs first 810 device launch date of January 5, 2015 for production. It has been alleged that Thompson also notes that in light of Samsung's November 2014 launch date, and the need for 9

months between first silicon and launch, Qualcomm more likely would have received the first silicon in January or February 2014.

143. Testing of the chipset and its various components begins immediately after receipt of the first silicon. First silicon represents the first opportunity to test the chip's design under so-called typical conditions of use. It has been alleged that according to Thompson, test result data regarding key performance metrics (including power, heat, and processing speeds) are typically known about one week after testing begins. Given that the initial testing of the first silicon is such a key benchmark for any semiconductor company (including Qualcomm), it has been alleged that Thompson confirmed that the results of tests of these key metrics are heavily scrutinized, monitored, and almost always communicated to the Company's key executives, such as certain of the Defendants here. In the case of the 810, any testing problems encountered during the first silicon testing should have been discovered shortly after receipt of the first silicon by no later than March 2014.

144. It has been alleged that Thompson's timeline is substantially corroborated in large part by CW 3. It has been alleged that CW 3 identified four key milestones in Qualcomm's development of its chipsets: (i) Silicon on Dock (*i.e.*, first silicon), which refers to the point in time Qualcomm received the first samples of the chipset for testing; (ii) Feature Complete ("FC"), which refers to the point in time when the chipset has all of its software components installed; (iii) Commercial Sampling, which refers to the date samples of the SoC is sent to OEMs; and (iv) Customer Ship date ("CS date"), which refers to the date the finished chipsets are delivered to OEMs.

145. It has been alleged that according to CW 3, Qualcomm typically provided the final chipset design to the chip fabricator (*i.e.*, Taiwan Semiconductor Manufacturing Company) for

"tape-out" or initial fabrication of the chipset approximately three months before Qualcomm receives the SoD or first silicon. It has been alleged that this is similar to what Thompson refers to as the "bring up" stage, which also occurred roughly three months before receipt of the first silicon. Likewise, it has been alleged that CW 3 confirmed that after receiving the SoD, Qualcomm began testing the chipset.

146. It has been alleged that according to CW 3, Qualcomm had two test groups—the Software Component Test Group and CW 3's group, the Product Test Group. The Software Component Test group had sub-groups, each of which tested the software for individual functional blocks of the chipset (*e.g.*, the modem or the GPU), beginning very shortly after Qualcomm received the SoD. The Product Test Group was responsible for testing the entire chipset, including all of its software components, after FC and prior to the CS date. It has been alleged that according to CW 3, Qualcomm typically reached the FC milestone within three months of SoD.

147. It has been alleged that CW 3 identified two metrics that the Product Test Group utilized when conducting their tests: (i) Crashes Per Thousand Hours (of testing) ("CPTH"); and (ii) Mean Time Between Failures ("MTBF"). These metrics indicated how stable a chipset was during testing. It has been alleged that according to CW 3, a successful chipset has a higher MTBF and lower CPTH—*i.e.*, the chipset runs for longer between failures, with fewer crashes over the testing period. It has been alleged that CW 3 stated that the Product Test Group sometimes was brought in shortly after receipt of SoD to identify big picture issues, given the Product Test Group had a better reputation for identifying problems with a chipset than the Software Component Test Group. This was especially so in the case of the Company's key products, such as the Snapdragon 810.

148. After FC, and while the Product Test Group was testing the chipset, Qualcomm engaged in Commercial Sampling, releasing the chipset with all of its software components to OEMs for their own testing. It has been alleged that CW 3 stated that Qualcomm had the option to make modifications to the chipset based on the OEMs' test results. Commercial Sampling, including both OEMs' testing and the Company's subsequent modifications, took approximately three months.

149. Prior to the CS date and after testing was complete, it has been alleged that CW 3 stated that Qualcomm customarily held one or more customer ship readiness review ("CSRR") meetings, during which the Company made a "go" or "no go" decision with respect to approving large-scale commercial production of the SoC. CSRR meetings, which it has been alleged that CW 3 noted typically took place three to six months before the customer launched the device utilizing the subject chipset, were attended by a broad cross-section of the teams necessary to develop the subject chipset. It has been alleged that according to CW 3, the CSRR meetings included a discussion of whether the relevant chipset was meeting key benchmarks, including specifically CPHT and MTBF.

### 4. The Development of the Snapdragon 810 Faces Numerous Obstacles

150. The development of the Snapdragon 810 began in mid-2013. During the initial planning stages for the 810, Defendants caused Qualcomm to identify the mobile devices in which the processor was to be incorporated and then designed the processor to match the technological specifications and capabilities of those devices. In this instance, Samsung's much-anticipated Galaxy S6 was one of the key "wins" Qualcomm coveted for the 810. Initially, Qualcomm planned to launch the 810 commercially in January 2015.

151. It has been alleged that according to CW 2, in 2013, Samsung surprised Qualcomm, demanding that Qualcomm have the 810 ready for commercial launch November 2014, two months earlier than previously planned. It has been alleged that according to CW 2, Samsung threatened to walk away from the deal and use its own in-house SoC in place of the 810 if Qualcomm could not deliver on the accelerated launch date. As it has been alleged that CW 1 explained, "Samsung pushed them, and Qualcomm did what they needed to do to win their business."

152. In addition to the expedited delivery schedule, Qualcomm was forced to change the 810 from a 32-bit to a more powerful 64-bit chip in an attempt to win Samsung's business. As it has been alleged that CW 4 confirmed, Qualcomm originally designed the 810 to be fabricated in a 20 nm node utilizing a 32-bit processor. In mid-2013, all of the premium-tier smartphones ran on 32-bit mobile processors.

153. Defendants thus risked Qualcomm losing out on the Galaxy S6 business and future Samsung flagship products if they refused these demands, creating pressure to significantly alter the Company's typical design process and production timeline.

154. Qualcomm and Samsung have had an extensive and complicated relationship. Samsung historically has purchased chipsets from Qualcomm for some of the most popular smartphones in the world. Indeed, as the Company's second-largest customer, Samsung accounted for an estimated 12% of Qualcomm's sales FY14. At the same time, however, Samsung also is a competitor, developing, manufacturing, and marketing rival SoCs to the same set of OEMs to which Qualcomm sells Snapdragon processors. Given this relationship, which was worth billions of dollars to Qualcomm, Defendants acceded to Samsung's demand to accelerate the commercial

launch date of the 810. As it has been alleged that CW 1 explained, "Samsung pushed them, and Qualcomm did what they needed to do to win their business."

155. Qualcomm originally designed the 810 to be fabricated in a 20 nm node utilizing a 32-bit processor. 32-bit refers to the speed at which a chipset can process data, while 20 nm refers to the size of each of the billions of transistors that are included in the chipset. This size of the transistor affects the total heat generated by a processor in that 20 nm transistors require more energy (and therefore generate more heat) to switch from the "on" and "off" positions, than smaller nodes such as 14 nm.

156. In September 2013, however, Apple unveiled the iPhone 5S with a first-ever 64-bit mobile processor. When operating at the same speeds, a 64-bit chipset processes data at double the rate of a 32-bit chipset, making the 64-bit chipset a more powerful processor. This, combined with Samsung's demand for a compressed design and production timeline, created even more pressure for Qualcomm.

157. Indeed, Defendants caused Qualcomm to eventually agree with other industry leaders that "[t]he mobile hardware and software ecosystem is already moving in the direction of 64-bit . . . ," and less than two weeks after the Apple rumor first surfaced, Samsung announced that it would be adopting 64-bit architecture in its upcoming Galaxy S6. As a result, in order for the 810 to be state of the art and, more importantly, used by Samsung in the Galaxy S6, Defendants decided that Qualcomm needed to design and manufacture the 810 as a 64-bit chipset.

158. The unexpected shift to 64-bit architecture was a significant change and created great pressure. One of the key differentiators and reasons for the outstanding performance of the Snapdragon series was Qualcomm's customized CPU core design. Although Qualcomm typically used a "reference design" from ARM for its cores, this design was historically customized through

design and software modifications made by Qualcomm, which were intended to optimize the overall seamless functionality of the various functional blocks on the SoC unit. However, Defendants had not yet caused the Company to design a customized 64-bit CPU core for its Snapdragon processors, wrongly predicting that the market was not poised to move to 64-bit chips so quickly. As it has been alleged that one Qualcomm employee put it: "The 64-bit Apple chip hit us in the gut . . . . We were slack-jawed, and stunned, and unprepared."

159. Despite Qualcomm's lack of viable customized technology, Defendants (as well as others, including Renduchintala) decided to make the Snapdragon 810 a 64-bit chipset by no later than December 2013, which allowed at least three months for Qualcomm to "tape-out" the processor, or fabricate the first silicon. Defendants' decision was influenced by Renduchintala's close relationship with Samsung, which he developed during his prior role as an Engineering Lead. As a result, Renduchintala ensured (and Defendants allowed) that Samsung received somewhat favorable treatment compared with other OEMs – specifically with respect to pricing and timing of commercial launch. Thus, as it has been alleged that certain of the CWs confirmed, it was Renduchintala who made the final decision to make the 810 a 64-bit chip. By late January 2014, Renduchintala's decision to include a 64-bit CPU in the 810 had been reported in industry media.

160. In order to quickly transform the 810 from a 32-bit SoC to a 64-bit SoC and still meet Samsung's accelerated launch date, Defendants caused Qualcomm to deviate from its historical practice of relying on customized CPU cores for its Snapdragon processors and utilized instead an off-the-shelf, ARM design CPU core for the 810. Prior to the 810, Qualcomm almost always customized the CPU's core to ensure a smooth and efficient functioning SoC. Defendants' sudden decision to completely deviate from the typical design process, and use an off-the-shelf

core in the 810, would prove to be a key contributor to the overheating problems that eventually plagued the Snapdragon 810.

161. The design of components for the 810 also impacted the overheating problem. For instance, the Snapdragon 810's CPU was designed to have eight "cores" or distinct processing units that worked in concert to regulate the phone's operations. In the 810, the cores are paired in a "big.LITTLE" configuration, wherein four more-powerful cores (manufactured by ARM, and called Cortex- A57 ("A57")), operating at a speed of approximately 2.0GHz, are paired with four less-powerful cores (also manufactured by ARM, and called Cortex-A53 ("A53")) operating at a slower 1.6GHz. Under typical circumstances, this "big.LITTLE" structure helps the CPU to manage its heat generation by (i) passing along simple, less taxing functions to the smaller cores, which operate at slower speeds, utilizing less energy; and (ii) directing the more complicated and taxing functions to the more powerful cores, which operate at higher speeds, while still allowing each of the cores to operate simultaneously.

162. However, the Cortex-A57 was prone to overheating, especially when manufactured with 20nm transistors. In fact, some in the industry were skipping the A57 altogether because it did not operate well in chipsets fabricated in a 20 nm node. By choosing to use an "off the shelf" A57 without customization in a 20 nm node, Defendants knew (or should have known) that overheating problems were nearly certain (and arguably inevitable) given the 810's design.

163. Indeed, it has been alleged that according to Thompson, although the 810 could theoretically operate at extremely high speeds, when put under any kind of significant demand at those speeds (*i.e.*, lots of data at high speeds), which is typical for the present day smartphone user, the primary CPUs (the four A57s) would overheat and force themselves to either slow or shutdown, placing the processing demand on the secondary four A53 CPUs, reducing the load on the four

A57s so that they could cool down. Despite this known correlation between the clock speed and the overheating issues, the Company (under Defendants' direction and on their watch) could not significantly curtail the chip's top speed to the levels needed to resolve the unit's excessive heat (because the 810's performance would degrade). It has been alleged that CW 3 confirmed that when the 810 was running at 2GHz, it was overheating and shutting down.

### 5. Testing of the Snapdragon 810 in March 2014 Reveals Serious and Undisclosed Problems

164. It has been alleged that Qualcomm received the first silicon for the Snapdragon 810 in February or March 2014. It has been alleged that according to CW 3, at this time, the Company began testing the chip. It has been alleged that the timing of Qualcomm's receipt of the first silicon for the 810 is corroborated by Thompson's chip development timeline.

165. It has been alleged that CW 4 identified the key milestones in Qualcomm's development of its SoCs: (i) First Silicon (*e.g.*, the first samples of the SoC), which includes three "elimination sample" test phases, known internally as ES 1, ES 2, and ES 3; (ii) Feature Complete ("FC"), which refers to the point in time when the SoC has all of its software components installed and end-to-end testing of the SoC begins; (iii) Commercial Sampling, which refers to the date samples of the SoC are first sent to OEMs; and (iv) Customer Ship date ("CS date"), which refers to the date the finished SoCs are delivered to OEMs. It has been alleged that CW 3 confirmed that these were some of the key milestones for Qualcomm's SoC development.

166. It has been alleged that CW 3 reported that Qualcomm utilized two forms of testing on the first silicon: (i) software component testing, which typically begins after the first silicon is received and looks at the SoC's individual software components, including the modem, GPU, and multimedia ("Software Component Testing"); and (ii) end-to-end testing the entire product, which

typically is conducted by the Product Test Group on the entire chipset after Software Component Testing is complete and prior to commercial release ("Product Group Testing").

167. It has been alleged that according to CW 4, the First Silicon phase of production for the 810 proceeded as follows:

- Qualcomm received the First Silicon for the 810 by Christmas 2013 and ES testing began in January 2014. During ES 1, which took four to six weeks, Qualcomm determined whether the 810 was "booting up" correctly and assessed the 810's CPU memory and functional stability. ES 1 testing of the 810 concluded at the end of February 2014.
- During ES 2, which also took four to six weeks, the Company performed a deeper dive into the tests performed in ES 1. Specifically, the Company looked at the performance of specific functional blocks on the 810, including the GPU. Qualcomm completed ES2 testing of the 810 in March 2014.
- The Company began ES 3 testing after ES 2 ended in March 2014 and concluded it at some point between the third week of April and the first week of May 2014. During ES 3, Qualcomm enabled more features of the 810, and tested its functionality. In fact, it was during ES 3 that the Company began extensive thermal testing of the 810.

168. It has been alleged that CW 3 and CW 4 identified two key performance metrics that Qualcomm analyzed when testing the 810: (i) Crashes Per Thousand Hours (of testing) ("CPTH"), and (ii) Mean Time Between Failures ("MTBF"). These metrics tested the stability of the chipset. It has been alleged that CW 3 confirmed that a stable chipset has a higher MTBF and lower CPTH (i.e., the chipset runs for longer between failures, with fewer crashes over the testing period). It has been alleged that CW 4 further explained that, as a result of the severity of the 810's thermal issues discussed herein, in or around May or June 2014, QCT specifically identified and isolated the number of crashes caused by the 810 overheating as a separate "line item" in the reports presented to QCT management.

169. It has been alleged that CW 3 confirmed that Qualcomm brought in his group to test the 810 chipset in March 2014, after the Company received the First Silicon. It has been alleged that according to CW 3, the Product Test Group can be brought in early to test for big picture

issues because the Product Test Group had a better reputation for identifying problems with a mobile processor than the Software Component Test Group.

170. It has been alleged that beginning in March 2014, CW 3 was responsible for drafting a weekly email containing a snapshot of all of the 810 testing data for that week ("snapshot"), including the number of crashes and issues identified with the most recent software builds. A software build, or configuration, is a test version of the software to be installed on the SoC. It has been alleged that CW 3 sent these weekly emails to a wide distribution list within the Company, including to his supervisor's boss, VP Rashmi Chari. It has been alleged that he also reported his understanding that Pal had access to the data in these weekly emails and was providing the data to Renduchintala. It has been alleged that CW 3 further confirmed that the data CW 3 compiled was utilized for presentations to "executive teams."

171. The Product Test Group began testing the 810 in March 2014. It has been alleged that CW 3 confirmed that the Product Test Group was brought in to test the 810 prior to the completion of Software Component Testing because the Product Test Group had a reputation for resolving problems that the individual software component test groups often could not.

172. It has been alleged that according to CW 3, the Product Test Group's March 2014 tests identified a number of performance issues, including thermal issues, and confirmed that every aspect of the 810 was failing. It has been alleged that although CW 3 noted that it was not necessarily unusual to see such issues at first silicon, CW 3 confirmed that Qualcomm was unable to resolve the issues identified in March 2014 by the Product Test Group (including overheating in the CPU) for more than nine months, according to the documents it has been alleged that CW 3 reviewed during the December 2014 CSRR processes. It has been alleged that CW 3 also reported that in his 22 years at Qualcomm, "I have not seen any other chip set get this much attention."

173. Notwithstanding the problems identified in Qualcomm's March 2014 testing of the Snapdragon 810, on April 7, 2014, Defendants caused the Company to publicly introduce the Snapdragon 810 to the public, heralding it as the Company's "highest performing platform to date, completing [its] lineup of 64-bit enabled, LTE-equipped chipsets for premium computing mobile devices," and noted that the 810 "enable[s] an exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets." Defendants also described the 810 as "tightly integrated and optimized for exceptionally low power consumption that does not sacrifice performance" despite the fact that Defendants rashly accelerated the development timeline, deviated from the Company's standard methodology, and knew by no later than March 2014 that every aspect of the 810 was failing and that the chip was not currently performing as represented. Indeed, as set forth in greater detail herein, the problems with the 810, including the thermal issues, continued.

174. The investment and financial media latched onto and repeated Defendants' statements. For example, on April 7, 2014, *Bloomberg* published an article titled "Qualcomm to Debut New Mobile Chips Setting Higher Bar for Rivals," which highlighted the 810's performance. *Bloomberg* also highlighted that the 810 was the biggest update to the Company's high-tier Snapdragon processors, meant to maintain Qualcomm's position as the market's primary supplier of high-end processors for high-tier mobile devices, "where its chips dominate."

175. Likewise, on April 9, 2014, *Motley Fool* published an article which reiterated the importance of Qualcomm's continued dominance of the mid- to high-tier smartphone market. It explained that "Qualcomm's launch of new high-end 64-bit chips is likely to secure its future dominance," and noted that the 810 was part of the Company's ongoing effort to remain well-

ahead of competitors, and that this latest development would allow Qualcomm to "tighten its existing stranglehold" on the global market.

### 6. Defendants' Knowledge of the Serious Problems Concerning the Snapdragon 810

176. The 810's thermal issues continued to surface during the Feature Complete stage in 2014, and Defendants were regularly apprised thereof through written reports and oral presentations. With respect to written evidence, Defendants caused Qualcomm to generate and/or distribute, *inter alia*, (i) Daily Audit Logs; (ii) Product Development Test Reports; (iii) Sub-System Reports; (iv) Root Cause Analysis Reports; and (v) Thermal Engineering Test Reports, all of which demonstrated that the 810 was exhibiting abnormal thermal problems.

177. It has been alleged that CW 4 confirmed that FC, which focused on end-to-end testing of the 810, began in late April or early May 2014. As part of this effort, it has been alleged that according to CW 4, Qualcomm performed extensive software testing on the 810 to determine whether the chip was working properly, including with respect to its power, performance, and stability. For example, it has been alleged that according to CW 4, Qualcomm conducted testing of the 810 on Mobile Test Protocol ("MTP") devices. It has been alleged that CW 3 explained that MTPs are two to three times the size of a typical mobile device. Due to their size, MTPs are better at dissipating heat, and thus should perform better, than a typical smartphone during testing. It has been alleged that CW 4 reported that, during the FC testing phase, the 810 was tested overnight in thousands of MTPs maintained in "device farms" located in San Diego, California; Boulder, Colorado; China; and India.

178. The overnight test results from the MTP device farms were maintained on a computerized Daily Audit Log. It has been alleged that according to CW 4, the Daily Audit Logs provided insight into what was causing the 810 to fail in the device farms, and were reviewed and

used by the engineers in an effort to determine which changes could be made to the 810 to optimize its performance going forward. It has been alleged that CW 4 specifically recalled that the MTPs in Qualcomm's device farms experienced abnormally high CPTH—they were crashing up to 1,000 times per night. It has been alleged that according to CW 4, the 810 never met certain MTBF thresholds and would not last more than an hour without failing. It has been alleged that CW 4 had never previously seen that type and amount of crashes with any previous Qualcomm chipset. It has been alleged that CW 4 confirmed that the Daily Audit Logs identified overheating as the biggest root cause of the crashes.

179. The data from the Daily Audit Logs, including the identification of any problems experienced by the MTPs and the general root cause of each MTP failure, reset, or restart (*e.g.*, "thermal"), was consolidated into a report called the Product Development Test Report ("PDT Report"). It has been alleged that CW 4 recalled that the PDT Reports contained several key metrics related to thermal testing, including CPTH and MTBF. It has been alleged that according to CW 4, the PDT Reports were generated daily and after a milestone was reached for a specific software build. PDT Reports were often sent directly to Renduchintala and Amon by Senior Vice Presidents. In addition, PDT Reports were consolidated and presented to Renduchintala and, at times, Amon during a weekly executive meeting, which (as it has been alleged) CW 2 also described.

180. It has been alleged that CW 4 further recalls that the number of crashes due to overheating was so unprecedented that Qualcomm created a special reporting metric to identify and isolate the number of crashes caused by the 810 overheating. This new metric was included as a separate "line item" in the reports provided to Renduchintala and Amon, among others, in

advance of the Bi-Weekly Executive Meetings, defined below, and in the CSRR materials circulated to at least Renduchintala, Amon and other QCT executives, prior to these meetings.

181. It has been alleged that CW 2 began working on the Snapdragon 810 project, or as it was internally known, Code 8094, in May 2014 as a Senior Staff Engineer on a team responsible for one of the 810's software sub-systems. Each of these software sub-systems generated a daily report. Along with Qualcomm management, it has been alleged that CW 2 also received several so-called root cause analysis reports that discussed the 810's thermal issues. Likewise, it has been alleged that CW 2 received over 1,000 emails daily, many of which discussed thermal issues with the 810. It has been alleged that CW 2 recalls that reports addressing the Snapdragon 810's thermal issues were generated on a daily basis.

182. It has been alleged that CW 2 and CW 4 independently confirmed that they received so-called Root Cause Analysis Reports during this period; and it has been alleged that CW 3 and CW 4 recalled receiving so-called Thermal Engineering Test Reports. Both of the reports documented the 810's thermal issues, and were sent to Qualcomm management. It has been alleged that CW 3 specifically recalls that the Thermal Engineering Test Reports were sent to Renduchintala, among other senior-level executives.

183. Additionally, it has been alleged that each engineer responsible for a software sub-system for the Snapdragon 810, including CW 2, participated in daily "Target Scrum" meetings between at least during May 2014 until November 2015. It has been alleged that these meetings, which were attended by Pal (a Snapdragon 810 Project Engineer), focused on issues the engineers were experiencing with the Snapdragon 810 including, specifically, thermal issues. In addition to the daily Target Scrum meetings, it has been alleged that CW 2 attended weekly status meetings during which reports regarding the 810 were presented the status of the project was discussed,

including the plans for the 810 for the following week. It has been alleged that CW 4 explained that there also was a 10:00 a.m. meeting, during which engineers presented and discussed the testing results, including specifically the thousands of crashes observed in device farm testing the night before.

184. It has been alleged that CW 4 further reported that team leads, including CW 4, met at 5:00 pm each day to further discuss the test results presented at the 10:00 a.m. meeting and suggest changes to the software configuration (or software builds) to resolve the issues or to conduct different tests overnight in the device farms ("Daily Team Lead Meetings"). It has been alleged that Pal (a Snapdragon 810 Project Engineer) and Rajeev Prabhakaran (Senior Director of Technology) attended the 5:00 p.m. Daily Team Lead Meetings and, thus, were aware of the overheating issues and MTP crashes.

185. It has been alleged that during the same time period, CW 2 also was aware that Pal regularly gave Renduchintala Snapdragon 810 project updates during weekly Principals Meetings. It has been alleged that CW 2 participated in some of these meetings, including telephonically after being told to dial-in by Pal. It has been alleged that one of CW 2's professional colleagues, a Qualcomm Technical Account Manager, would advise CW 2 about issues discussed at those meetings CW 2 did not personally attend. It has been alleged that according to CW 2, slides were presented at these meetings to show Renduchintala, among others, what issues the Snapdragon 810 was facing.

186. It has been alleged that CW 4 also recalled that, in May 2014, QCT executives, including Renduchintala, Tony Schwartz, Pal, and on certain occasions, Amon, met every Tuesday and Thursday at 2:00 pm to discuss the 810 ("Bi-Weekly Executive Meetings"). During the Bi-Weekly Executive Meetings, it has been alleged that Schwartz made PowerPoint presentations

distilling the key points from the PDT Reports. It has been alleged that CW 4 was personally present during certain of these executive meetings in which Renduchintala was present and the thermal issues plaguing the 810 were discussed.

187. It has been alleged that prior to each Bi-Weekly Executive Meeting, the participants, including Renduchintala and Amon, received an email containing an executive summary of the issues to be discussed at the meeting, as well as the raw testing data for the 810. It has been alleged that CW 4 confirmed that the 810's thermal problems that were witnessed during testing were highlighted in these emails, including the separate "line item" showing the number of crashes, failures and resets specifically attributable to the 810's overheating problems. The emails also attached the PowerPoint presentation given by Schwartz during the meeting.

188. It has been alleged that CW 2 stated that by no later than June 2014 he was personally aware that the Snapdragon 810 was experiencing more severe than normal thermal issues. It has been alleged that CW 2 also stated that based on his understanding, Renduchintala was fully aware of the thermal issues with the 810 by no later than June 2014 because: (i) Pal provided him with information regarding the 810 project, including reports that demonstrated that there were thermal issues with the 810; and (ii) Renduchintala was responsible for allocating additional resources to try to address these issues. Specifically, it has been alleged that CW 2 confirmed that Renduchintala personally called for more engineers and financial resources during the summer of 2014 to address the 810's thermal issues.

189. It has been alleged that CW 4 stated that he became personally aware of the 810's overheating problems by no later than March or April 2014. It has been alleged that CW 4 further confirmed that Renduchintala and Amon would have been aware of the 810's thermal issues within two to four weeks after ES 3 testing began– *i.e.*, no later than April 2014 – and throughout FC

testing by virtue of their attendance at and receipt of materials for the twice-weekly Executives Meetings.

190. It has been alleged that by July 2014, CW 3 reported that "everyone was in a panic" regarding the large number of issues with the 810. As a result, it has been alleged that CW 3 confirmed that the 810 received far greater resources—*e.g.*, more people, more hardware, more lab space—than the Company usually provided and involved a lot of people running around. It has been alleged that CW 3 further stated that with respect to the abnormal thermal problems with the 810, they were "throwing everything at it" but that the problems would not go away.

191. Significantly, it has been alleged that CW 3 confirmed that the amount and frequency of software builds, *e.g.*, versions of the software used for the SoC, being tested was more than 10 times greater for the 810 than any prior chipset. Specifically, it has been alleged that CW 3 and CW 4 confirmed that Qualcomm typically tested three software builds per week (or approximately one build every two days), but with the 810, the Company tested five to six software builds a day, including on weekends.

192. It has been alleged that CW 3 also stated that Pal, who had access to his weekly snapshot email of 810 testing updates, was providing this information to Renduchintala by no later than July 2014.

193. It has been alleged that CW 4 confirmed that FC for the 810 concluded at the end of June 2014. After FC, in the summer of 2014, Qualcomm engaged in so-called Commercial Sampling, *i.e.*, releasing samples of the 810 to OEMs so that they could test the 810 in their prototype devices. It has been alleged that CW 4 confirmed that Qualcomm granted OEMs, including Samsung, LG, and HTC, access to the 810 during Commercial Sampling. It has been alleged that CW 3 recalled that Qualcomm had the option to make modifications to the 810 based

on the OEMs' test results. Commercial Sampling, including both the OEMs' testing and the Company's subsequent modifications, took approximately three months.

194. It has been alleged that CW 2 confirmed that rumors of the 810's overheating began circulating among the OEMs, starting in August 2014. CW 2 reviewed OEM customer testing reports and recalled that they documented overheating and instability issues. It has been alleged that CW 2 further stated that OEMs determined that the observed thermal issues were not caused by their respective MTPs. It has been alleged that CW 6 likewise recalled that Samsung specifically raised with Qualcomm the 810's overheating issues that Samsung experienced during testing of the chip.

195. It has been alleged that CW 2, CW 3, and CW 4 all confirmed that Qualcomm attempted to resolve the thermal issues with the 810 during the Commercial Sampling phase with no success.

196. In August 2014, Defendants caused Qualcomm to send Samsung and the other OEMs who intended to use the 810 in their flagship devices, samples of the SoC to test in their prototypes. It has been alleged that CW 2 stated that there were rumors circulating among the OEMs, including LG, regarding the thermal issues with the Snapdragon 810 in August 2014. It has been alleged that CW 2 also reviewed OEM customer testing reports, which documented overheating issues with the 810.

197. It has been alleged that according to CW 2, the Company conducted a number of additional tests to determine if the thermal issues were caused by the 810 or the OEMs' prototype mobile devices. CW 2 confirmed that in almost every instance, Qualcomm confirmed that the thermal issues were not caused by the OEMs' mobile device designs. The only common thread among these observed overheating problems was the Snapdragon 810.

198. It has been alleged that CW 2 further stated that the OEMs themselves also discovered that the thermal issues were not caused by their mobile device prototypes after analyzing the 810 in a "Mobile Test Protocol" device or MTP. It has been alleged that according to CW 3, MTPs are test devices developed by Qualcomm (and per CW 2 the OEMs) that are two to three times the size of a typical mobile device and are used to tests chipsets in more real-world settings. Due to their sheer size, MTPs are better at dissipating heat than a typical real-world mobile device, so they did not accurately reflect how the chip would actually perform on a smaller, real-world device. Despite using larger devices, however, Qualcomm's and the OEMs' MTPs still exhibited overheating issues when testing the Snapdragon 810. This was a stark red flag indicating to Defendants that the Snapdragon 810's thermal problems would be even worse on a normal-sized phone.

199. It has been alleged that CW 1 confirmed that there were a lot of internal discussions at Qualcomm in September/October 2014 about thermal issues with the Snapdragon 810, including during lunch meetings with other engineers. It has been alleged that CW 1 further stated that Company insiders were discussing these issues in 3Q14.

200. It has been alleged that according to CW 2, between September 2014 and November 2014, Renduchintala specifically raised questions regarding the 810's abnormal thermal issues (questions demonstrating Renduchintala's substantive knowledge of the thermal issues and their extensive history), prompting Pal to schedule ad hoc conference calls (sometimes on the weekends) in which Pal, CW 2, and sometimes Renduchintala himself participated. It has been alleged that CW 2 specifically recalled one such meeting in September 2014 wherein Pal referred to the 810 as a "piece of crap." It has been alleged that CW 2 recalled another call in November 2014 wherein Renduchintala asked, "What is the root cause of the thermal issues?" For

ad hoc conference calls in which Renduchintala did not directly participate, it has been alleged that CW 2 understood that the information provided by CW 2 and the other participants to Pal was provided by Pal to Renduchintala.

201. It has been alleged that CW 3 characterized Renduchintala as a "micromanager" that needed to know everything that was occurring within the division. It has been alleged that based on information provided to CW 3 by the Senior Director of the Product Test Group during weekly Product Test Group meetings, CW 3 reported that, during the November/December 2014 timeframe, Renduchintala received daily written reports. It has been alleged that according to CW 3, by December 2014, the "bulk" of these reports discussed the 810's abnormal thermal issues—which still were not resolved. Indeed, it has been alleged that according to CW 3, the 810's thermal issues prompted the daily reports and once the 810's thermal issues arose, Renduchintala demanded receipt of the aforementioned daily reports. It has been alleged that CW 3 further recalls that Renduchintala, at least in December 2014, attended daily Snapdragon scrum meetings where the 810's thermal issues were discussed. It has been alleged that CW 3 also recalled that in December 2014, he was asked by his superior to retrieve the PDT Reports on the 810 from March to December 2014 for Pal's review. Those reports documented the still unresolved thermal issues, and it has been alleged that according to CW 3, Pal provided this information to Renduchintala by no later than July 2014.

202. It has been alleged that CW 8 recalled that five to six engineers from the APT Unit (CW 8's unit), who worked on the 810, told CW 8 in late 2014 that the 810 was experiencing overheating and power consumption issues. It has been alleged that CW 8 further recalled that, as a result of these issues, several of CW 8's colleagues had to work through Christmas and New Years in 2014. It has been alleged that CW 8 added that the thermal and power consumption issues

were "common knowledge" at the Company—"everyone knew about it"—and Qualcomm spent months trying to resolve these problems to no avail.

203. Moreover, it has been alleged that based on information provided to CW 3 by the Senior Director of the Product Test Group during weekly Product Test Group meetings, CW 3 reported that, during the November/December 2014 timeframe, Renduchintala received daily written reports, the "bulk" of which discussed the 810's abnormal thermal issues—which still were not resolved—and the efforts being taken to correct them, and Renduchintala at least in December 2014, attended daily Snapdragon scrum meetings where the 810's thermal issues were discussed. It has been alleged that according to CW 3, the 810's thermal issues instigated the daily reports. It has been alleged that CW 3 also reported that in December 2014, he was asked by his superior to retrieve Product Test Group reports on the 810 going back to March 2014 for Pal's review. It has been alleged that those reports documented the performance problems with the 810, including thermal issues.

204. It has been alleged that CW 2 noted that in August 2014, there were rumors circulating within Qualcomm that Samsung was aware of the Snapdragon 810's thermal issues and would use its own chip instead of Snapdragon 810 chips from Qualcomm. It has been alleged that CW 1 reported that colleagues and co-workers were stating that Samsung was dropping the Snapdragon 810 because of these overheating issues in Q314. It has been alleged that during this period, CW 2 met with his counterpart at Samsung, with whom he had a cordial relationship, to discuss the rollout of the Snapdragon 810. In October 2014, during one of those weekly meetings, it has been alleged that CW 2's counterpart at Samsung confirmed the rumor that Samsung planned to abandon the 810 because of the thermal issues.

205. It has been alleged that within one to two weeks of that meeting, CW 2 attended a meeting with Renduchintala and other engineers. It has been alleged that during the meeting, CW 2 asked Renduchintala if it was true that Samsung was abandoning the 810. It has been alleged that Renduchintala replied that it was true and that all teams should stop working on the Samsung Snapdragon 810 commercial launch. It has been alleged that at the same time, CW 1 also noted discussions among colleagues—other Qualcomm engineers—during lunch meetings indicating that Samsung was dropping the Snapdragon 810 from its plans because of the overheating issues.

206. It has been alleged that CW 6 confirmed that Samsung specifically raised with Qualcomm the overheating issues with the 810 that the OEM experienced during its testing of the chip and deliberation over whether to use the 810 in the Galaxy S6. It has been alleged that CW 6 reported that Samsung raised a lot of questions about the 810's heat emission. It has been alleged that according to CW 6, pursuant to Qualcomm's general practice, Qualcomm's marketing and sales departments handled the discussions and negotiations with Samsung regarding whether it would use the 810 in the Galaxy

207. It has been alleged that CW 6 further stated that, pursuant to Company practice, members of CW 6's team provided technical support to Qualcomm's marketing and sales teams to aid in those discussions and negotiations. It has been alleged that these same team members informed CW 6 that Samsung raised the issue of the 810's overheating during its deliberation over whether to use the chip in the Galaxy S6. It has been alleged that CW 6 further reported that CW 6's team was charged, pursuant to its general practice, to continue working with Samsung to resolve the thermal issues up to the time when Samsung informed Qualcomm that it would not be using the 810. It has been alleged that CW 6 recalled that, as with any large customer, it was

Qualcomm's normal practice to try to convince Samsung to reconsider. It has been alleged that CW 6 called the loss of Samsung "hard to swallow," as Samsung was a major customer.

208. It has been alleged that CW 8 also learned in early 2015, from the same engineers who informed CW 8 of the 810's thermal and power consumption issues, that Samsung had cited overheating as a reason it abandoned the 810. It has been alleged that according to CW 8, Samsung's decision not to use the 810 caused a "big blow up" at the Company, which ultimately forced Qualcomm to lay off employees.

209. As it has been alleged, despite knowing that Samsung, the OEM with the largest global smartphone market share, had dropped the Snapdragon 810 for its Galaxy S6, Samsung's highly anticipated flagship device, during the Company's November 19, 2014 Analyst Day, Amon told investors:

> Snapdragon processors continue to set the design point for the premium tier has been a number of flagship devices across many of the OEMs. I won't list them all, but I think it's very clear that we'll be able to maintain our leadership position in the premium tier.

**7. Defendants Falsely Deny Rumors of Overheating in the Snapdragon <u>810</u>**

210. On December 4, 2014, *Business Korea* published an article titled, "Unexpected Hurdle: Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG," which reported that it was "unclear whether . . . the supply of the Snapdragon 810 will exist in the first half of next year due to technical problems such as overheating and a decline in speed." Specifically, the article quoted an "industry source" who stated two days earlier: "Qualcomm is faced with hard-to-solve problems. The Snapdragon 810 overheats when it reaches a specific voltage" and that for that reason, among others, "it is unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6 [and] the G4. . . ." According to the article, while "Samsung is likely to solve the problem by featuring its own Exynos chips in the Galaxy S6,[ ]LG

seems to be in trouble" because "it won't be easy for LG to find an alternative chip for the G4;" given it's "focus on premium smartphones" LG "badly need[s] the Snapdragon 810."

211. In response, Defendants denied (or caused the denial of) the rumors to several media outlets, including TechRadar, Tom's Hardware, and Gadgets 360 and confirmed that "everything with the Snapdragon 810 remains on track" for commercial launch in 1Q15. These denials continued into early January 2015 when Aberle confirmed that Qualcomm was "on track with the 810" during his January 5, 2015 presentation at the Company's press conference at the Consumer Electronics Show ("CES") in Las Vegas. Two days later, Tom's Hardware updated an earlier article to note, "[w]e had an opportunity to speak with Tim Leland [Qualcomm's VP of Product Management] . . . about these rumors regarding Snapdragon 810's performance. According to him, . . . there aren't any significant technical issues that will cause a delay."

### 8. Despite Known Design Flaws and Overheating Problems, Defendants Launch the Snapdragon 810 and Falsely Represent these Problems

212. After all of the Snapdragon 810's software components had been installed (known as "Feature Complete" or "FC") and the product testing was complete, Defendants caused the Company to conduct one or more CSRR meetings ("CSRR"), which were attended by representatives of the various groups, including the Product Test Group. During this meeting, which typically took place three to six months prior to commercial launch (comporting with typical industry timing protocols), the various representatives would discuss whether the unit was ready to ship to OEMs, making either a "go" or "no go" decision. Crashes Per Thousand Hours and Mean Time Between Failures were among the key testing metrics discussed at the CSRR to assess readiness to ship. Several CSRRs for the Snapdragon 810 took place in November and December 2014, just prior to the approval for commercial production, and showed abnormally high Crashes Per Thousand Hours and abnormally low Mean Time Between failures. Significantly, Defendants

made the final decision to go ahead with commercial production by December 2014, knowing that the chip had severe overheating problems that rendered impotent the performance they promised from its purportedly cutting-edge design.

213. During these day-long CSRR meetings, it has been alleged that CW 3 recalled that various representatives would discuss testing benchmarks and make either a "go" or "no go" decision on the chip's release. Likewise, it has been alleged that CW 4 noted that CPTH and MTBF, as well as the new thermal metric "line item" that was created specifically to identify all device crashes due to the 810 overheating were among the key testing metrics discussed at the CSRR meeting to assess readiness to ship. These metrics, as it has been alleged that CW 4 recalled, were depicted on a "Dashboard" presentation included in slide decks and distributed to attendees prior to the meetings, including Renduchintala, Schwartz and Amon. It has been alleged that CW 4 further stated that meeting participants, including Renduchintala and Amon, also received executive summaries and raw data prior to each meeting via email. Minutes and "action items" were also generated following each CSRR meeting and distributed to all invitees, so that those who were not able to attend would be informed.

214. It has been alleged that Several CSRR meetings for the 810 took place in November and December 2014, and the materials discussed at those meetings showed abnormally high CPTH and abnormally low MTBF test results, which evidenced continued overheating of the 810. In fact, these were the same metrics present when the MTP devices were crashing 1,000 times per night during FC. Despite these adverse test results demonstrating that the 810 continued to overheat, Defendants made the final decision to go ahead with commercial production of the 810 during these meetings.

215. LG launched the first smartphone incorporating the Snapdragon 810—the G Flex 2—at CES on January 5, 2015. It has been alleged that according to CW 2, Qualcomm pressured LG to launch the G Flex 2 in January 2015. Qualcomm did so, it has been alleged that CW 2 reported, despite knowledge of abnormal thermal issues with the 810. It has been alleged that CW 2, who supported LG for the release, explained that Qualcomm still had not resolved the overheating problems with the 810 in January 2015, even up to a few days prior to the product's commercial launch. As it has been alleged, neither Qualcomm nor LG originally intended to launch the G Flex 2 this early.

216. These thermal issues in the G Flex 2 caused LG's 2Q15 earnings to drop by 60%. In fact, the Android Authority article "Flashbacks and Forecasts: LG in 2016," published on January 22, 2016, noted in its post-hoc analysis that LG's 2Q15 "earnings slump[ed] by 60% YoY, making Q2, 2015 LG's lowest quarterly profit in a year and a half." The article further noted that 2Q15 "was the quarter in which the Snapdragon 810 and G Flex 2's poor [market] reception were felt most acutely[,]" and LG even "slip[ped] out of the global top five smartphone vendors . . . ." Significantly, LG only recognized $172,000 in profit in its mobile device division in 2Q15, and it had a "staggering loss" of $68 million in 3Q15.

217. On January 20, 2015, *Bloomberg* posted an article titled, "Samsung Said to Drop Qualcomm Chip From Next Galaxy S," reporting that Samsung "will use its own microprocessors in the next version of the Galaxy S smartphone" because the Snapdragon 810 "overheated during the Korean company's testing," based on statements from "people with direct knowledge of the matter." Both Qualcomm and Samsung refused to comment on the *Bloomberg* article.

218. Less than ten days later, on January 28, 2015, Defendants caused the Company to release its results for 1Q15 and announced that they expected a "large customer" not to use the

Snapdragon 810 in its "flagship device." Analysts immediately saw through Defendants' half-hearted attempt to disguise the identity of the large OEM. As Defendants caused the Company to confirm in May 2015, the "large customer" was Samsung and the "flagship device," was the Galaxy S6.

219. Defendants were quick to dispel any indication that Samsung had dropped the 810 because the SoC had thermal issues. For example, during a subsequent earnings conference call, defendant Mollenkopf falsely asserted that the 810 "is working the way that we expected [it] to work"; while Aberle added that the issue was "isolated really to one account and one portion of their portfolio." In a follow up statement to the media, Amon was far more unequivocal, telling CNET on January 31, 2015, "Categorically, we don't see any problem with the chip." Despite Defendants' best efforts to contain the damage that resulted from losing the Galaxy S6, the price of the Company's common stock dropped by 10.58% in a single day.

220. Given the significant stock price decline following the loss of Samsung, Defendants began issuing various statements, which falsely asserted that the 810 was not plagued by overheating issues. For example, on February 2, 2015, Defendants caused Qualcomm to issue a press release titled, "Qualcomm Snapdragon 810 Processor Powers Premium Tier Mobile Experiences of 2015," which included not only laudatory (and false) statements by Renduchintala confirming that the 810 "didn't compromise on performance, connectivity and entertainment," but also direct quotations from key OEMs confirming that they intended to use the 810 in upcoming products. Significantly, neither of the OEMs that had the option of utilizing its own SoC for its upcoming devices—Samsung and Huawei—chose to speak out in support of the 810. The false and misleading press release had the intended effect; on February 2, 2015, the price of Qualcomm's common stock rose by 5%.

221. Defendants also posted (or caused to be posted) an article on Qualcomm's website titled, "Snapdragon 810 processor: cooler than ever," which purported to describe a "test" the Company had conducted to debunk the persistent rumors that the 810 had overheating problems. In the article, Qualcomm proclaimed that the 810 was "engineered to use less power and remain cooler." As described in the press release, the "test" looked at whether functional blocks other than the CPU (*e.g.*, the GPU and the video processor) exhibited abnormal thermal results. The Company (under Defendants' direction and on their watch) did not provide the results of its test of the CPU functional block; if it had, Defendants likely would not have been able to falsely proclaim the 810 as "cooler than ever."

222. On March 2, 2015, HTC unveiled the second flagship device to incorporate the Snapdragon 810, the M9, at the Mobile World Congress. Similar to LG's G Flex 2 smartphone, the M9 was widely reported to have overheating problems that caused subsequent performance problems—problems which Defendants had caused the Company to vigorously (and falsely) deny. Further, users of the M9 also demonstrated through the use of benchmarks that the phones were performing objectively poorly because of overheating and throttling.

223. Additionally, there were reports of problems with Xiaomi's flagship, the Mi Note Pro, shortly after those devices were made available to consumers. Like LG and HTC, Xiaomi paid a price for using the 810 in its premium-tier product. On January 16, 2016, *The Wall Street Journal* reported that "[t]he lack of its own high-end chip technology also proved to be a competitive disadvantage for Xiaomi last year" when reports of the 810's overheating problems "dampened sales of Xiaomi's most expensive handset yet, the 2,299 yuan ($349) Mi Note," analysts said.

224. Sony's flagship devices—the Xperia Z3+ and Z4—likewise performed poorly due to the 810, causing Sony to suffer losses in its flagship devices. According to a July 30, 2015 article by *Android Police*, "the mobile division responsible for Xperia-branded phones and tablets saw its worst sales numbers in three years." The article added that sales for Sony's 1Q15 "fell 16%" and Sony only "moved 7.2 million Xperia devices in the quarter, a 23% drop from [that] time last year." In a February 6, 2016 retrospective, *Android Authority* explicitly blamed the Snapdragon 810, calling it "the bane of many flagship phones in 2015 . . . , affecting the LG G Flex 2, Xperia Z3+ and HTC One M9 in the first few months of the year."

225. It has been alleged that CW 5 recalled that CW 5's contact from Sony notified CW 5 that Sony was experiencing both thermal and power consumption issues with the 810 in its Xperia Z4 device. It has been alleged that when CW 5 reported these thermal and power issues in December 2014 to Customer Support Engineers at the Company's San Diego Headquarters, including specifically to a person with the first name "Gagan," Gagan was already aware of them.

226. It has been alleged that CW 5, and a team of five to six other individuals, personally worked with Sony to try to solve the power consumption issues Sony was experiencing with the Xperia Z4. It has been alleged that CW 5 recalled that Customer Support Engineers in San Diego were simultaneously working to resolve these issues. It has been alleged that CW 5 stated during January and February 2015, CW 5 communicated with Sony almost every day. It has been alleged that CW 5 stated that the communications with Sony would occur face-to-face, by email, and by telephone. It has been alleged that CW 5 further stated that CW 5 maintained an excel spreadsheet tracking CW 5's communications with Sony that identified: (i) the correspondence itself; (ii) the issues discussed with Sony; and (iii) any proposed solutions. It has been alleged that the discussions between CW 5 and Sony continued through at least April 2015.

227. It has been alleged that according to CW 5, Qualcomm suggested potential solutions for the 810, which included software configurations and customizations. It has been alleged that CW 5 recalled that Sony tried to add additional hardware to the device to solve the overheating problem in the Xperia Z4. Given the amount of attention devoted to solving Sony's issues with the 810, CW 5 characterized them as "serious."

228. It has been alleged that CW 7 similarly confirmed that Sony witnessed and was "very concerned" with the 810's overheating problem in the Xperia Z3+/Z4. It has been alleged that CW 7 also recalled that Verizon decided not to partner with Sony on its Xperia Z3+ or Xperia Z4 devices on account of the overheating issues being experienced by the 810 in the devices. It has been alleged that according to CW 7, Verizon's decision adversely affected Sony's Xperia Z3+ and Z4 sales as Sony "couldn't sell" the phones.

229. In addition to CW 5's and CW 7's firsthand accounts (as it has been alleged), public reports confirmed that the 810 overheated in Sony devices. On March 9, 2015, *PhoneArena* released an article titled, "Sony allegedly battling with Snapdragon 810 heat dissipation from the thin Xperia Z4." The article provided that according to an infamous technology industry "leakster," "Sony might be looking for engineering solutions to dissipate the arguably significant amount of heat that Snapdragon 810 generates."

230. On June 9, 2015, *PhoneArena* issued a report on the Xperia 4 and Xperia 3+, which were both released on June 1, 2015. The article, titled "Revised Qualcomm Snapdragon 810 no longer overheats? Video of a Sony Z3+ prototype begs to differ," noted that Qualcomm had supplied Sony with a new version of the 810, v2.1. The authors stated, "[r]eportedly, this version of the Snapdragon 810 SoC does a better job at managing the heat generated by the chip." Despite the reports, however, "a video has surfaced showing that overheating issues are still present on the

Sony Xperia Z3+. A couple of warnings pop up relating to high temperatures." One of the messages provides, "Note. Camera will now turn off temporarily to cool down."

231. A day later, June 10, 2015, ZDNet reported that DoCoMo, the largest carrier in Japan, was placing an overheating warning label on devices with the 810. The devices included the Sony Xperia Z4, Sharp Aquos Zeta SA-03G, and Fujitsu Arrows F-04G. The label gave customers advice to avoid overheating.

232. As one media outlet, Mobileburn, put it, "It really is a disaster for Qualcomm, not to mention the manufacturers of the smartphones that will now be sold with a warning."

233. Ultimately, despite all the rumors and reported problems, Defendants continued to vehemently deny the overheating issues with the Snapdragon 810. However, these denials were belied by the allegations set forth herein, and the following: (1) Qualcomm (under Defendants' direction and on their watch) offered to provide Samsung with a modified 810 in an attempt to keep Samsung's business; (2) Qualcomm (under Defendants' direction and on their watch) issued an updated version of the 810 to various OEMs to address the 810's propensity to overheat; and (3) Qualcomm (under Defendants' direction and on their watch) expedited the creation of the Snapdragon 820 to replace the 810 one full year ahead of schedule.

234. In addition to Defendants' attempts to fix the 810, they also expedited the creation and release of its successor—the Snapdragon 820—to replace the 810. In particular, beginning in or around 2013, Qualcomm decided to move from the traditional one-year marketing and distribution schedule to a two-year schedule with the 810, wherein it would commercially distribute the 810 for two years before launching its next flagship SoC. It has been alleged that according to CW 2, a good chip can successfully remain in the market for three, even four years. It has been alleged that according to CW 4, Qualcomm made this decision in order to cut the

extraordinary cost associated with developing a new chip every year. In addition to the monetary expense, it has been alleged that CW 4 further explained that the one-year cycle taxed Qualcomm employees, who were "getting burned out" by the constant pressure to produce new SoCs on an annual basis.

235. Defendants caused Qualcomm to begin designing the 820 in the summer of 2014, officially unveiled it in March 2015, and made it commercially available in early 2016; an entire year ahead of schedule. It has been alleged that according to CW 4, Renduchintala ordered the expedited design of and development schedule for the 820 and did so specifically because of the 810's thermal problems.

236. It has been alleged that CW 4 also recalled that the 820 did not feature revolutionary technology—it simply reconfigured the cores and transistors of the 810 so that the chip would no longer overheat. Defendants caused Qualcomm to effectively concede that the 820 addressed the 810's thermal issues as McDonough posted the following on Twitter on November 5, 2015: the "820 is turning out amazing and meeting or beating OEM thermal requirements. You'll feel cool having an 820 phone."

237. By deliberately expediting the development and release of the Snapdragon 820 to avoid the 810's overheating problems, Defendants restored the Company's relationship with its second-largest customer, Samsung. Indeed, while Samsung rejected the 810 for the Galaxy S6 because it overheated, it returned to Qualcomm and used the 820 in the Galaxy S7, which Samsung released in March 2016.

238. On April 28, 2015, LG announced that its next flagship device, the G4, would use the Snapdragon 808, a chip that was actually designed to be less powerful than the 810, according to Company specifications. Originally, as it has been alleged that CW 2 confirmed, LG had agreed

to use the Snapdragon 810 in the G Flex 2 and the G4 but after the G Flex 2 had experienced overheating problems due to the 810, LG made the decision to go with the Snapdragon 808 instead. Indeed, it made no sense for LG to utilize an inferior processor for one of its flagship devices. As it had with other rumors regarding the 810's overheating problems, Defendants caused Qualcomm to quickly deny that LG had recently shunned the 810 for the 808 in the G4, stating, "[t]he decisions on which chipset to put on which handset come from over a year ago."

239. At around the same time, media outlets, including *ars technica*, began releasing the results of recent benchmark tests they had run, comparing the 810's performance and heat generation to results other SoCs. These tests revealed that after running for a very short period—*e.g.*, 30 seconds—the auto-shutdown feature for the four largest cores (the A57s) kicked in, severely throttling the performance and speed of the device. As explained herein, this "throttling" was the result of the 810 CPU overheating.

240. In response to the benchmark tests results and LG's decision to utilize the 808 for the G4, McDonough gave an interview to *Forbes* magazine on May 6, 2015. During the interview, McDonough called the rumors surrounding the 810 "rubbish" and "false," stating, unequivocally that "there was not an overheating problem with the[] 810 in commercial devices."

241. Approximately six weeks later, McDonough gave another interview, this time to *ExtremeTech*, wherein he stated, "[t]he Snapdragon 810 processor is performing as expected and we have not observed any abnormal thermal issues."

### 9. Defendants' False and Misleading Statements Concerning the Snapdragon 810

242. As set forth herein, the Snapdragon 810 was Qualcomm's marquee product during much of the Relevant Period, and analysts and investors viewed it as the Company's most important and profitable chipset. Because Qualcomm generated the majority of its revenues from

the sale of chipsets, including the Snapdragon series, and had obtained the highest profits from its premier 800 series Snapdragon chipsets, the perceived success of Snapdragon 810 was highly material information and crucial to Qualcomm's overall growth. Defendants intended the Snapdragon 810 for use in all of the top-of-the-line premier smartphones for some of the largest OEMs in the world, including Samsung, LG, HTC, and Xiaomi. The Snapdragon 810 also was intended to "epitomize[] [Qualcomm's] premium tier leadership" for 64-bit, 4G/LTE chipsets. While most of Qualcomm's competitors were only launching their first generation 4G/LTE chipsets in 1Q14, Qualcomm's launch of Snapdragon 810 in April 2014 represented its fifth generation 4G/LTE chipset, creating a significant competitive advantage that was closely watched. As a result, Defendants' representations set forth below which touted the design, power, efficiency, viability and overall success of the Snapdragon 810 processor and denied that the Snapdragon 810 had any abnormal thermal issues or overheating problems were highly material.

**a. <u>April 7, 2014 Press Release</u>**

243. On April 7, 2014, Defendants caused Qualcomm to announce the Snapdragon 810 in a press release titled, "Qualcomm Announces 'The Ultimate Connected Computing' Next-Generation Snapdragon 810 and 808 Processors." The press release set forth, in relevant part:

> The Snapdragon 810 and 808 processors are Qualcomm Technologies highest performing platform to date, completing Qualcomm Technologies' lineup of 64-bit enabled, LTE-equipped chipsets for premium mobile computing devices. The Snapdragon 810 and 808 processors enable an exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets.
>
> * * *
>
> The Snapdragon 810 processor, as Qualcomm Technologies' highest performing Snapdragon platform to date.

244. The statements set forth above were materially false and misleading or omitted to state material information when made. Rather than enabling an "exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets," or being Qualcomm's "highest performing Snapdragon platform to date," Defendants knew (or should have known) that under their direction and on their watch, initial testing of the Snapdragon 810 demonstrated that every aspect of the chip was failing as a result of the existence of myriad issues, including overheating. Thus, Defendants' representations regarding the current performance and actual capabilities of the chip were materially misleading and created a false impression of the true state of readiness of the Snapdragon 810. Additionally, these statements were materially false and misleading because they omitted the material fact that Defendants knew (or should have known) that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two-year technological lead time over its competitors, including MediaTek, and placed serious doubt on Qualcomm's ability to maintain its dominant market position with flagship mobile devices.

**b. <u>August 26, 2014 Article</u>**

245. On August 26, 2014, Defendants caused Qualcomm to publish an article on its corporate website titled, "How ARM architecture and Snapdragon processors are supporting the 64-bit future of mobile." In the article, Qualcomm stated:

> The thing is, a mobile processor is so much more than a CPU, Snapdragon processors integrate the essential technologies to enable great mobile experiences; technologies like an LTE-advanced modem, GPU, DSP, and a lot more. It's a comprehensive package, an entire system right there on a chip. That way our processors can choose the right engine for the right job. We call it heterogeneous computing, and it is designed to make for better performance and more efficient battery usage. . . . Snapdragon processors with integrated 64-bit ARM CPUs, when combined with the benefits of the ARM ecosystem and the many other custom technology blocks, will completely change the next generation of user experience. For the best.

246. The statements set forth above were materially false and misleading or omitted to state material information when made. Rather than enabling an "great mobile experience," and "better performance and more efficient battery usage," Defendants knew (or should have known) that under their direction and on their watch, the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810.

247. Moreover, the "next generation of user experience" was not changing "for the best" but, in fact, was in serious jeopardy because of the abnormal and severe overheating issues that Qualcomm's next generation chip was currently facing. These statements were materially false and misleading because they omitted the material fact that Defendants knew (or should have known) that under their direction and on their watch, the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two-year technological lead time over its competitors, including MediaTek, and placed serious doubt on Qualcomm's ability to maintain its dominant market position with flagship mobile devices.

**c. <u>The 2014 Form 10-K</u>**

248. As set forth above, on November 5, 2014, Defendants caused Qualcomm to file the 2014 Form 10-K, which was signed by defendants Mollenkopf, Davis, Mollenkopf, Davis, Alexander, Cruickshank, Dittamore, Hockfield, Horton, Jacobs, Lansing, Manwani, Nelles, Randt, Ros, Rubinstein, Scowcroft and Stern.

249. With respect to the Snapdragon 810, the 2014 Form 10-K stated:

> Each Snapdragon processor is a highly integrated, mobile optimized system on a chip incorporating our advanced technologies, including a high performance central processing unit (CPU), digital signal processor (DSP), graphics processing unit (GPU) and modem, multimedia subsystems, including high fidelity audio, high-definition video and advanced imaging capabilities, a hardware-based security suite

> and highly accurate location positioning engines. Our CPU cores are designed to deliver high levels of compute performance at low power, allowing manufacturers to design slim and powerful devices with longer battery life between charges. . . . The heterogeneous compute architecture of our Snapdragon processors is designed to ensure that the CPU, DSP and GPU work efficiently together, each being powered up and utilized only when needed, which enhances the processing capacity, speed and efficiency of our Snapdragon processors and the battery life of devices using our processors.

250. In addition, and as set forth, *supra*, the 2014 Form 10-K also contained SOX Certifications, signed by defendants Mollenkopf and Davis, which were substantially similar to those set forth above.

**d. <u>A Series of Articles Follow</u>**

251. On December 4, 2014, *Business Korea* published an article titled, "Unexpected Hurdle: Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG" reported that according to an internal source "[t]he Snapdragon overheats when it reaches a specific voltage" and for that reason, among others, it was "unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6, the G4, and the Xperia Z4."

252. Thereafter, on December 8, 2014, *TechRadar* published a statement that Defendants caused Qualcomm to make in an update to a December 6, 2014 article titled, "Galaxy S6 and LG G4 facing delays thanks to Snapdragon 810 defects?," debunking reports of overheating problems with the Snapdragon 810 first published by *Business Korea*: "We won't comment on any of the rumor or speculation you referenced but I can tell you that everything with Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015."

253. On the same day, *Gadgets 360* also posted an article titled "Qualcomm Rubbish Rumours of Snapdragon 810 Delays and Issues," which included similar representations from Qualcomm concerning Snapdragon 810:

> Following last week's report that Qualcomm is facing several issues with its Snapdragon 810 chipset that might cause a delay in its rollout, Jon Carvill, Senior Director of Public Relations at Qualcomm, finally cleared the air by stating that everyone is on track. Carvill refused to give his take on the several speculations, but said that, "I can tell you that everything with Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015."

254. Likewise, *Tom's Hardware* posted an article titled, "Snapdragon 810 May Face Delays, But Qualcomm Denies Rumors Are True," stating, "Qualcomm has denied that any of these rumors [initially identified in the Business Korea article] are true in a short but clear statement to Tom's Hardware: 'Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015.'"

255. Rumors that Qualcomm (under Defendants' direction and on their watch) was planning to provide Samsung with a modified 810 surfaced in early 2015. On January 22, 2015, an article in *The Wall Street Journal* reported that according to "[a] person familiar with the matter," Qualcomm offered a "fix" to the 810's overheating issues in the form of a modified 810 chip in an effort get Samsung to use it in their Galaxy S6. It was reported that the modified chip would be available to Samsung in March 2015.

256. *GSM Arena* confirmed *The Wall Street Journal* report on January 24, 2015, stating:

> Industry insiders, however, have stated that Qualcomm is developing an updated version of the SoC for Samsung to use. The new release will be available to the Korean company in March, which poses the question whether the Snapdragon 810 will actually make it in time for the Galaxy S6. The piece of news comes as a bit of an acknowledgement by Qualcomm of the chipset's issues, which the company has strenuously denied so far.

257. However, on January 27, 2015, *Android Authority* noted that Qualcomm would get itself into "hot water with other clients," including LG and Xiaomi, if it were to modify the 810 design because that would effectively admit that Qualcomm sold LG and Xiaomi an overheating chip that they already had incorporated into the G Flex 2 and Mi Note Pro, respectively.

258. Similarly, the January 28, 2015 edition of *The Korea Times*, addressing "a number of reports. . . . stating that Qualcomm will provide a modified chipset to Samsung Electronics," stated that:

> Qualcomm may be caught in legal dispute with LG Electronics should it modify its latest Snapdragon 810 chipset, which allegedly has overheating issues, a source said. According to reports, Qualcomm plans to update the chip to fix these [sic] after Samsung Electronics decided to ditch the chip for its Galaxy S6 model. 'If Qualcomm officially confirms that it will modify the Snapdragon 810, it means that the company admits the chipset has a flaw. That could trigger legal disputes,' the source close to the matter said. The Snapdragon 810 is already used in a number of top-tier smartphone models including LG's G Flex 2 and the Xiaomi's Mi Note Pro. If the rumor about the modification of the chipset by Qualcomm proved to be true, it means that LG and Xiaomi's latest smartphones use chips with overheating issues.

**e. <u>First Quarter 2015</u>**

259. On January 28, 2015, Defendants caused Qualcomm to announce its financial results for three months ended December 28, 2014 and held a same-day conference call for analysts the discuss the results (the "1Q15 Conference Call"). During the 1Q15 Conference Call, defendant Mollenkopf provided the following update on the Snapdragon 810:

> [O]ur view of the long-term strategic environment and QCT's leadership position remains strong. . . . our design momentum for the Snapdragon 810 processor remains robust with more than 60 products in the pipeline, including the recently announced LG G Flex2 and the Xiaomi Mi Pro Note.
>
> ***Snapdragon 810 is performing well, and we look forward to a growing number of devices to be launched by our customers throughout the year.***

260. Defendant Mollenkopf also stated, "the 810 is actually doing quite well. Any concerns about the 810 terms of design traction really are probably limited to one OEM versus anything else." He further noted, "I want to be clear, too, I think the 810 we think is going to be quite strong in terms of design traction, and it will be in a lot of devices. As I said, it will be over 60 devices."

261. Significantly, as discussed in detail below, Judge Anello in the Securities Action found defendant Mollenkopf's above-statements that the "Snapdragon 810 is performing well" and that the "810 is actually doing quite well" were false and misleading when made.

262. During the 1Q15 Conference Call, defendant Mollenkopf had the following exchange with Citigroup analyst, Ehud Gelblum ("Gelblum") regarding the Snapdragon 810:

> GELBLUM: . . . can we just hit at the heart of the 810 issue? Has obviously been a lot of news in the press about overheating. If we could just kind of hit on – is it your – just want to confirm is it your opinion or thought process that the issues with that flagship device happened on a compatibility issue or incompatibility issue between the 810 and that particular device and that any other device, those issues are not a concern? If you could just give us a little detail on why that might be to let us kind of get a feeling as to maybe there is nothing particularly wrong with the 810 per se, but that it just happened to be a matchup with that one device – that would be helpful. . . .
>
> MOLLENKOPF: . . . On the 810, I'll be very clear, this device is working the way that we expected to work and we have design traction that reflects that. If you look at the number of designs, over 60, it has essentially won all the premium designs across multiple ecosystems – in China, Windows Mobile, as well as Android. So we are quite pleased with how that is performing. ***We – there is concern, as you mentioned, it's really related to one OEM, and I don't think you should extend that to imply that something has changed fundamentally between us and that OEM.*** And of course, that OEM has a number of different models that we feel well-positioned across our entire product tiers. So I think that's going to be a great product for us. We are going to follow that, up as I mentioned in my script, with a device that returns to our internally developed CPU with integrated modem and our – going at the latest nodes. So I don't think we see any change in strategy, and we are quite pleased with that device. We just wish we had one more design.

263. Significantly, Judge Anello in the Securities Action found defendant Mollenkopf's above-statement that there was concern only "related to one OEM" was likewise false and misleading when made.

264. Subsequently, Aberle had the following exchange with Arete Research analyst, Brett Simpson ("Simpson") regarding the Snapdragon 810:

> SIMPSON: Just on QCT, at the high end the situation with the 810 share loss, is this really focused on one launched device with this OEM? Or will it be something

> that you see impacting other flagship launched devices with this OEM throughout the year? . . . .
>
> ABERLE: . . . on your first question about the 810 in a particular account, I would think if it as isolated really to one account and one portion of their portfolio. I can't really talk about what would happen in the future; it's really a better question for them versus us. Broadly in the industry, I think we are quite pleased with the design traction, and we just would love to see them take more share versus some other folks in the – see the premium tier growing more would be great for that product, I think is really the key.

265. The next day, analysts repeated Defendants' representations, including their attempt to downplay Samsung's decision not to use Snapdragon 810 in its premiere Galaxy S6 phone, their denials that the loss was due to overheating issues, and their representations that it was an isolated issue that would not spread to other customers. Deutsche Bank, for instance, reported that "[t]he loss of a socket at Samsung was a clear negative for their SOC; however we do not believe it is as bad as feared. Management noted on the call that the loss was likely not due to the 810 overheating, but rather the lack of differentiation with their application processor. Samsung has a substitute (e.g. Exynos), where other OEMs do not."

266. Similarly, on January 30, 2015, Morningstar noted that "[d]espite the Samsung loss, we still see Qualcomm remaining the clear-cut wireless chip leader for the foreseeable future, and tend to think of the 810 issue as isolated in nature."

267. The next day, Morningstar added: "[r]eports suggest that Qualcomm's Snapdragon 810 chip was overheating, causing Qualcomm to make the switch, but we think the jury is still out on the root cause of Samsung's switch. Other OEMs are adopting the 810 in their flagship phones, while Samsung has incentive to switch to internal processors for potential cost savings. We don't anticipate Qualcomm losing many more key customers or having production quality issues in future chipsets…."

268. The statements set forth above (which involved the Company's core operations, as Samsung accounted for 10% of Qualcomm's revenues from 2011-2013) were false and misleading or omitted to state material information. Far from "performing well" or "working the way [Defendants] expected," as explained above, Defendants knew (or should have known) that under their direction and on their watch, the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device relying on the 810 chipset.

269. Likewise, the assertions made or caused to be made by Defendants that "any concerns" with the 810 were "limited to" or "related to one OEM" were materially false and misleading because, for the reasons set forth above, Defendants knew (or should have known) that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat and that other OEMs were concerned about using the 810 chipset in their devices. Indeed, as set forth above, despite agreeing to the use the 810 in its premium tier devices, LG backtracked as a result of the 810's abnormal thermal issues and utilized the slower, prior generation Snapdragon 808. Additionally, these statements were false and misleading because Defendants knew (or should have known) that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

**f. <u>January and February 2015</u>**

270. On January 29, 2015, *Re/code* published an article titled "Qualcomm Exec Denies Any Problems With Snapdragon 810," which quoted Amon as saying "We don't see any problem with the 810. . . . I think there is a lot of misinformation out there." Re/code stated that Amon

"also added that the company isn't making any special versions of the 810, as had been rumored, and that the existing chip is "performing very well."

271. On January 31, 2015, *CNET* published an article titled, "Qualcomm's Mobile Dominance Shaken From Loss Of Flagship Phone," which included the following quote from Amon: "There's a lot of rumor and misinformation about the 810 . . . . Categorically, we don't see any problem with the chip."

272. On February 1, 2015, *The Wall Street Journal* published an article titled, "Samsung's Own Chips Were Factor in Blow to Qualcomm," which included the following statement from Amon from Friday, January 30, 2015: "There is a lot of misinformation out there about what is really happening . . . . We feel very confident about the 810's leadership."

273. Seeking to further debunk rumors regarding the Snapdragon 810's abnormal thermal issues, Defendants caused Qualcomm to issue a press release on February 2, 2015, which included numerous statements from OEMs and the Company touting the Snapdragon 810. Titled, "Qualcomm Snapdragon 810 Processor Powers Premium Tier Mobile Experiences of 2015," the press release was intended to, and had the effect of, providing reassurance that there were no issues with the Snapdragon 810.

274. The February 2, 2015 press release included quotes from major OEMs, including LG, HTC, Sony, Motorola Mobility (owned by Lenovo), OPPO, and Xiaomi, purportedly praising the Snapdragon 810. Additionally, Renduchintala stated, "The smartphone experience . . . will be defined by products that don't compromise on performance, connectivity and entertainment, and Snapdragon 810 will be at the heart of enabling these features . . . . With a growing design pipeline currently in excess of 60 devices, we're excited about the innovation our OEM customers will unlock for consumers who demand superior mobile experiences in 2015."

275. On February 6, 2015, *Forbes* published an article titled, "Samsung On A Possible Collision Course With Qualcomm," which included the following quote from McDonough: "Snapdragon 810 is progressing as expected . . . . We've won 60 designs. It's a pretty sizeable number, it'll power the majority of premium Android and Microsoft phones."

**g. <u>February 12, 2015 Website Report</u>**

276. On February 12, 2015, Defendants posted a report on Qualcomm's website and Snapdragon blog authored by Marketing Senior Manager Adam Kerin, titled, "Snapdragon 810 processor: cooler than ever" which further attempted to address concerns that the 810 had abnormal thermal issues by comparing an unidentified "pre-commercial smartphone with Snapdragon 810" and "a commercial smartphone with [a previous generation of Snapdragon 800 processors]." The report stated:

> For months we've talked about improved Snapdragon 810 performance, including the new Qualcomm Adreno 430 GPU with 30 percent more performance and 20 percent lower power than previous generation. But now we get to show you that devices with Snapdragon 810 can also be cooler. Don't take my word for it, let's take a look at the results.

277. Defendants caused Qualcomm to state, "after about 20 minutes of gaming, the [previous generation of Snapdragon 800 series processor] has hit the thermal ceiling. At over 30 minutes of gaming, the Snapdragon 810 smartphone still has additional headroom." Defendants caused Qualcomm to add that "[t]he story is the same with 4K video capture. After about 5 minutes of continuous recording, the . . . smartphone [with a previous generation of Snapdragon 800 processor] approaches the skin temperature threshold, while the Snapdragon 810 smartphone is well below the limit."

278. Based on the results of the Company's tests, Defendants caused Qualcomm to state, "A cooler smartphone means a better performing smartphone. When a device hits the thermal

threshold, it will throttle performance to cool down. If you want the best of both worlds, higher performance with lower power, than you want a Snapdragon 810 powered smartphone." In the report, Defendants caused Qualcomm to state:

> Whether you've been using a Qualcomm Snapdragon powered mobile device since our earliest days and thinking about an upgrade, or wondering what all the commotion is about. I'm pleased to tell you that one of the best has gotten even better.
>
> Not only is the Snapdragon 810 processor designed to deliver more performance and better experiences, but it's also engineered to use less power and remain cooler.

279. Defendants then caused Qualcomm to state that readers should "[c]heck out the 'cool' new Snapdragon 810 smartphones already announced, like the LG G Flex2 and Xiaomi Mi Note Pro, stay tuned for the upcoming products from Motorola, Sony, HTC, OPPO, and Microsoft."

280. On February 12, 2015, *Trusted Reviews* also published an article titled "Qualcomm rubbishes Snapdragon 810 Overheating Concerns," which recounted Trusted Reviews' conversations with Tim Leland ("Leland"), Qualcomm's Vice President of Product Management, and McDonough regarding Snapdragon's overheating issues. According to the article, "Qualcomm has spoken out on the recent spate of Snapdragon 810 rumours, stating its latest System on Chip (SoC) offering hasn't suffered from production delays or overheating issues." The article quoted McDonough as stating:

> The exterior temperature of an 810 device is actually lower than it is for an 800 device—and the 800 was a flagship that everybody shipped . . . . Part of the reason we wanted to show you the thermal data is that we are not going to spend a lot of our time chasing rumours . . . . Usually rumours are wrong and you never get to the truth, so it is nice for use to be able to start with the truth . . . . If the 800 was the gold standard, we're beating the gold standard and we feel good about that."

281. Adding to McDonough's comments, Leland stated:

> If you look at the Snapdragon 800—a very successful processor for Qualcomm—if you look at the target zones while playing Asphalt 8 at 30 frames per second, you can see after 15 to 20 minutes you start getting to the high end of that range of target zone for thermal design.
>
> However, with the Snapdragon 810, using lessons learned from the 800, we have been able to extend the timeframe before you're in that upper thermal zone while still enjoying 30 fps.
>
> With the 810 you can go for more than half an hour. That's quite a lot of time for something that is generally considered a short-burst gaming experience.

282. Also on February 12, 2015, Aberle spoke on behalf of Qualcomm at the Goldman Sachs Technology & Internet Conference. During his remarks, Aberle stated:

> Without speaking specifically about Samsung, obviously we did talk about in this particular design cycle the 810 not landing one of the flagship designs. Although on the flipside we've had a tremendous amount of traction with the part.
>
> We've got over 60 designs and so really the part is performing exceedingly well. We're happy with the performance, we're happy with the traction across the OEM base. It's really isolated to an important but one design in one account.

283. During his presentation, Aberle had the following exchange with a Goldman Sachs analyst, Simona Jankowski ("Jankowski"), regarding the Snapdragon 810:

> JANKOWSKI: And I did want to just try to clear up that point specifically about the 810 not getting into the one large marquee design win. On the call you said that it was performing as expected, but at the same time there have been reports in the supply chain that there were some overheating or power management issues.
>
> Could you just clarify for us, were those issues just popping up specific to that one customer and that one design win just relative to how that particular system design was interacting with the chip's characteristics? Or was that decision just completely unrelated to any potential issues on the chip and just more of a strategic decision by the customer?
>
> ABERLE: Our feeling is it's probably more the latter. If you look at – the phones have already launched. The LG phone has launched with the 810 in it already. So obviously it's performing well.
>
> You've got to be careful – rumors come through the rumor mill and you've got to be careful at times when people look at – you're bringing up a new part on a new

> node and they might sample something at a particular point in time isn't reflective of the end performance of the device.
>
> And so, where we are now I think we feel like the part is performing as expected. It's won a tremendous amount of design, so if there was a problem I think you'd be seeing it more broadly outside of that one account.

**h. <u>March 2, 2015 Disclosures</u>**

284. On March 2, 2015, Amon and Renduchintala, among others, presented at the GSM Association Mobile World Congress on behalf of Qualcomm. During a related questions and answers period, the following exchange between RBC Capital Markets analyst Mark Sue ("Sue") and Amon and Renduchintala took place:

> SUE: . . . . Gentlemen, every year, like clockwork, we would come to the show and Qualcomm's Snapdragon would be designed in a slew of major flagship releases or smartphones.
>
> This year is a little bit different, so going forward do you feel that may be something has structurally changed? How can we regain -- Qualcomm regain its leadership in that [role]?
>
> RENDUCHINTALA: . . . Mark, I would say that outside of one device this year is going to be like every other year here.
>
> If you walk around the show I think you will see a number of flagships used of major OEMs that use our leading technology. And I think that maybe as a contrast in one particular one won't be showcasing our technology this year.
>
> But I think, if you look at the rest of our traditional partners, you will see a very vibrant network of new products that use our technology. So I think you will be fairly surprised at how broadly and how pervasively our technology is being used across a number of flagship [trends].
>
> * * *
>
> AMON: So just to add to your question on Snapdragon; one thing, just to provide some quantification, if you look at today the Snapdragon 810 we had said publicly that we have a pipeline of 60 different designs.
>
> As Murthy outlined, we have one design loss but it's still with that major OEM. There's a number of Snapdragon designs in their portfolio.

> And I also would like to call the attention of a number of highend OEMs also coming from China, upcoming OEMs that have been going into the premium tier also designing Snapdragon 810. So the number of different designs we have with 810 is over 60.

285. Shortly thereafter, Renduchintala and BMO Capital Markets analyst, Tim Long ("Long") had the following exchange regarding Snapdragon:

> LONG: . . . . just going back to the large customer who chose not to use Snapdragon, could you talk a bit about if they are using other Snapdragon and a lot of modems as well? How do you think about the risk of them making the same decisions, whether it's use their own technology, cofab, whatever?
>
> * * *
>
> RENDUCHINTALA: . . . I think there were very specific circumstances around that OEM's decision about the decisions they made on the Snapdragon 810. It was really, if you remember, the genesis of the Snapdragon 810 change of plan was triggered by a move to 64-bit. And given that we didn't want to disturb the trajectory of our own custom CPU development in that domain, which you'll find in the 820 we talked about today, we decided to use a more standard approach to that scenario.
>
> So I think you can regard – we regard the Snapdragon 810 engagement with that OEM as a one-off and we are confident that the technologies, capabilities, and differentiation, both in the applications processor side and in the modem side, are going to provide very, very compelling value propositions going forward. So for us, of course, the threat of different silicon solutions being evaluated against Snapdragon will always exist, but we are pretty confident that we have a portfolio of technologies on both the AP side and on the modem side that will continue to make that portfolio very, very competitive.
>
> We are very, very clear that our roadmap and the general trajectory and value that will be putting into our Snapdragon roadmap is in no way, shape, or form impaired from the past.
>
> And the Snapdragon 810 really is just a factor of being caught in a very, very rapid change in technology paradigm where we didn't want to sacrifice our long-term roadmap for doing something expedient and short-sighted.

286. Aberle's statement that "We are getting a lot of traction with the [Snapdragon] 810 processor" was repeated and included in a March 2, 2015 article published by VentureBeat titled, "Qualcomm shows off deep learning for mobile devices and ultrasonic fingerprint scanning."

287. As Defendants intended, analysts repeatedly adopted and reiterated the above statements. On March 2, 2015, for example, BMO Capital Markets published a report confirming that "Management believes the [Samsung] loss is a one-off, and noted other wins with Samsung." Several weeks later, in a report dated March 26, 2015, Trefis reiterated:

> Qualcomm is hopeful that it will not be affected much [by the loss of Samsung], as LG Electronics and the Chinese smartphone manufacturer Xiaomi have decided to use its chipsets for their respective devices. Though Qualcomm expects the above factors to impact its OCT . . . revenue growth and operating margins in the near-term product cycle, its view of the long-term strategic environment and QCT's leadership position remains strong. The design momentum for the Snapdragon 810 processor remains robust, with more than 60 products in the pipeline, including the recently announced LG G Flex2 and the Xiaomi Mi Pro Note.

288. Additionally, Trefis affirmed this analysis in an April 20, 2015 report entitled "Qualcomm's Q2 2015 Earning Preview: Increasing Competition to Lower Guidance in 2015," stating "Qualcomm claims to have already addressed many of the initial product challenges . . . and continues to further enhance the performance of this chip. It expects to see a broad range of devices successfully launch and drive volume with this chip in the future. The design momentum for the Snapdragon 810 processor remains robust, with more than 60 products in the pipeline…." Indeed, in a report dated April 20, 2015, Deutsche Bank repeated Qualcomm's mantra that "the Snapdragon 810 overheating issue was never true…."

289. The statements set forth above were false and misleading or omitted to state material information. Far from not "compromising on performance" or "performing exceedingly well" or "progressing as expected," Defendants knew (or should have known) that under their direction and on their watch, the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device relying on the 810 chipset. Additionally, Defendants' characterization of rumors concerning the 810's abnormal thermal problems as "misinformation" materially false and

misleading for the same reasons. Likewise, the February 2, 2015 press release, which Defendants issued in order to quell rumors regarding the abnormal thermal problems already identified in the 810 was itself materially false and misleading for these same reasons.

290. Further, Defendants' assertion that Samsung's decision was "just completely unrelated to any potential issues on the chip," that "any concerns" with the 810 were "limited to" or "related to one OEM" were false and misleading because, as set forth herein, Defendants knew (of should have known) that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat and that other OEMs were concerned about using the 810 chipset in their devices.

291. Indeed, as set forth above, despite agreeing to the use the 810 in its premium tier devices, LG backtracked as a result of the 810's abnormal thermal issues and utilized the slower, prior generation Snapdragon 808. Additionally, these statements were false and misleading because Defendants knew (or should have known) that the existence of overheating issues in the Snapdragon 810 (occurring under their direction and on their watch) made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

### i. <u>Second Quarter 2015 Financial Results</u>

292. On April 22, 2015, Defendants caused Qualcomm to announce its financial results for the three months ended March 31, 2015 ("2Q15"). On a related conference call with analysts, defendant Mollenkopf stated:

> With respect to the roadmap, we remain confident that our differentiated Snapdragon processor and modem leadership positions us well across multiple price tiers and customer segments entering the next product cycle. In the premium tier, we are very pleased with the design traction on the Snapdragon 810, with over 60 designs having won the key premium design slots, with the exception of Samsung.

> Since our last earnings call, LG has begun shipping the innovative G Flex 2; Sony has announced the incredibly thin Xperia Z4 phone and tablet; and Xiaomi has announced the Mi Note 4 with category-nine carrier aggregation. Recent teardowns and press reports correctly highlight the advantages delivered by our integrated approach.

293. On April 28, 2015, McDonough denied to CNET that LG had changed its decision to use the Snapdragon 810 for its G4 device (in favor of the Snapdragon 808) because of the overheating problems: "The decisions on which chipsets to put on which handsets come from over a year ago." On the same date, an article on ExtremeTech reported that a Qualcomm marketing executive, Michelle Leyden Li, said that the Snapdragon 810 did not have a problem.

294. On May 6, 2015, McDonough gave an interview to *Forbes* regarding the Snapdragon 810. During the interview, McDonough stated as follows:

> The rumours are rubbish, there was not an overheating problem with the Snapdragon 810 in commercial devices . . . . If that's true, which we're saying it is, why was there so much rumour? Why was someone spreading false information about the 810? Our point of view is that those rumours happened with the LG G Flex 2 and Qualcomm 810 being first to market with the premium-tier application processor. Then somebody decided to put out some false rumours about that, which is unfortunate but sometimes that's how business is done. That has forced us to spend a lot of time addressing the false rumours.

295. When asked to comment on "the unusual benchmarking results and heat issues" related to HTC One M9 during the interview with *Forbes*, McDonough responded:

> Everything you're saying is fair. But we all build pre-released products to find bugs and do performance optimization. So when pre-released hardware doesn't act like commercial hardware, it's just part of the development process. I think someone very artfully took that and used it to fuel the rumors and took something that's completely normal and sent it to some less sophisticated news outlets to give them a story.

296. On May 27, 2015, Renduchintala presented at the Cowen Technology, Media & Telecom Conference on behalf of Qualcomm. During his remarks, he represented the following regarding the Snapdragon 810:

> And I think the device in the market has performed to our expectations and to the expectations of that of our customers. We have won over 60 flagship designs. Of course, there is one major one we didn't win and I think that is more to do with the alternatives that were available at that point in time that used technology choices that quite frankly when we made the decision on the 810 we didn't feel were available to us in an economically viable opportunity. And I think the competitive dynamic brought to bear showed that, at the end of the day in the alternatives that existed for a certain one OEM, they chose to go a different route.
>
> But in terms of the performance of the 810, we have been very pleased with the flagship designs that have been launched on that product, the LG 2Flex, the HTC M19, the Xiaomi Note Pro. I think all devices [] show the device performing in stellar fashion.

297. During the conference, Renduchintala had the following exchange with a Cowen & Co. analyst, Tim Arcuri ("Arcuri") regarding the Snapdragon 810:

> ARCURI: . . . Can we just talk just for one more moment about the 810? And I think both LG and HTC, they have talked publicly recently and they've said that they are trying to combat the heating issues that they have seen from the chip in their phones with some software.
>
> Sounds like they are doing some thermal throttling and they have been public about this.
>
> But, of course, you don't get the performance when you do that either and if you look at the benchmarks against the phone that is using a captive solution, they are not seeing that issue.
>
> So can you talk whether there has been any incremental expenses that you have had to bear because I think many people are sort of looking at how QCT margins have come down and they've gotten a lot lower than people thought they would? If people could be convinced that this is a one-time issue and there were a number of cascading issues that sort of coalesced right now to basically drive QCT margins down to a cyclical low, then I think people could get much more excited about investing in the stock because you're going to see this big snapback. So can you address whether there are any sort of incremental expenses having to support your other customers that did in fact design in 810?
>
> RENDUCHINTALA: . . .Well, first of all, any processor that has significant capability has the kind of horsepower that the Snapdragon 810 requires software to keep it in thermodynamic balance. That has been true in the past; it is going to be true in the future. And I think what people tend to forget is that every processor goes through some degree of management of the [crescent] state of its processing

> assets, throttling if you call it. And you can see that when you compute synthetic benchmarks.
>
> But what you tend to find is that, in most user-driven experience, that dynamic is so under the surface of visibility, it is almost transparent. It is something that naturally happens and really what we are focused on is delivering a great user experience and the way we manage our system resources to keep thermal in balance while interesting in synthetic benchmarks has very little to do with how it relates to direct user experience.
>
> As it relates to any extra expense, we have shipped commercially the 810 with a fairly sophisticated suite of software to be able to keep that platform in thermodynamic balance. And what we have spent is we have spent quite a bit of time with our customers educating them as to how to use that and making sure it was used to the best effect in all products.
>
> So I think what you are seeing now is I think a number of designs on the 810 where the understanding of that software and the way to manage that software has really been able to be used in a manner where it has shown the capability of the processor in its full regale and I think there's been a number of tests both in the gaming and in the video area where people have done the likes of torture testing where we have shown extremely competitive performance compared to 14 FinFET type performance. So I think at the end of the day the combination of well hardened software together with a well-balanced system architecture I think leads to a great user experience.

298. On June 30, 2015, McDonough gave an interview to ExtremeTech regarding the Snapdragon 810. During the interview, after being asked to respond to incidences of Sony's Xperia Z3+ overheating, McDonough stated, "The Snapdragon 810 processor is performing as expected and we have not observed any abnormal thermal issues." McDonough further noted that the Company had not done anything unusual to create V2.1 of the Snapdragon 810.

299. The statements set forth above were false and misleading or omitted to state material information. For example, Defendants' characterization of the reports the 810 was exhibiting abnormal thermal problems as "rubbish" or "false," and their repeated assertions that (i) "there was not an overheating problem with the Snapdragon 810," (ii) they had "not observed any abnormal heating issues," and (iii) the 810 was "performing in stellar fashion" and "to our

expectations" were false and misleading when made because Defendants knew (or should have known) that under their direction and on their watch, the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device relying on the 810 chipset.

300. Further, Defendants' assertion that Samsung's decision had "more to do with the alternatives that were available at that point in time" than any issues with the 810 were materially false and misleading because, for the reasons set forth herein, Defendants knew (or should have known) that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat and that other OEMs were concerned about using the 810 chipset in their devices. Indeed, as set forth above, despite agreeing to use the 810 in its premium tier devices, LG backtracked as a result of the 810's abnormal thermal issues and utilized the slower, prior generation Snapdragon 808.

301. Additionally, these statements were materially false and misleading because Defendants knew (or should have known) that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

**10. <u>The Truth Very Slowly Emerges</u>**

302. The relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions began to be revealed and/or partially materialized after the close of trading on January 20, 2015 (although, as discussed above, Defendants continued to cause the Company to issue false and misleading statements after this date). On that date, *Bloomberg* published an article titled "Samsung Said to Drop Qualcomm Chip from Next Galaxy S," which reported on rumors, sourced from people with knowledge of the matter, saying that

"Samsung . . . will use its own microprocessors in the next version of the Galaxy S smartphone, dropping its use of a Qualcomm Inc. chip that overheated during the Korean company's testing." Additionally, *Bloomberg* noted that according to these rumors, "Samsung . . . tested a new version of Qualcomm's Snapdragon chip, known as the 810, and decided not to use it." Neither Qualcomm nor Samsung confirmed nor denied the reports.

303. In response to this partial disclosure, Qualcomm's common stock fell $0.89 per share, or 1.23% from a close $72.48 per share on January 20, 2015 to a close of $71.59 per share on January 21, 2015.

304. Analysts attributed the 1.23% decline to *Bloomberg's* unconfirmed report that Samsung would not use the Snapdragon 810 in the Galaxy S6. Although unconfirmed, analysts nonetheless acknowledged the importance of the reports, noting that the loss of the Samsung's flagship device would be a blow to Qualcomm.

305. Despite this partial disclosure of adverse news, Defendants continued to affirmatively deny the allegations of overheating problems with Snapdragon 810, and continued with their misrepresentations and omissions regarding the true reasons for the loss of Samsung and their false statements regarding the design, performance and success of Snapdragon 810.

306. The relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions was further revealed and/or partially materialized after the close of trading on January 28, 2015. On that date, Defendants caused Qualcomm to issue a press release revealing for the first time that the Company would have to lower "outlook for the second half of fiscal 2015 in our semiconductor business, QCT, largely driven by the effects of," among other things, "[e]xpectations that our Snapdragon 810 processor will not be in the upcoming design cycle of a large customer's flagship device."

307. Analysts uniformly confirmed that the "large customer" was Samsung and that the "flagship device" was the upcoming Galaxy S6, facts the Company itself confirmed in March 2016.

308. In response to this partial disclosure, the price of Qualcomm's common stock declined by $7.01 per share, or 10.58% from a close of $70.99 per share on January 28, 2015 to $63.69 per share on January 29, 2015. Analysts uniformly attributed the 10.58% decline in Qualcomm's stock price on January 29, 2015 to the Company's revelation that Samsung would not utilize the Snapdragon 810 in the Galaxy S6.

309. The relevant truth and/or foreseeable risks concealed by Defendants' misconduct was further disclosed and/or materialized after the close of trading on July 22, 2015. On that date, Defendants caused Qualcomm to issue a press release announcing the Company had again reduced its guidance for its "semiconductor business, QCT, in the fiscal fourth quarter compared to our prior expectations driven primarily by factors impacting premium-tier demand, including: increased concentration within the premium tier causing reduced demand for certain OEM devices that include our chipset; lower demand for our premium-tier chipsets from a vertical customer [i.e., Samsung]; and lower sell through in China of certain handset models using our premium-tier chipsets." During the conference call, defendant Davis had the following exchange with Tavis McCourt, a Raymond James & Associates analyst:

> McCOURT: . . . I was wondering if there's any way you could quantify the impact of the 810 issues, whether it's some of your customers choosing to use prior generation chips or any expenses that you've had to incur that are kind of abnormal related to that?
>
> * * *
>
> DAVIS: . . . The -- in terms of the 810, I think probably the biggest single impact as we look at the year -- first off, again, much like the fourth quarter, it's almost entirely attributable to changes in the premium tier and certainly, the socket loss at

> a major vertical customer [Samsung]. And so that would typically have been a customer for the 810 for their new generation devices. But it's also been a factor of the impacts that are happening in the premium tier overall that we are seeing SKUs other than the leading SKUs that are not selling through at the levels that customers thought, that are impacting some of our premium tier chipsets as well. So the only other thing from a cost standpoint is, we have had some increased E&O, and certainly some portion of 810 is a part of that. But overall, it's really been more a function of the significant shift in demand that we've seen throughout the year.

310. Thereafter, the price of Qualcomm common stock declined by $2.41 per share, or 3.75%, from a close of $64.19 per share on July 22, 2015, to close at $61.78 per share on July 23, 2015.

311. Analysts directly attributed the 3.75% stock price decline to the ongoing design, performance and overheating issues with the Snapdragon 810.

312. As a result of Defendants' actions and misrepresentations, the Company has suffered damages. These damages include (but are not necessarily limited to) being named as a defendant in the now sustained Securities Action, severe loss of reputation and standing, and a diminishment in the price of its common stock. As such, the Company has been damaged.

**11. As a Result of Defendants' Misconduct, Securities Claims Are Sustained Against the Company Regarding the Snapdragon Processor**

313. On October 20, 2017, Judge Anello sustained certain of the Securities Action plaintiff's claims in the Securities Action. Judge Anello stated that because the Court found that the plaintiff in the Securities Action sufficiently pled falsity, loss causation, and a strong inference of scienter, with reference to some statements, the Court denied the defendants' motion to dismiss the Section 10(b) and Section 20(a) claims as to defendants Mollenkopf and Qualcomm.

314. Judge Anello held that Samsung's pattern of using a Snapdragon SoC in every Galaxy device since 2011, except for the S6, supports an inference that Samsung rejected the 810 due to its overheating issues on its own would merely make it possible that the Samsung rejected

the 810 because of overheating issues, but in line with the additional facts alleged in the Securities Complaint, it is plausible that Samsung's decision not to use the 810 in the Galaxy S7 was related to the 810's overheating. Judge Anello stated:

> As a result, Plaintiff's SAC no longer bases its contention that Samsung decided not to use the 810 due to the 810's overheating issues on undetailed allegations based on a confidential witness and unidentified sources. Plaintiff now supports the allegation with several confidential witnesses, media sources' reports, and Samsung's pattern of using Snapdragon SoCs. While each of these reasons on its own might be insufficient to support the allegation that Samsung decided not to use the 810 because of its overheating issues, the facts alleged corroborate one another and make it plausible that Samsung found overheating in the 810 to be dispositive.

315. Judge Anello's opinion further set forth:

> On January 28, 2015, Defendants Mollenkopf and Qualcomm made two statements, explaining that the 810 was "performing well," or "as expected," and that any concerns are related to "one OEM." SAC ¶¶ 232-33. Plaintiff has pleaded with sufficient particularity that on January 28, 2015, there were problems with the 810 not limited to one OEM and that it was not "performing well." Defendants contend that Plaintiff insufficiently pleads falsity of these statements based on problems during development of the 810, reports of overheating by consumers and supposed benchmark tests, a possible product update, the acceleration of a successor chip, and statements and actions of certain OEMs. MTD at 21. Specifically, Defendants argue that none of Plaintiff's allegations support Plaintiff's theory that production of the 810 suffered debilitating thermal issues or was fundamentally compromised, and therefore Defendants' statements could not have been materially false or misleading when made. Id. Defendants also argue that these are statements of opinion. Reply at 9. The Court finds that none of these arguments warrant dismissal of Defendants Mollenkopf or Qualcomm with respect to the January 28, 2015 statements at this stage of the proceedings.
>
> Specifically, within the timeframe of these statements, Plaintiff alleges that immediately following LG's release of the G Flex 2 on January 5, 2015, CW2 and CW3 recall consumers complained their smartphones were operating slowly and resetting because of the 810. SAC ¶ 142. Indeed, on January 22, 2015, before Defendants' statements, the Wall Street Journal published an article reporting that LG was "working around 'the chip's heat emission.'" SAC ¶ 143. Further, CW5 reports that Customer
>
> Support Engineers at Qualcomm and Sony worked closely together to resolve overheating issues with the 810 in January 2015. SAC ¶ 171. OnePlus was also supposed to launch the OnePlus 2 on January 28, 2015, but delayed the launch due to overheating issues. SAC ¶ 194. On January 23, 2015, Forbes reported that the

> launch was "forced back . . . because of 'manufacturing challenges with the . . . 810,'" related to the same overheating issues that reportedly caused Samsung to reject the 810 for its Galaxy S6. Id. Thus, Plaintiff has sufficiently pleaded a material misrepresentation or omission as to statements made on January 28, 2015. See Robb v. Fitbit Inc., 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016) (finding that the plaintiff sufficiently pleaded facts demonstrating falsity by alleging customer complaints, studies, and confidential witness statements).

316. Judge Anello further found that the plaintiff in the Securities Action had adequately pled scienter. In the opinion, Judge Anello stated:

> "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." Nursing Home Pension Fund, Local 144, 380 F.3d at 1230. Complaints which rely on the existence of internal reports must contain "at least some specifics from those reports as well as such facts as may indicate their reliability." In re Silicon Graphics, 183 F.3d at 985. Here, Plaintiff alleges that Qualcomm maintained, generated and/or distributed the following internal reports demonstrating that the 810 was experiencing abnormal thermal issues between March 2014 and December 2014: (1) Daily Audit Logs; (2) Product Development Test Reports ("PDT Reports"); (3) Sub-System Reports; (4) Root Cause Analysis Reports; and (5) Thermal Engineering Test Reports. SAC ¶ 83. Plaintiff explains that, according to CW4, Qualcomm performed extensive software testing on the 810 on MTP devices. SAC ¶ 84. The results from these tests were maintained on a Daily Audit Log, which "provided insight into what was causing the 810 to fail . . . and were reviewed and used by engineers." SAC ¶85. CW4 confirmed that overheating was identified as the biggest root cause for the negative test results. Id. The data from the Daily Audit Logs was compiled into a PDT Report, which contained several key metrics relating to thermal testing. SAC ¶86. The PDT Reports were generated daily and after milestones were reached for software builds. Id. These PDT Reports "were often sent directly to Defendants Renduchintala and Amon . . . ." Id. CW2 reports that Sub-System Reports, which confirmed the 810's overheating issues, were generated daily. SAC ¶ 88. CW2 and CW4 confirmed that Root Cause Analysis Reports and Thermal Engineering Test Reports likewise reported the 810's thermal issues and were sent to Qualcomm management. Id.
>
> The SAC alleges that Defendant Renduchintala received daily PDT Reports outlining the 810's thermal issues, attended several meetings and conference calls to discuss the 810's thermal issues, and received numerous emails regarding the testing results of the 810. SAC ¶¶ 92-95; 297-305. Plaintiff alleges that Defendant Renduchintala "would have kept [Defendant] Mollenkopf apprised of the thermal problems with the 810, and the Company's inability to resolve them" because Defendant Renduchintala reports to Defendant Mollenkopf. SAC ¶ 309. As a result, Plaintiff has sufficiently pleaded a strong inference that Defendant Renduchintala

reported the 810's overheating issues directly to Defendant Mollenkopf and that Defendant Mollenkopf had access to several reports outlining the overheating issues.

Additionally, Plaintiff has sufficiently alleged that it is plausible that the nature of the relevant fact here is of such prominence that it would be absurd to suggest that Defendant Mollenkopf, the CEO of Qualcomm, was unaware of it. Under the "core operations" theory, scienter may be inferred where the facts critical to a business' "core operations" or important transactions are known to key company officers. See South Ferry LP No.2, 542 F.3d at 784-85. Allegations suggesting a core operations inference will generally not support a strong inference of scienter, absent "additional detailed allegations about the defendants' actual exposure to information." Id. at 784. However, "such allegations may independently satisfy the PSLRA when they are particular and suggest that defendants had access to the disputed information." Id. at 786. The "core operations" inference allows even generalized allegations about a defendant's role to suffice "in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that the management was without knowledge of the matter." Id. (citing Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 988 (9th Cir. 2008)). Here, Samsung accounted for 10% of Qualcomm's revenues from 2011-2013 and the 810 was the focus of media scrutiny at the time. Further, the 810 was supposed to be QCT's "Cadillac" processor and Plaintiff alleges that Defendant Renduchintala "would have" reported all information relevant to issues with the 810 to Defendant Mollenkopf—suggesting that Defendant Mollenkopf had access to the disputed information. Accepting those factual allegations as true, which the Court must for the purpose of this motion, it could arguably be "absurd" to suggest that Defendant Mollenkopf was not aware of issues relating to the 810's overheating. See Roberti, 2015 WL 1985562, at *12-13 (C.D. Cal. Feb. 27, 2015); see also Nursing Home Pension Fund, Local 144, 380 F.3d at 1230.

Accordingly, the pleadings support a strong inference of scienter on the part of Defendant Mollenkopf with respect to his knowledge that the 810 was defective, and the Court will, therefore, impute scienter to Defendant Qualcomm. As discussed previously, Plaintiff has sufficiently alleged that it is plausible the 810 suffered from serious overheating issues and was defective. An analysis of Plaintiff's scienter allegations likewise suggests that it is cogent to infer that Defendant Mollenkopf and Qualcomm made either false or misleading statements intentionally, or with deliberate recklessness, as they either had direct knowledge of the 810's propensity to overheat or had access to such knowledge. Because the Court finds scienter with respect to Defendant Mollenkopf and Qualcomm, the Court declines to analyze scienter under a holistic review of Plaintiff's allegations. See Tellabs, 551 U.S. at 322-24 (permitting the Court to read a series of less precise allegations together to meet the PSLRA requirement).

317. Significantly, Judge Anello found that the actionable statements alleged in the Securities Action met the materially ***heightened*** pleading standards imposed upon the Securities Action plaintiff by the PSLRA,[6] which are inapplicable in this shareholder derivative action.

**C. Defendants Cause the Company to Issue False and Misleading Proxy Statements in Violation of Section 14(a) of the Exchange Act**

318. In addition to the above-discussed false and misleading statements, in light of the Company's illicit antitrust actions (both domestic and worldwide) and its issues with the Snapdragon 810, it is clear that certain of the Company's Relevant Period Proxy Statements, which sought shareholder votes for, *inter alia*, the election of directors and executive compensation packages, were likewise false and misleading.

**1. The 2015 Proxy Statement**

319. On January 22, 2015, Defendants caused Qualcomm to disseminate to shareholders the Company's 2015 Proxy Statement (the "2015 Proxy") in connection with the Company's annual shareholder meeting. Defendants drafted, approved, reviewed and/or signed the 2015 Proxy before it was filed with the SEC on Form DEF 14A and disseminated to Qualcomm

[6] The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002). To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed. *Id.* at 1085. With respect to pleading scienter, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind. 15 U.S.C. § 78-u4(b)(2). The inference of scienter must be more than merely reasonable—it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the inference of scienter cogent, and at least as compelling as any opposing inference one could draw from the facts alleged. *See Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 551 U.S. 308 (2007). Notably, the PSLRA's heightened pleading standards ***do not apply*** to this shareholder derivative action. *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010).

shareholders. Defendants knew, or were deliberately reckless in not knowing, that the 2015 Proxy was likewise materially false and misleading.

320. Significantly, the 2015 Proxy incorporated the Company's Code of Ethics and Governance Principles. Further, the 2015 Proxy likewise failed to disclose the full extent of the Company's illicit antitrust activities (and the extent of the harm they would inflict upon the Company), which included the illicit actions in South Korea, the United States, the E.U. (i.e. violating worldwide anti-competition laws), and that Defendants caused Qualcomm to engage in illicit and/or illegal anticompetitive conduct in the United States to maintain a monopoly for semiconductors used in mobile phones. The 2015 Proxy failed to disclose that the Company (under Defendants' direction and on their watch) was no longer abiding its well-established licensing policies and was refusing to offer licenses to standard-essential patents to competing chipmakers, had violated and was continuing to violate its FRAND commitments, and was giving out royalty relief to mobile phone manufacturers that agreed to largely or exclusively purchase Qualcomm's chipsets (*i.e.*, bundling the negotiations and terms of its license and chipset agreements).

321. Similarly, the 2015 Proxy failed to disclose the full extent of the problems with the Snapdragon 810, and thus failed to disclose that the express terms of both the Code of Ethics and Governance Principles have been violated by Defendants.

322. Additionally, the 2015 Proxy likewise contained false and misleading disclosures regarding the Board's role is risk oversight. In this regard, the 2015 Proxy stated:

> **BOARD'S ROLE IN RISK OVERSIGHT**
> Qualcomm does not view risk in isolation, but considers risk as part of its regular evaluation of business strategy and business decisions. Assessing and managing risk is the responsibility of Qualcomm's management, which establishes and maintains risk management processes, including action plans and controls, to balance risk mitigation and opportunities to create stockholder value. It is management's responsibility to anticipate, identify and communicate risks to the Board and/or its committees. The Board oversees and reviews certain aspects of the

> Company's risk management efforts, either directly or through its committees. Qualcomm approaches risk management by integrating its strategic planning, operational decision making and risk oversight and communicating risks and opportunities to the Board. The Board commits extensive time and effort every year to discussing and agreeing upon the Company's strategic plan, and it reconsiders key elements of the strategic plan as significant events and opportunities arise during the year. As part of the review of the strategic plan, as well as in evaluating events and opportunities that occur during the year, the Board and management focus on the primary success factors and risks for the Company.
>
> While the Board has primary responsibility for oversight of the Company's risk management, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight. Specifically, the Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls and compliance with certain public reporting requirements. The Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities with respect to risks arising from compensation policies and programs. The Governance Committee assists the Board in fulfilling its risk management oversight responsibilities with respect to risks related to corporate governance, succession planning and emergency procedures (including disaster recovery and security). The Finance Committee assists the Board in fulfilling its risk management oversight responsibilities with respect to risks related to major strategic investment decisions and other financial transactions, treasury functions and policies and budget processes. Each of the committee Chairs reports to the full Board at regular meetings concerning the activities of the committee, the significant issues it has discussed and the actions taken by the committee.
>
> We believe that our leadership structure supports the risk oversight function of the Board. With two members of management, our Executive Chairman and our Chief Executive Officer, serving on the Board, they are able to promote open communication between management and directors relating to risk. Additionally, each Board committee is comprised solely of independent directors, and all directors are actively involved in the risk oversight function.

323. This was false and misleading due to the fact that the Board was presiding over illegal and/or illicit activity, as set forth above.

324. Finally, the 2015 Proxy also contained a "say on pay" vote. Accordingly, Qualcomm stockholders were asked to vote on the compensation of the very individuals who not only violated the Company policies cited in the 2015 Proxy, but likewise subjected the Company to massive liabilities by engaging in the illicit activity described herein (none of which was fully

or accurately disclosed in the 2015 Proxy). Such compensation was based (at least in part) on financial results achieved through illicit and/or illegal activity. Regarding the "say-on-pay" vote, the 2015 Proxy stated, in pertinent part:

> In the "Executive Compensation Highlights" section of the Proxy Summary, and in the Compensation Discussion and Analysis (CD&A) section, we note that during fiscal 2014 our senior executives were aggressively targeted in recruiting efforts by other companies. The Compensation Committee and the Board believe that the special compensation actions implemented in fiscal 2014 were effective in addressing this challenge and consistent with our compensation philosophy. We maintained our longstanding policies, procedures and practices, which we discuss in the CD&A.
>
> This stockholder advisory vote, commonly known as "Say-on-Pay," is required pursuant to the Securities Exchange Act of 1934, as amended, and gives our stockholders the opportunity to approve or not approve, on a non-binding advisory basis, the compensation paid to our named executive officers (NEOs). The Board recommends a vote for the following resolution:
>
> **"Resolved, that the stockholders of QUALCOMM Incorporated approve, on a non-binding advisory basis, the compensation paid to the Company's named executive officers, as disclosed in this proxy statement, including the Compensation Discussion and Analysis, compensation tables and narrative disclosures."**

**2. <u>The 2016 Proxy Statement</u>**

325. On January 21, 2016, Defendants caused the Company to file with the SEC and disseminate to shareholders a Proxy Statement on Form DEF 14A (the "2016 Proxy"). Defendants drafted, approved, reviewed and/or signed the 2016 Proxy before it was filed with the SEC on Form DEF 14A and disseminated to Qualcomm shareholders. Defendants knew, or were deliberately reckless in not knowing, that the 2016 Proxy was likewise materially false and misleading.

326. Significantly, the 2016 Proxy incorporated the Company's Code of Ethics and Governance Principles. Further, the 2016 Proxy likewise failed to disclose the full extent of the Company's illicit antitrust activities (and the extent of the harm they would inflict upon the

Company), which included the illicit actions in South Korea, the United States and the E.U. (and the related violations of law in those countries/jurisdictions), that Defendants caused Qualcomm to engage in anticompetitive conduct to maintain a monopoly for semiconductors used in mobile phones, and Defendants' actions that resulted in Apple's inability to choose another supplier for chipsets (and relatedly, Qualcomm's retaliation against Apple for cooperating with South Korean authorities).

327. As with the 2015 Proxy, the 2016 Proxy failed to disclose that the Company (under Defendants' direction and on their watch) was no longer abiding its well-established licensing policies and was refusing to offer licenses to standard-essential patents to competing chipmakers, had violated and was continuing to violate its FRAND commitments, and was giving out royalty relief to mobile phone manufacturers that agreed to largely or exclusively purchase Qualcomm's chipsets (*i.e.*, bundling the negotiations and terms of its license and chipset agreements).

328. Additionally, the 2016 Proxy likewise contained false and misleading disclosures regarding the Board's role is risk oversight. This was false and misleading for the reasons set forth above with respect to the 2015 Proxy. In this regard, the 2016 Proxy stated:

> **BOARD'S ROLE IN RISK OVERSIGHT**
> Qualcomm does not view risk in isolation, but considers risk as part of its regular evaluation of business strategy and business decisions. Assessing and managing risk is the responsibility of Qualcomm's management, which establishes and maintains risk management processes, including action plans and controls, to balance risk mitigation and opportunities to create stockholder value. It is management's responsibility to anticipate, identify and communicate risks to the Board and/or its committees. The Board oversees and reviews certain aspects of the Company's risk management efforts, either directly or through its committees. Qualcomm approaches risk management by integrating its strategic planning, operational decision making and risk oversight and communicating risks and opportunities to the Board. The Board commits extensive time and effort every year to discussing and agreeing upon the Company's strategic plan, and it reconsiders key elements of the strategic plan as significant events and opportunities arise during the year. As part of the review of the strategic plan, as well as in evaluating

> events and opportunities that occur during the year, the Board and management focus on the primary success factors and risks for the Company.
>
> While the Board has primary responsibility for oversight of the Company's risk management, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight. Specifically, the Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls and compliance with certain public reporting requirements. The Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities with respect to risks arising from compensation policies and programs. The Governance Committee assists the Board in fulfilling its risk management oversight responsibilities with respect to risks related to corporate governance, succession planning and emergency procedures (including disaster recovery and security). The Finance Committee assists the Board in fulfilling its risk management oversight responsibilities with respect to risks related to major strategic investment decisions and other financial transactions, treasury functions and policies and budget processes. Each of the committee Chairs reports to the full Board at regular meetings concerning the activities of the committee, the significant issues it has discussed and the actions taken by the committee.
>
> We believe that our leadership structure supports the risk oversight function of the Board. With two members of management, our Executive Chairman and our Chief Executive Officer, serving on the Board, they are able to promote open communication between management and directors relating to risk. Additionally, each Board committee is comprised solely of independent directors, and all directors are actively involved in the risk oversight function.

329. Finally, the 2016 Proxy also contained a "say on pay" vote. Accordingly, as happened in 2015, Qualcomm stockholders were asked to vote on the compensation of the very individuals who not only engaged in the illicit activity described herein and violated the Company policies cited in the 2016 Proxy, but likewise subjected the Company to massive liabilities. Indeed, such compensation was based (at least in part) on financial results achieved through illicit and/or illegal activity. This was false and misleading for the reasons set forth above regarding the 2015 Proxy. Regarding the "say-on-pay" vote, the 2016 Proxy stated, in pertinent part:

> **"Resolved, that the stockholders of QUALCOMM Incorporated approve, on a non-binding advisory basis, the compensation paid to the Company's named executive officers, as disclosed in this proxy statement, including the**

**Compensation Discussion and Analysis, compensation tables and narrative disclosures."**

330. The Company suffered damages as a result of the false and misleading Proxies for the reasons set forth above.

## DERIVATIVE AND DEMAND ALLEGATIONS

331. Plaintiff brings this action derivatively in the right and for the benefit of Qualcomm to redress the breaches of fiduciary duty and other violations of law by Defendants.

332. Plaintiff will adequately and fairly represent the interests of Qualcomm and its shareholders in enforcing and prosecuting its rights.

333. In light of the foregoing, on January 14, 2016, Plaintiff issued a demand letter pursuant to Delaware law (the "Demand") on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company. A true and correct copy of the Demand is attached hereto as Exhibit A.

334. Thereafter, Plaintiff's counsel received a letter dated January 21, 2016 from Sandra C. Goldstein ("Goldstein") of the law firm Cravath, Swaine & Moore LLP ("Cravath"), which requested evidence of Plaintiff's ownership of Qualcomm stock. In addition, Ms. Goldstein's letter stated that the Board had formed the Committee, which was being assisted by "independent counsel" from the law firm Richards, Layton & Finger, PA ("Richards Layton").

335. Even though Ms. Goldstein's letter provided no legal authority to condition a response and/or investigation of the Demand on the receipt of proof of Plaintiff's stock holdings, on January 27, 2016, Plaintiff provided Ms. Goldstein with redacted proof of Plaintiff's ownership of Qualcomm stock.

336. Thereafter, Plaintiff's counsel received a letter dated May 10, 2016 from Gregory P. Williams ("Williams") of Richards Layton, which formally refused the Demand (the "Refusal").

The Refusal stated that "the members of the Committee recommended unanimously to the Board that the Company should not take any action—legal, therapeutic, or otherwise" with respect to the Demand, and that the Board had unanimously accepted the recommendations of the Committee. A true and correct copy of the Refusal is attached hereto as Exhibit B.

337. It is clear from the Refusal that the investigatory process of the Demand (including an utter lack of investigation of many of the Demand's allegations) was fatally deficient, and the conclusions reached were inexplicable.

338. The "investigation" can be separated into two parts: 1. the Snapdragon allegations/FTC investigation; and 2. the antitrust allegations. Defendants conducted no investigation whatsoever into the former allegations, and undertook an insufficient investigation into the latter.

**A. The Board Fails to Conduct Any Investigation into the Snapdragon Allegations/FTC Investigation**

339. As an initial matter, it is clear from the Refusal that there was no investigation whatsoever into the Snapdragon 810 allegations or with respect to the FTC investigation. According to the Refusal, "given the early stage of the FTC's investigation, the Committee determined that it would be premature to review that matter at this time." The Refusal stated that with respect to the Snapdragon 810 allegations (referred to in the Refusal as "the statements regarding the Company's financial performance"), the Committee opted "not to investigate these issues at this time in the belief that doing so would be premature" given that the Securities Action is pending, and that "Delaware courts will often stay a derivative action that seeks to recover losses suffered by the Company from other litigation in defense of the primary litigation."

340. Thus, Defendants admitted that there was no investigation whatsoever into the Snapdragon 810 allegations (or the allegations regarding the FTC investigation), which is

particularly troublesome given the now-sustained Securities Action. At best, the Committee investigated whether to investigate these issues, and opted not to investigate. This is wholly improper, and flies in the face of well-established Delaware law requiring the commencement of an investigation into the allegations raised in a shareholder demand. The Committee did not fulfill the task to which it was assigned, and as such the Committee acted in bad faith.

341. In addition, the issues of whether Defendants breached their fiduciary duties and were unjustly enriched are independent from whether they engaged in a fraud under the federal securities laws (and subjected to substantially lesser legal standards). Further, given the facts at issue in the Demand, any potential misconduct by Defendants had already occurred, and a delay in investigating could not change what had already occurred. The fact that Delaware courts will often stay a derivative action in deference to the "primary litigation" does not allow Defendants to refuse to investigate a shareholder demand. While a derivative action may be stayed in certain instances, Defendants were still required to conduct a bona fide investigation into the allegations set forth in the Demand, particularly because the claims set forth in the Demand are all subject to a lesser standard than those in the Securities Action. At no time did the Committee, Board or any other person or counsel contact Plaintiff or his counsel and propose that part of the investigation be stayed. Nor can Defendants now claim that they have deferred investigation of these issues. The Refusal is clear that the Committee concluded—and the Board agreed—that there were no breaches of fiduciary duty claims regarding the issues raised in the Demand. This is punctuated by the final line of the Refusal, which states that the "Board accepted the recommendations of the Committee and determined unanimously that the best interests of the stockholders would not be served by taking any action in response to the [Demand]." Thus, the Board refused all allegations

in the Demand while failing to conduct any investigation whatsoever into certain of the allegations. This is improper, in bad faith, and not subject to the protections of the business judgment rule.

**B. <u>The Board's Improper Investigation into the Antitrust Allegations</u>**

342. The Refusal confidently stated with respect to the antitrust allegations that the "evidence does not support breach of fiduciary duty claims," and that the "Committee concludes that no officer or director consciously disregarded his or her duties, engaged in any intentional misconduct, or otherwise acted in bad faith" with respect to the issues raised in the Demand. Yet the previous year, Defendants had caused the Company to pay $975 million as part of the China Settlement, as well as to lower its royalty rates on patents used in China. Additionally, as recently announced, the Company was found to be in violation of South Korean law and forced to expend over $850 million to resolve the SKFTC's investigation. Moreover, similar probes in the United States and the European Union were and/or are ongoing and recent reports suggest that the Company could face further massive financial exposures in these areas as well. Given these facts, declining to conduct a bona fide investigation into the antitrust allegations made in the Demand is clearly a decision made in bad faith and not protected by the business judgment rule. And given the combination of these facts, arriving at the conclusion that no officer or director violated his or her fiduciary duties is utterly inexplicable, and is a conclusion made in bad faith and not protected by the business judgment rule.

343. Additionally, with respect to the antitrust allegations, the Refusal contains a list of twenty-six individuals purportedly interviewed by the Committee (with the assistance of counsel). Each of these individuals is an employee, former employee, director and/or counsel of or to the Company and/or the Board (or Board committee). It is readily apparent that the Board did not interview a single member of any commission or body who would or could possibly corroborate

Plaintiffs' claims of wrongful conduct. At a minimum, a reasonable investigation would have included an interview with Margrethe Vestager (EU Commissioner in charge of competition policy), or some other member of the EC with comparable knowledge of the Commission's investigation. A reasonable investigation should also have included an interview with a member or members of China's NDRC and the SKFTC with comparable knowledge of the NDRC and SKFTC investigations, respectively.

344. The Board's failure to even attempt to speak with any individual who participated in the investigations by the EC, NDRC, and SKFTC raises questions about the diligence with which the Board pursued its investigation. At a minimum, it demonstrates that the internal investigation—to the extent that there was one—was restricted in scope, perfunctory, and half-hearted.

345. Moreover, as set forth in the Audit Committee Charter (defined herein), each member of the Audit Committee was charged with (among other things) overseeing and reviewing the Company's legal and regulatory compliance (including monitoring compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption laws), as well as the Company's internal controls. As set forth herein, it is the Company's legal and regulatory compliance (under Defendants' direction and on their watch) that is being questioned. Nonetheless, defendant Horton, a member of the Audit Committee, was a member of the Committee and charged with investigating the Demand, which means that a member of the Audit Committee was tasked with investigating his own conduct. The members of the Audit Committee thus presided over, caused, and/or participated in the illicit conduct alleged herein, and an Audit Committee member was then tasked with "investigating" this activity in response to the Demand. Based on the allegations set forth in the Demand, it is difficult to identify a more self-interested and less suitable individual to

investigate the Demand than one who serves or served on the Audit Committee. Indeed, the Demand explicitly set forth that the violations of fiduciary duty alleged therein were specifically applicable to the members of the Audit Committee. Yet, though numerous other options existed for such an investigation, the Board tasked the "investigation" to a member of the committee that had the greatest incentive to find no wrongdoing. It is therefore not surprising that a member of the Audit Committee would recommend that there be no investigation whatsoever into certain the allegations (*i.e.*, the antitrust allegations) set forth in the Demand, and recommend that no action be taken on any of the allegations. This is reinforced by the Refusal's contention that with respect to alleged violations of the FCPA, "the Committee found that the Board's Audit Committee sufficiently conducted an investigation regarding the alleged violations of the FCPA and provided recommendations to improve the Company's policies and practices which have been implemented." It is also worth noting that every member of the Board (each of whom voted to refuse the Demand) was a director during at least some of the events at issue (*i.e.*, the wrongdoing alleged herein).

346. Clearly, the Board's failure to conduct any investigation whatsoever into the Snapdragon and FTC allegations and a bona-fide investigation into the antitrust allegations raised in the Demand, along with its complete disregard of the actual merits of the claims set forth in the Demand and prejudgment of the merits of the claims set forth in the Demand, is improper and demonstrates the Board's lack of diligence and good faith. The entire "process" was procedurally deficient. The Board's abdication of its duty to investigate the Demand was not reasonable, and was a decision made in bad faith, and is not entitled to the protections of the business judgment rule. Further, the conclusions reached by the Refusal are inexplicable. Thus, Plaintiff has been

left with no other recourse than filing this Action, and given the wrongful, bad-faith refusal of the Demand, this Action must be allowed to proceed.

**COUNT I**
**Claim for Breach of Fiduciary Duty Against Defendants**

347. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

348. As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company and its subsidiaries were operated in a lawful manner, and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems being experienced with the Company's and/or its subsidiaries' business practices and operations, should have exercised good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

349. Defendants willfully ignored the obvious and pervasive problems being experienced with Qualcomm's internal controls practices and procedures, and failed to make a good faith effort to correct these problems or prevent their recurrence, which ultimately led to the Company becoming the subject of the antitrust and other governmental investigations, as well as the financial harm set forth herein.

350. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Qualcomm disseminated accurate, truthful and complete information to its shareholders.

351. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Qualcomm shareholders materially misleading and inaccurate information through, *inter alia*, Qualcomm's SEC filings and other public statements

and disclosures as detailed herein and as confirmed by Judge Anello in the Securities Action. These actions could not have been a good faith exercise of prudent business judgment.

352. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Qualcomm and its subsidiaries, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing Qualcomm and its subsidiaries to affirmatively violate the law and to misrepresent material facts regarding its business practices, financial position and business prospects.

353. Defendants had a duty to Qualcomm and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Qualcomm and its subsidiaries.

354. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Qualcomm and its subsidiaries in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Qualcomm's affairs, and in the use and preservation of Qualcomm's assets.

355. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Qualcomm and/or its subsidiaries to engage in the illicit scheme complained of herein which they knew had an unreasonable risk of damage to Qualcomm, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Qualcomm.

356. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

357. As a result of the misconduct alleged herein, Defendants are liable to the Company.

358. Plaintiff, on behalf of Qualcomm, has no adequate remedy at law.

**COUNT II**
**Claim For Unjust Enrichment Against Defendants**

359. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

360. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Qualcomm in the form of salaries, bonuses, and other forms of compensation.

361. Plaintiff, as a shareholder and representative of Qualcomm, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT III**
**Claim for Violations of Section 14(a) of the Securities Exchange Act of 1934 Against Defendants**

362. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

363. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, both the 2015 Proxy and the 2016 Proxy (collectively, the "Proxies") violated §14(a) and Rule 14a-9 because they solicited Qualcomm shareholder votes for, *inter alia*, director reelection and executive compensation, while

simultaneously misrepresenting and/or failing to disclose the full extent of the Company's illicit antitrust activities, that Defendants caused Qualcomm to engage in anticompetitive conduct to maintain a monopoly for semiconductors used in mobile, Defendants' actions that resulted in Apple's inability to choose another supplier for chipsets (and relatedly, Qualcomm's retaliation against Apple for cooperating with South Korean authorities), and/or the fatal problems with the Snapdragon 810, and the extent of the harm that the Company would incur as a result.

364. As alleged herein, in the Proxies, Defendants specifically referenced and incorporated the Company's Code of Ethics and Governance Principles, both of which required the compliance with all laws, rules, and regulations. Because the Company, under Defendants' direction and on their watch, was affirmatively engaging in illicit activity in violation of numerous international antitrust laws, Defendants affirmatively violated both the Code of Ethics and the Governance Principles. Not only did the Proxies fail to disclose these illicit activities, they likewise did not disclose that the express terms of the Code of Ethics and Governance Principles were being violated.

365. In addition to requiring compliance with all laws, rules, and regulations, the Governance Principles specifically required Defendants to, *inter alia*, "[r]eview and assess major risks facing the Company and evaluate management's approach to addressing such risks" and "[a]ssure maintenance of proper accounting, financial and other appropriate controls."

366. Despite these requirements, the 2015 Proxy not only failed to disclose the "major risks" facing the Company regarding the Snapdragon 810, but also Defendants' failure to adequately "[r]eview and assess" them. In fact, as discussed above, rather than "reviewing," "assessing," or "evaluating" the risks posed by the Snapdragon 810's problems when they first knew (as required by the Governance Principles), Defendants instead continued to issue a series

of false and misleading statements, as confirmed by Judge Anello in the Securities Action. Further, Defendants failed to disclose in the 2015 Proxy that as a result of the problems with the Snapdragon 810 and the numerous false and misleading statements concerning it, Defendants were violating the Governance Principles on this basis alone.

367. As set forth herein, the Proxies failed to disclose that the Company (under Defendants' direction and on their watch) was no longer abiding its well-established licensing policies and was refusing to offer licenses to standard-essential patents to competing chipmakers, had violated and was continuing to violate its FRAND commitments, and was giving out royalty relief to mobile phone manufacturers that agreed to largely or exclusively purchase Qualcomm's chipsets and (i.e. bundling the negotiations and terms of its license and chipset agreements).

368. In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading.

369. The misrepresentations and omissions in the Proxies were material. The Proxies were essential links in the accomplishment of the continuation of Defendants' scheme by which they claim to adhere to, *inter alia*, the express terms of the Code of Ethics and Governance Principles. Revelations of the true extent regarding the Company's illicit antitrust activities and the serious risks created by the Snapdragon 810, Defendants have subjected the Company to as a result would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

370. In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading, and/or that the Proxies

omitted material information. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxies.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing Qualcomm to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding to Qualcomm restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 13, 2017

**RIGRODSKY & LONG, P.A.**

By: */s/ Brian D. Long*
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
Jeremy J. Riley (#5791)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Phone: (302) 295-5310
Fax: (302) 654-7530

*Attorneys for Plaintiff*

**OF COUNSEL:**

**PROMISLOFF & CIARLANTO, P.C.**
Jeffrey J. Ciarlanto
David M. Promisloff
5 Great Valley Parkway, Suite 210
Malvern, PA 19355
Phone: (215) 259-5156
Fax: (215) 600-2642

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
300 Mt. Lebanon Boulevard
Suite 206-B
Pittsburgh, PA 15234
Phone: (412) 391-5164
Fax: (412) 471-1033

**BRODSKY & SMITH, LLC**
Evan J. Smith
Two Bala Plaza, Suite 510
Bala Cynwyd PA 19004
Phone: (610) 667-6200